

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LARRY G. DOCKERY,

    On behalf of himself and
    All others similarly situated,

                Plaintiffs,

    v.

STEPHEN E. HERETICK
715 Loudoun Avenue
Portsmouth, VA, 23707,
and
321 HENDERSON RECEIVABLES LLC
Post Office Box 7780-4244
Philadelphia, Pennsylvania, 19182-4244,
and
J.G. WENTWORTH ORIGINATIONS LLC
201 King Of Prussia Rd. Suite 200
Radnor, PA 19087
and
SENECA ONE FINANCE, INC.
7920 Norfolk Avenue
Bethesda, MD 20814,
and
STRUCTURED SETTLEMENT INVESTMENTS,
LP,
4629 State Road
Drexel Hill, PA 19026,
and
STRUCTURED SETTLEMENT PURCHASER
JOHN DOE INC. PURCHASER
DEFENDANTS 1-100, and
JOHN DOE INDIVIDUAL
DEFENDANTS 1-100.

                Defendants,

And

NEW YORK LIFE INSURANCE COMPANY
51 Madison Avenue, New York, NY 10010,
and

Civil Action No.:

**FILED**
SEP 14 2017
KATE BARKMAN, Clerk
By_____ Dep. Clerk

Jury Trial Demanded

METROPOLITAN LIFE INSURANCE COMPANY,:
200 Park Avenue, New York, NY 10166,                     :
and                                                      :
SYMMETRA LIFE INSURANCE COMPANY,      :
777 108th Avenue, NE, Suite 1200                        :
Bellevue, WA, 98004-5135,                               :
and                                                      :
JOHN DOE INC. INSURORS 1-50.                            :

Nominal Defendants.

## CLASS ACTION COMPLAINT

This case is brought to end and to remedy a scheme pursuant to which Defendant funding entities, a lawyer, and cooperative state court judges have joined together to frustrate and evade the requirements of state and federal law. Those laws protect the beneficiaries of Structured Settlement Annuities ("SSAs") from exploitation at the hands of predatory factoring companies.

The precise goal and effect of the scheme was the exploitation of these beneficiaries that is supposed to be prevented by the very laws that Defendants have successfully worked together to breach and defeat. That scheme to exploit resulted in the transfer of the right to receive income from the SSAs here at issue, from the Plaintiffs – SSA beneficiaries -- to the Purchaser Defendants, with the active assistance of the Attorney Defendant and certain persons, not named as Defendants herein but further identified below.

The Insurance Company Nominal Defendants are the entities responsible for making payments under the SSAs here at issue. Those companies received the premiums that purchased these annuities for the benefit of the Plaintiffs; and they continue to be legally responsible for making, and indeed they continue to make, payments under those policies as they come due pursuant to the policies' terms.

2

## INTRODUCTION

1. Federal law enacted in the 1970s created the market for SSAs by authorizing tax-free treatment of annuity payments, under certain limited circumstances. SSAs are often used in the settlement of personal injury or medical malpractice cases, particularly where large sums will be required to fund long-term medical treatment or personal care of the injured Plaintiff.

2. Tax-free treatment is available only if the beneficiary of the SSA never takes formal legal title to the annuity.

3. Applicable state and federal laws sharply limit and strictly regulate the terms upon which the beneficiaries of SSAs may sell the payment streams to which they are entitled.

4. The beneficiaries of SSAs are often persons who were seriously injured, and frequently persons who will require expensive medical or other treatment over the course of many years, and who have brought tort actions which were settled with the payment of funds used to purchase an SSA.

5. Not only are the tort victims, and beneficiaries of SSAs, in need of a stream of income to compensate them for their injuries, or to pay for their care: often such persons are profoundly vulnerable – frequently as a result of the injuries which the SSAs are specifically designed to remedy. These impaired beneficiaries are therefore prime targets for predatory purchasers who seek to take advantage of their vulnerability to purchase the income stream from SSAs at woefully inadequate prices.

6. The potential profit from such purchases are extraordinary, because the beneficiaries
   of SSAs are very often unable to make well-informed judgments about the true value
   of the income streams to which they are entitled.

7. Indeed, SSAs were created in significant part because their beneficiaries are often
   financially unsophisticated and unable to rationally manage the large sums of money
   to which their injuries have entitled them.

8. The state and federal laws regulating SSAs were enacted to protect the beneficiaries
   of SSAs from exploitation at the hands of people who seek to profit from their
   victims' lack of financial sophistication by purchasing the right to the beneficiaries'
   income streams at steeply discounted prices.

9. These laws seek to achieve that goal by requiring that the right to receive the income
   stream from an SSA can be transferred only after a court determines that the sale is in
   the best interest of the beneficiary. In order for a court to be in a position to issue
   such a determination, a series of steps is reqnired, culminating in what is supposed to
   be meaningful judicial review of all aspects of the transaction including

   a. The terms of the purchase;

   b. The financial and personal situation of the beneficiary, including his or her
      actual need for the funds and his or her ability to rationally use the funds
      generated by the purchase; and

   c. Compliance with the mandate that the beneficiary receive independent
      financial advice or that the beneficiary make a knowing and informed waiver
      of the right to receive such advice.

4

10. The scheme at issue in this case was hatched and carried out by the defendants including, centrally, an attorney – Stephen E. Heretick, Esquire ("Heretick"), who was a Portsmouth, Virginia City Council member and who is currently a member of the Virginia House of Delegates. Heretick's scheme was designed entirely to defeat this regulatory scheme, and to enable sales of the income streams from SSAs on terms that:

   a. would never be accepted by a beneficiary of an SSA if the beneficiary had been advised by a well-informed and objective advisor; and

   b. would never be approved after meaningful judicial review.

11. The scheme evaded the state and federal requirements identified above by creating what was, in name only, a judicial review process but which was, in reality, a rubber stamp for virtually every transaction brought before complicit judges by Defendant Heretick – i.e., for every single transaction at issue in this case. Heretick, in turn, represented virtually every single Purchasing Defendant who ever filed a Petition in Portsmouth County, Virginia, and he was counsel for the Purchasing Defendant in every transaction and "judicial proceeding" at issue in this case.

12. In creating this rubber stamp process Heretick was joined by Dean W. Sword, a now-retired judge, as well as other judges on the Portsmouth County Circuit Court who presided in the "judicial proceedings" here at issue after Judge Sword left the bench. (Judge Sword retired in or about 2014, but returned to the bench after his retirement and only ceased presiding after that return.) These judges are defined herein as among the "Complicit Judges."

5

13. As part of the rubber stamp process designed by the Complicit Judges and Heretick, beneficiaries were induced in every single instance at issue in this case – thousands of cases filed beginning in the year 2000 and extending into at least the year 2014 – to waive their right to counsel and their right to independent financial advice.

14. Such beneficiaries thereby became sitting ducks for exploitation at the hands of Heretick's clients, the Purchasing Defendants.

15. The Complicit Judges made the scheme work by:

    a. Giving Defendant Heretick a regular block of time during which he alone could bring many cases at a time – often bundles of cases in a single session – which would be approved *en masse* with no meaningful judicial review;

    b. Approving transactions even though the beneficiary was not represented by counsel and had received no independent financial counseling, ostensibly because in every one of these hundreds of cases handled by Defendant Heretick, the beneficiary had purportedly waived his or her right to counsel and to independent financial advice. This lack of any independent advice to the beneficiary stripped the court of any ability to ensure that the terms of the transaction were fair to the beneficiary; and

    c. Approving every transaction here at issue without the beneficiary appearing before the court.

16. The payments in the payment streams transferred in the proceedings at issue in this case are still being made now and extend well into the future. For example, as more fully defined below, payments transferred by Plaintiff Dockery are still being made now; are not life contingent until 2019; and extend until at least 2034.

6

## I.     JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 18 U.S.C. § 1964, a section of
    the Racketeer Inflnenced and Corrupt Organizations Act ("RICO"). With respect to
    Plaintiffs' state law claims, this Court has supplemental jurisdiction pursuant to 28
    U.S.C. § 1367.

18. Venue is proper in this district pursuant to 18 U.S.C. § 1965 of RICO, in that at least
    dozens of the payments at issue in this case were, as a resnlt of the scheme here at
    issue, made to Defendant 321 Henderson Receivables, LLC, and Defendant
    Structured Settlement Investments LP, both of which reside in this District.

19. In connection with the acts, conduct and other wrongs complained of herein,
    Defendants, directly or indirectly, used the means and instrumentalities of interstate
    commerce and the United States mails.

## II. THE PARTIES

### A. Plaintiff

20. Larry G. Dockery is an individual who resides now and has at all times relevant
    hereto resided, in Gate City, Virginia.

21. Plaintiff Dockery was born in 1962. Although he completed high school, he was in
    special education classes throughout his formal education. After graduation, Dockery
    found work as a janitor in a mill, owned by Louisiana/Pacific Corporation, that
    manufactured particle board.

22. As the result of an accident that occurred on or about March 4, 1988, Dockery's left arm was severed in a piece of machinery, and he was no longer able to work to support himself. A tort action was brought on his behalf against the manufacturer of the equipment, which was ultimately settled with a commitment by the manufacturer's insurer, Unigard Insurance Company, to pay a total of $407,757 to Dockery, his counsel, and CIGNA Insurance Company, and to make a series of periodic payments to Dockery.

23. The responsibility for making the periodic payments was ultimately transferred by Unigard to Nominal Defendant Safeco Life Insurance Company, also known as Symetra Life Insurance Company, 777 108th Avenue NE, Suite 1200, Bellevue, WA 98004-5135.

24. As a result, Dockery became the annuitant and beneficiary of an annuity which provided for the following payments:

- Monthly payments, to be made on the 17th day of each month beginning on September 17, 1989, in the original amount of $1200, increasing at the rate of 3% compounded annually, to be paid through the span of Mr. Dockery's life but in no event for less than 30 years
- A payment of $15,000 on August 17, 1994
- A payment of $30,000 on August 17, 1999
- A payment of $45,000 on August 17, 2004
- A payment of $60,000 on August 17, 2009
- A payment of $75,000 on August 17, 2014
- A payment of $90,000 on August 17, 2019
- A payment of $105,000 on August 17, 2024
- A payment of $120,000, on August 17, 2029
- A payment of $135,000 on August 17, 2034

## B. Defendants

25. Defendant Heretick is an attorney licensed to practice in the Commonwealth of Virginia, was a member of the Portsmouth, Virginia City Council and is a member of

8

the Virginia House of Delegates. He has served as counsel for each of the Purchasing
Defendants which are further defined below, in each instance in which a stream of
payments was purchased by one of these Purchasing Defendants. Heretick is a citizen
of the Commonwealth of Virginia.

26. Defendant 321 Henderson Receivables LLC ("321 Henderson") is a limited liability
corporation in the business of, among other things, purchasing payment streams from
SSAs. 321 Henderson purchased dozens of the streams of payments which are at
issue in this case. Specifically, 321 Henderson purchased payment streams from
SSAs issued to Plaintiff Larry Dockery. In connection with such purchases 321
Henderson was represented by Defendant Heretick. 321 Henderson maintains its
principal place of business in the Eastern District of Pennsylvania.

27. J.G. Wentworth Originations LLC ("Wentworth") is a limited liability corporation in
the business of, among other things, purchasing payment streams from SSAs,
including streams of payments which are at issue in this case and which were initially
issued to Plaintiff Larry Dockery. In connection with such purchases Wentworth was
represented by Defendant Heretick. Wentworth maintains its principal place of
business in the Eastern District of Pennsylvania.

28. Seneca One Finance, Inc. ("Seneca"), is a limited liability corporation in the business
of, among other things, purchasing payment streams from SSAs. Seneca purchased
dozens of the streams of payments which are at issue in this case. In connection with
such purchases Seneca was represented by Defendant Heretick. Seneca maintains its
principal place of business in Bethesda, Maryland.

9

29. Structured Settlement Investments LP ("SSILP") is a limited liability corporation in the business of, among other things, purchasing payment streams from SSAs. SSILP purchased certain of the streams of payments which are at issue in this case. In connection with such purchases SSILP was represented by Defendant Heretick. SSILP maintains its principal place of business in the Eastern District of Pennsylvania.

30. Each of Defendants Structured Settlement Purchaser John Doe Inc. 1-100 is a purchaser of streams of payments from SSAs. Each purchased dozens of the streams of payments which are at issue in this case.

31. Each of the Defendants identified above as a purchaser of streams of payments from SSAs is referred to herein as a Purchaser Defendant.

## C.     Nominal Defendants

32. Nominal Defendant New York Life Insurance Company ("New York Life") is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business at 51 Madison Avenue, New York, NY, 10010.  New York Life issued, and is currently making payments on, annuities which are the subject of this case, inasmuch as the right to receive the periodic payments called for by annuity contracts with New York Life were purportedly transferred during the legal proceedings which are at issue in this case and which are described more fully below.

33. Nominal Defendant MetLife Insurance Company ("MetLife") is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue, New York, NY, 10017.  MetLife issued, and is

10

currently making payments on, annuities which are the subject of this case, inasmuch as the right to receive the periodic payments called for by annuity contracts with MetLife were purportedly transferred during the legal proceedings which are at issue in this case and which are described more fully below.

34. Nominal Defendant Symmetra Life Insurance Company, f/k/a SAFECO Life Insurance Company, 777 108th Avenue NE, Suite 1200, Bellevue, WA 98004-5135. Symmetra issued, and is currently making payments on, annuities which are the subject of this case, inasmuch as the right to receive the periodic payments called for by annuity contracts with MetLife were purportedly transferred during the legal proceedings which are at issue in this case and which are described more fully below. Symmetra issued and is currently making payments on the annuities issued to Plaintiff Dockery.

## III.    PERSONS  NOT NAMED AS DEFENDANTS WHO PARTICIPANTED IN THE HERETICK SCHEME

35. In addition to the persons named above as Defendants, the Heretick scheme was designed and carried out with the active participation of others, during the relevant time period, who were judges on the County Circuit Court of Portsmouth, Virginia. One of these men, Dean W. Sword was a judge who sat on the Circuit Court of Portsmouth, Virginia.  Sword presided over thousands of the Petitions here at issue beginning in the year 2000.  Judge Sword retired in or around 2014, but he returned to the bench after his retirement and continued to preside over the Petitions here at issue after his retirement. He ultimately left the bench for good several months after his

11

retirement. He participated in the formation and execution of the scheme here at issue, pursuant to which those Petitions were "heard" and resolved.

36. Other judges helped design and execute the Heretick scheme here at issue who also sat, or still sit on the Circuit Court of Portsmouth, Virginia. These other judges took on the role played by Judge Sword after Judge Sword left the bench. These other judges continued the practice of granting to Heretick the block of time in which he alone was allowed to bring multiple of these Petitions to be rubber-stamped for approval all at once.

37. These other judges also continued to approve Heretick's Petitions in great numbers, even though in every instance: the annuity beneficiary was not represented by counsel; had received no independent financial advice; and was not present at the hearing. In other words, these judges, just like Judge Sword, approved Heretick's Petitions *en masse* even though there was absolutely no independent evidence in the record that could possibly provide a factual basis for the Court to conclnde that the transaction before it was in the best interest of the beneficiary.

38. Together, these other judges presided over hundreds of the Petitions here at issue, and participated in the formation and execution of the Agreement pursuant to which those Petitions were "heard" and resolved. All such judges are referred to herein as Complicit Judges.

12

## IV.  FACTUAL BACKGROUND

### A.  State and Federal Law Governing The Creation of SSAs And The Sale of Payments Made Pursuant to SSAs

39. SSAs were first created in the 1970s as a mechanism by which persons who had

    sustained serious injuries could receive payments in a tax-advantaged manner from

    the persons who had caused those injuries.

40. SSAs are typically used in cases where:

    a.  A tort victim will require expensive medical or other treatment over the course

        of many years, and/or

    b.  A tort victim is found by a court to be in need of protection to ensure that the

        victim does not fritter away a fund of money obtained on his or her behalf in

        resolution of a tort claim – often a tort claim based on conduct that has

        gravely injured the victim physically and impaired his or her judgment.

41. The payment streams from an SSA may be transferred only with judicial approval.

    This principle was enunciated in the Uniform Periodic Payment of Judgments Act,

    enacted in 1990.  That model statute was the basis for legislation in the vast majority

    of states, including the Commonwealth of Virginia.

42. The Virginia Statute, Virginia Code § 59.1-476, requires findings that

    a.  The transfer is in the best interest of the payee, taking into account the welfare

        and support of the payee's dependents;

    b.  The payee has been advised in writing by the transferee to seek independent

        professional advice regarding the transfer and has either received such advice

        or knowingly waived in writing the opportunity to seek and receive such

        advice; and

13

    c. The transfer does not contravene any applicable statute or the order of any
       court or other government authority.

43. Virtually every other state and commonwealth in the Union similarly regulates the
    circumstances under which the beneficiary of an SSA can alienate his or her
    entitlement to the payment stream created by the SSA.

44. Such protection requires judicial approval of the sale, which can only be issued after a
    judicial proceeding in which the court finds that the sale is in the best interest of the
    beneficiary.

45. Virginia's law, like the similar laws in other states and commonwealths, is subject to
    the terms and conditions imposed by a federal statute, 26 U.S.C. § 5891, which
    mandates that the state laws be followed by imposing a prohibitory and punitive tax
    of 40% on the sale of the payment stream of an SSA unless the applicable state law is
    obeyed.

46. Among the requirements is the issuance of a "qualified order" of a court of competent
    jurisdiction.

47. For purposes of Section 5891, a "qualified order" means a final order, judgment, or
    decree which finds that the transfer does not contravene any Federal or State statute
    or the order of any court or responsible administrative authority, and is in the best
    interest of the payee, taking into account the welfare and support of the payee's
    dependents.

48. In all cases relevant hereto, for an order to be a qualified order, it must be issued
    under the authority of an "applicable State statute" by an "applicable State court" as
    those terms are defined by Section 5891.

14

49. In cases relevant hereto, for purposes of Section 5891, the term "applicable State statute" means a statute providing for the entry of an order, judgment, or decree described in § 5891(2)(A) which is enacted by the State in which the payee of the structured settlement is domiciled.

50. For purposes of Section 5891 the term "applicable State court" means, with respect to any applicable State statute, a court of the State which enacted such statute.

51. Under the regime established by Section 5891, in order for an order to be a "Qualified Order," the transactions at issue in this case must be approved by a court of the state in which the seller of the income stream – the Named Plaintiff and all members of the class – are domiciled.

52. "Domiciled" for purposes of this provision means the place where the person resides and intends to return to and remain.

53. One essential element of the fraud at issue in this case is the circumvention through fraud, and thus the violation, of this provision.

54. In hundreds of instances, Defendants violated this provision by inducing the beneficiary of the SSA to state, falsely, that he or she was domiciled in Virginia. Defendants needed each beneficiary to make this statement in order to give the Circuit Court of Portsmouth, Virginia, jurisdiction over the proceeding seeking approval of the sale.

55. Another essential element of the fraud at issue in this case is the circumvention, through fraud, of the state law provisions designed to protect SSA beneficiaries from being induced to sell streams of annuity payments on terms to which no rational, well-informed, or well-advised person would sell such payment streams, and on terms

15

which would never be approved of by any court that engaged in any meaningful review of the transaction, or in any proceeding in which the Beneficiary was represented by counsel.

56. As more fully alleged below, Defendants and the Complicit Judges together developed and executed the Heretick scheme to profit from the breach of these state laws, and from the exploitation of the beneficiary victims which is possible when these state law protections are defeated.

## V.   THE PURCHASER DEFENDANTS' SCHEME TO EARN THE TRUST OF SSA BENEFICIARIES

57. In order to induce individuals to sell their SSA future payments, the Purchaser Defendants used television, radio, print advertising and the internet to market their services. Such advertisements openly promised to guide SSA beneficiaries to a financial benefit, and were designed to induce beneficiaries to trust and rely upon the Purchaser Defendants' honesty, integrity and financial and legal expertise.

58. Purchaser Defendant Wentworth was an early adopter of an aggressive advertising campaign targeting SSA beneficiaries for this purpose. According to the company's own SEC filings, "The Company markets its structured settlement business throngh a variety of channels. Newspaper and television advertising is used to publicize the Company's services to the broad population of claimants who may require the Company's services. . . . From March 1996 through September 1997, the Company broadcast approximately 88,000 thirty-second television commercials nationwide." J.G. Wentworth and Co., Inc., Registration Statement (Form S-1) (Dec. 11, 1997). Additionally, the company touted its "200-seat telemarketing call center with both inbound and outbound capacity equipped with predictive dialing technology." *Id.*

16

59. Wentworth's early advertisements portrayed the company as a trusted service provider waiting to help SSA beneficiaries get their money faster. As the Wall Street Journal reported in 1998, "Since March 1996, the firm has broadcast more than 90,000 thirty-second television spots, most featuring a gray-haired narrator known as 'Mr. Wentworth.' . . . One commercial shows an automated-teller machine that talks and spits out wads of bills. Another depicts dozens of men and women busily fielding calls at the firm's 21,520-square-foot phone center outside New York City. 'What you are witnessing is an American financial rescue,' Mr. Wentworth declares." Vanessa O'Connell, J.G. Wentworth Offers Lump Sum In Exchange for Monthly Payments, Wall Street Journal (February 25, 1998),

https://www.wsj.com/articles/SB888362142709833500 .

60. Wentworth's aggressive advertising campaign has continued in years since. As the company's website proudly explains, "[o]ver the years, J.G. Wentworth has created memorable TV spots that help educate consumers about the products we provide. From people shouting 'It's my money and I need it now' to opera singers belting out 'Call J.G. Wentworth - eight seven seven cash now!' we've built iconic campaigns that effectively deliver how we can help you gain more access to cash from your structured settlement payments." https://www.jgwentworth.com/en/about-jg-wentworth/commercials.

61. For example, a well-known television ad from 2010 featured opera-singing bus passengers, who declared, "They've helped thousands, they'll help you too. One lump sum of cash they will pay to you. If you get long-term payments but you need cash now, Call J.G. Wentworth." https://www.youtube.com/watch?v=cN9OKXtzHtE

17

62. Such ads have been seen so widely that they've inspired hundreds of parody videos in which the company's signature jingle is interpreted by, *inter alia*, children (https://www.youtube.com/watch?v=5J7bPRafWDc), musicians (https://www.youtube.com/watch?v=JArS2iNcUuY), and even dogs (https://www.youtube.com/watch?v=NsDsG_AlyFk).

63. The message of these ads, that Wentworth can help SSA beneficiaries achieve greater financial benefits, is echoed again and again on Wentworth's website, which describes Wentworth as a "reputable company" that "can help you every step of the way." http://www.getcashnow4futurepayments.com/facts-you-should-know-before-selling-your-structured-settlement.php . It touts the "industry-leading structured settlement payment purchasing team" from whom SSA beneficiaries will "always receive the personalized service you deserve."

https://www.jgwentworth.com/en/about-jg-wentworth . It boasts that Wentworth "earned our leading position through our commitment to customer service, industry knowledge and experience, and the financial strength necessary to provide extremely competitive pricing." https://www.jgwentworth.com/en/about-jg-wentworth . And it assures SSA beneficiaries that Wentworth's "experienced representatives will answer your questions and give you another way you can take control of your money." https://www.jgwentworth.com/en/structured-settlements .

64. The Wentworth website further states that the company will work to get the sale of SSA future payments approved by a judge, explaining, "your account executive will work with our underwriting department to make sure that we have everything we need to present to the judge." https://www.jgwentworth.com/en/structured-

18

settlements/process/reviewing-paperwork . "Before your court date arrives, we'll talk over what you can expect when it's time for you to appear before a judge and help prepare you for any questions the judge may ask. These conversations are a perfect time for you to ask any last-minute questions you have. But if you want to get an answer sooner, you can call your account executive anytime." *Id.*

65. Another page assures potential sellers "No, you do not need a lawyer when you appear before the judge . . . Your hearing is for the judge to decide whether to approve the transaction; it is not a trial." https://www.jgwentworth.com/en/structured-settlements/process/faq.

66. These current Wentworth materials were consistent with solicitation and other materials provided to members of the class.

67. Purchaser Defendant Seneca's website likewise urges SSA beneficiaries to trust its honesty, integrity and expertise. Its homepage emphasizes, in large bold letters, Seneca's tag-line, "Yonr Trusted Source", stating "SenecaOne is Your Trusted Source® for discovering lasting solutions to your long-term financial outlook. We provide personalized cash-flow solutions and services to help you get your money fast." It states that Seneca will be "right alongside you every step of the way."

68. On its "Who We Are" page, Seneca states that it "takes a personalized approach to solving your immediate cash needs as well as helping you discover long-term solutions. We get to know our customers and build a deep-level understanding of their unique financial needs—one on one, one at a time." Seneca further emphasizes that SSA beneficiaries should repose trust and confidence in Seneca:

> No matter how many people we have helped, SenecaOne never
> forgets it is the individuals and their concerns that are at the heart

of what we do. Our commitment to each and every individual customer is the basis for SenecaOne's personal approach to customer service—something that has helped make us successful and kept our customers satisfied. Our BBB A+ rating is recognition of that commitment to service excellence.

SenecaOne is a member firm of the National Association of Settlement Purchasers, the only professional trade organization for participants in the secondary market for structured settlements. As an NASP member, SenecaOne helps to keep the marketplace fair, competitive, and transparent.

69. Seneca further touts its "One to One Service Guarantee" as demonstrating its honesty,

trustworthiness, and commitment to the interests of SSA beneficiaries:

When we speak of building a relationship based on a personal approach to customer service, we mean it. You can rest assured that when you pick up the phone, your Specialist on the other end of the phone will be with you from your very first step until you cross your personal finish line. And beyond. Should a future need arise, your Specialist is still there for you. It isn't just a "get-your-money-and-you're-on-your-way" relationship.

Our one-to-one approach in working with each of our customers and educating them on their options is a big part of what makes SenecaOne different. Your dedicated Annuity or Funding Specialist will be with you from the first time you pick up the phone all the way until you receive your payment, no matter what the need. Every step of the way.

70. Seneca further emphasizes that its customer representatives, which it terms

"Specialists", will work to further the SSA beneficiaries' financial and other interests,

even going so far as to suggest that Seneca will provide legal representation

(emphasis added):

As a SenecaOne customer, you will always be paired with ONE dedicated specialist. The same Specialist. From start to finish. No being bounced around. No re-explaining your situation. Just you and one point of contact. Every time.

From picking up the phone to receiving your payment—your dedicated Specialist will be there to help you. Every step of the

20

way. *Even if that step requires you to visit a courtroom—we're by
your side.* SenecaOne will continue to go above and beyond,
working closely with you to find the best solution.

71. These current Seneca materials were consistent with solicitation and other materials

provided to members of the class.

72. Through these solicitation materials and others like them, Purchaser Defendants

positioned themselves as financial experts who would work on behalf of the SSA

beneficiaries. Through them, the Purchaser Defendants gained the trust of SSA

beneficiaries and promised to guide them to financial benefits greater than those they

received from their SSAs.

## VI.   THE HERETICK SCHEME TO DEFEAT THE STATE AND FEDERAL
##        LAWS PROTECTING BENEFICIARIES

73. The Purchaser Defendants are in the business of buying and selling the right to

receive income streams from annuities. The Purchaser Defendants identify potential

victims in a variety of ways. Some advertise on television, radio and/or in print.

74. The Purchaser Defendants also identify beneficiaries of SSAs who are vulnerable to

the Purchasers' tactics by reviewing the records of courts approving the sales of SSAs

and of courts adjudicating Petitions for the transfer of the right to receive payments

under SSA's. The records of the Circuit Court of the Portsmouth, Virginia, Circuit

Court are a particularly target-rich environment because of the Heretick scheme,

implemented there by Heretick and the Complicit Judges. This even further increased

the number of petitions seeking judicial approval of such sales which were filed in the

Portsmouth Virginia Circuit Court, to the benefit of, at least, Heretick and the

Purchaser Defendants.

75. Once a Purchaser Defendant identifies a victim, it invests substantial resources in inducing the victim to trust the Purchaser; pretending to be his friend. Purchaser Defendants often send their intended victims cash advances and "gifts," and through this conduct they obtain the victim's confidence. They then proceed to use that confidence to raid the victim's structured settlement.

76. The goal, attained in every instance at issue in this case, is to induce the beneficiary of an SSA to agree to sell the stream of monthly payments to which the beneficiary is entitled on terms which are as low as possible and:

   a. Would not be agreed to by any rational, well-informed or well-advised seller, and

   b. Would not be approved by any court which engaged in any meaningful review of the transaction, or in any proceeding in which the beneficiary was represented by counsel.

77. Persons who are vulnerable to such treatment are typically lured into a relationship with the Purchaser Defendants through the offer of trips to strip clubs, sporting events, bars or restaurants at which the Purchaser Defendant will treat the victim to a good time. Purchaser Defendants offer transportation to such rendezvous, and bear the expenses incurred, with the expectations that (a) the victim will come to believe that the Purchaser Defendant personnel are the victim's friends and have the victim's best interests at heart, so the victims come to trust the Purchaser Defendants and to rely on them and their judgment, and (b) if the victim sells his rights to his annuity payment stream, he will, at least for some time, be able to afford to pay for such outings on his own.

22

## A. Misrepresentations to Defeat the State Law Mandate That The Beneficiary Be Permitted to Obtain Independent Advice Regarding the Transaction

78. The law in Virginia grants to each beneficiary of an SSA who seeks to sell the right to some or all of the SSA payments the right to be represented by counsel in the proceeding that will adjudicate his or her entitlement to sell.

79. Every petition filed on behalf of a class member in this case includes a statement like the one made regarding the Named Plaintiff in the petitions filed to secure judicial approval of a sale by him of certain payments from an SSA of which he was a beneficiary: that the beneficiary "has been advised in writing by the Transferee [i.e. the purchaser of the stream of payments] to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived such advice in writing."

80. This statement, and every statement like it made with respect to every member of the class, was false, and was known by Heretick, and by the Purchasers, and by the Complicit Judges, to have been false or misleading when made.

81. Defendants and the Complicit Judges jointly acted to defeat this right in every single instance at issue in this case.

82. Proof that Heretick knew the statement was false is that Heretick, was aware, and invoked as a fact to the Court, the fact that each and every member of the class – thousands of individuals, and the vast majority of the persons affected by the Petitions

23

he filed – had knowingly and effectively waived their right to counsel of any kind; and that they also had waived their right to appear before the court.

83. Defendant Heretick, and the Complicit Judges, had actual knowledge that, except in very unusual circumstances, without independent financial or legal counsel, and without a personal appearance in court by the person ostensibly the object of the court's protection in the kind of Petitions here at issue, there was no opportunity and no basis for the court to make an actual determination, on the basis of evidence, that the person selling the stream of annuity payments had been properly advised or was making a wise decision.

84. Thus, in reality – in contrast to the mandate of Virginia law – the Named Plaintiff and other payee members of the proposed class in this case were in fact advised, by or on behalf of Purchaser Defendants, that if the payee sought independent professional advice regarding the transfer, the transfer would not take place.

85. Proof that the Complicit Judges knew that the statement referenced in ¶79 was false is that the Complicit Judges presided over, and approved, every single one of the thousands of petitions at issue in this case even though in every single one the beneficiary proceeded without counsel and without a personal appearance by the beneficiary. In every single such instance, therefore, there was absolutely nothing in the record from which the Court could have concluded that the beneficiary had made an informed judgment to part with his or her rights to the income that were being sold; or that the terms of the transaction were fair, other than the representation of the purchaser – a representation made in each and every instance only by Defendant Heretick, counsel for an adverse party which the Court had no reason to rely on.

24

86. Indeed, in a telephone conversation on Friday, August 18, 2017, a docket clerk at the Portsmouth County Circuit Court stated that applicants for such transfers "usually aren't" represented by counsel in Petitions filed before that court.

87. Avoiding the presence of counsel was an essential element of the Heretick scheme because the presence of an objective person, charged with protecting the interests of the beneficiary, would have resulted in either the termination of the proceeding or a demand that the sale take place on terms that were actually fair to the beneficiary – a requirement that Defendants had to avoid at all costs.

## B. Misrepresentations to Defeat The State and Federal Law Requirements That The Beneficiary Be Domiciled In The State Whose Court Issues the Decree Permitting the Sale

88. In many instance at issue in this case, the Purchaser Defendant also paid to have the victim brought to Virginia, where the Purchaser arranged to have the victim execute papers stating, falsely, that the victim was a resident of Portsmouth County or some other county in Virginia. Heretick would then file these papers in court.

89. Heretick handled over 6000 petitions in which many of the beneficiaries were identified as residents of Portsmouth County, Virginia.

90. The Purchaser Defendants, and, on information and belief, Heretick himself, knew that these statements were false when made, or he was recklessly indifferent to the truth of these representations, even though he was advancing them, on behalf of his clients, as his client's counsel and as an officer of the court.

91. Heretick, as counsel for the Purchaser Defendants, would then initiate a legal proceeding in the Circuit Court for Portsmouth County, Virginia, seeking judicial

approval of the sale, by the victim, to one of the Structured Settlement Purchasers
named herein.

92. In the many hundreds of cases in which this was done, Heretick would proffer to the
Court evidence that the beneficiary resided in Virginia. Because the evidence had
only recently been created, such evidence – in the form of a driver's license or lease –
would bear a date very close to the date on which the hearing was being held. But
because there was never any meaningful judicial review of these Petitions, there is not
a single instance in any of these hundreds of cases in which the Court noticed that the
beneficiary's evidence of residence in Virginia was so recently minted as to give
reason to doubt its veracity.

93. In late 2015 the Washington Post ran an article describing the scheme here at issue.
In the wake of that article the Commonwealth of Virginia changed its law to require
that its courts would have jurisdiction over a Petition seeking the sale of the right to
receive payments from a SSA only if the beneficiary resided in the county in which
the court was located. *The Flawed System That Allows Companies to Make Millions
Off the Injured,* Washington Post, Dec. 27, 2015. This change of law was a direct
response to, and an effort to stop, the Heretick scheme.

94. In the wake of this change of law, the number of Petitions filed by Heretick has
dropped dramatically, but they have not ceased. For those Petitions still filed in the
Portsmouth County Circuit Court, the scheme continues to operate even now.

95. In those instances in which the beneficiary did not in fact reside Virginia, the location
identified in the Petitions as the beneficiary's residence, the court was without
jurisdiction to adjudicate the Petition.

## VII.  FRAUDULENT CONCEALMENT

96. Defendants took extensive steps to prevent their scheme from becoming public knowledge.

97. Those steps included, among other things, the effort to seal as many of the cases as possible, thereby making it difficult or impossible for any one victim to realize that he or she had been deprived of due process, and of an objective court hearing, as a result of the Heretick scheme.

98. In addition, to prevent disclosure of the identity of plaintiffs and the operation of their scheme, at the Portsmouth courthouse, the seller's names often do not appear on the court docket. Many firms, which file using subsidiaries or shell companies, sometimes only refer to sellers by their initials, even though Portsmouth Clerk of Circuit Court Cynthia P. Morrison has said publicly that these concealments of identity "should not be." *The Flawed System That Allows Companies to Make Millions Off the Injured,* Washington Post, Dec. 27, 2015

99. An additional key element of the Heretick scheme involved preventing Plaintiffs from retaining counsel or from obtaining independent financial advice. Among the purposes and effects of this aspect of the Heretick scheme was to prevent Plaintiffs from receiving objective advice about the scope of the Plaintiffs' rights and a dispassionate evaluation of the court procedure to which Defendants subjected Plaintiffs. Defendants thereby prevented Plaintiffs from learning sooner than they did about the Heretick scheme at issue in this case.

100.  Defendants also strongly encouraged victims not to appear in court – and the judges involved in the scheme approved these thousands of petitions without the

27

presence of a single one of the victims. By successfully preventing the victims from coming to court, Defendants also made it far more difficult for the victims to realize what was happening – and in particular, made it impossible for them to know that they were not in fact submitting their Petition to an impartial arbiter who would enforce the law and protect their rights, but instead to a judge who was in the pocket of the Purchaser Defendants, and of their counsel, Defendant Heretick, and that the judge would rubber stamp petitions Heretick placed in front of him.

## VIII. THE DOCKERY TRANSACTIONS

101.   In a series of deals each one of which was submitted to Judge Sword for approval, and approved by him, buyers represented by Defendant Heretick peeled off parts of Dockery's annuity.

102.   In every petition filed by Heretick in Portsmouth Circuit Court, and ruled on by Judge Sword, Dockery had no lawyer and had received no independent financial advice, and he never appeared in court in connection with any of these Petitions.

103.   Judge Sword approved every one.

104.   Every one of the Petitions sought, and obtained, the right to purchase from Dockery an entitlement to receive some of his SSA payments on terms that were grossly unfair and that did not represent the market value of those payments or the amount that Dockery would have obtained if he had had independent financial or legal advice.

105.   These included the following payments and payment streams, some of which include payments that are yet to be made. Some of the payments yet to be made are life-contingent, but all payments to be made prior to September 17, 2019 are not and

28

thus the only risk inherent in such payments is the risk that the Safeco will become insolvent or otherwise fail to make the payments.

106. Every payment defined below was, is or will be made either through the dispatch of a check through the United States mails, or through a wire or electronic transfer, either of which constitutes a "transaction" as defined by 18 U.S.C. §1956(c)(3) and a "financial transaction" as defined by 18 U.S.C. §1956(c)(4). All such actions constitute "predicate acts" under the Racketeer Influence and Corrupt Organizations Act, as defined in 18 U.S.C. §1961(a).

107. The funds thus transferred are the fruit of a scheme to defraud, as more fully alleged below, and each such transfer therefore also constitutes a violation of 18 U.S.C. §1957, which is also defined as a "predicate act" by 18 U.S.C. §1961(a). Such predicate acts are ongoing and will, if Defendants' scheme remains in place and operational, remain ongoing until at least September 17, 2019.

108. The payments, and Orders authorizing transfer of the right to receive such payments, are as follows:

109. Order Approving Transfer dated September 25, 2002, authorizing Defendant J.G. Wentworth to purchase the rights to certain payments from Dockery which payments are not identified in the Court Order directing them, but an appendix thereto which is not in Plaintiff's possession.

110. Order Approving Transfer dated May 29, 2003, No. 03-336, authorizing Defendant 321 Henderson Receivables to purchase the rights to certain payments from Dockery, and directing that such payments be made to Defendant 321 Henderson at Post Office Box 7780-4244, Philadelphia, Pennsylvania, 19182-4244.

29

This Order directed the transfer from Dockery, and to 321 Henderson, of the right to receive the following payments:

- A payment of $5,000 to be made on August 17, 2004;
- A payment of $20,000 to be made on August 17, 2009;
- A payment of $75,000 to be made on August 17, 2014;
- A payment of $95,000 (corrected to $90,000) to be made on August 17, 2019

111.    Order Approving Transfer dated April 29, 2004, Docket No. 04-290, authorizing Defendant 321 Henderson Receivables to purchase the rights to certain payments from Dockery, and directing that such payments be made to Defendant 321 Henderson at Post Office Box 7780-4244, Philadelphia, Pennsylvania, 19182-4244. This Order directed the transfer from Dockery, and to 321 Henderson, of the right to receive the following payments:

- A payment of $105,000 to be made on August 17, 2024
- A payment of $60,000 to be made on August 17, 2029.

112.    Order Approving Transfer dated July 29, 2005, Docket No. 05-564, authorizing Defendant SSILP to purchase the rights to certain payments from Dockery, and directing that such payments be made to Defendant Structured Settlement Investments at P.O. Box 13238, Newark, NJ 07101-3238. This Order directed the transfer form Dockery, and to Structured Settlement Investments, of the right to receive the following payments:  170 monthly payments of $300 each, commencing on July 17, 2005 and continuing through and until August 17, 2019.

113.    Order Approving Transfer dated October 9, 2007, Docket No. CL07-2092, authorizing Defendant 321 Henderson Receivables to purchase the rights to certain

payments from Dockery, and directing that such payments be made to Defendant 321 Henderson at Post Office Box 7780-4244, Philadelphia, Pennsylvania, 19182-4244. This Order directed the transfer from Dockery, and to 321 Henderson, of the right to receive the following payments:

- Ten monthly payments in the amount of $400 each, commencing November 17, 2007 and ending August 17, 2008;

- One hundred and thirty two monthly payments in the amount of $412 each, increasing at the rate of 3% every twelve months, beginning on September 17, 2008, and ending on August 17, 2019.

114.    Order Approving Transfer dated June 13, 2008, Docket No. CL08-1170, authorizing Defendant 321 Henderson Receivables to purchase the rights to certain payments from Dockery, and directing that such payments be made to Defendant 321 Henderson at Post Office Box 7780-4244, Philadelphia, Pennsylvania, 19182-4244. This Order directed the transfer from Dockery, and to 321 Henderson, of the right to receive the following payments:

- 96 monthly payments in the amount of $400 each, increasing at the rate of 3% every 12 months, beginning on September 17, 2011, and ending on August 17, 2019;

- One payment of $60,000 on August 17, 2029

- One payment of $75,000 on August 17, 2034

115.    Order Approving Transfer dated December 9, 2008, Docket No. CL08-2633, authorizing Defendant 321 Henderson Receivables to purchase the rights to certain payments from Dockery, and directing that such payments be made to Defendant 321

31

Henderson at Post Office Box 7780-4244, Philadelphia, Pennsylvania, 19182-4244.
This Order directed the transfer from Dockery, and to 321 Henderson, of the right to
receive the following payments:

- Eight monthly payments of $250 each, beginning on January 17, 2009, and
  ending on August 17, 2009;

- 120 monthly payments of $250 each, increasing at the rate of 3% annually,
  beginning on September 17, 2009, and ending on August 17, 2019;

- One payment of $30,000 on August 17, 2034.

116.   Order Approving Transfer dated June 9, 2009, Docket No. 09-1215, authorizing
       Defendant 321 Henderson Receivables to purchase the rights to certain payments
       from Dockery, and directing that such payments be made to Defendant 321
       Henderson at Post Office Box 7780-4244, Philadelphia, Pennsylvania, 19182-4244.
       This Order directed the transfer from Dockery, and to 321 Henderson, of the right to
       receive the following payments:

       - Nine monthly payments of $250 each, beginning on December 17, 2009, and
         ending on August 17, 2010;

       - Twelve monthly payments of $257.50 each, increasing at the rate of 3%
         annually, beginning on September 17, 2010, and ending on August 17, 2019.

117.   Order Approving Transfer dated July 6, 2010, Docket No. CL10-1423,
       authorizing Defendant Seneca to purchase the rights to certain payments from
       Dockery, and directing that such payments be made to Defendant Seneca One LLC,
       Francois Guimond, 500 Doctor Martin Luther King Jr. Street North, Suite 500, St.

32

Petersburg, Florida 33705. This Order directed the transfer from Dockery, and to 321 Henderson, of the right to receive the following payments:

- Twelve monthly payments in the amount of $980.26 commencing on September 17, 2010, and ending on August 17, 2011;

- Twelve monthly payments of $618.67, commencing on September 17, 2011, and ending on August 17, 2012;

- Twelve monthly payments of $203.86, commencing on September 17, 2014, and ending on August 17, 2015;

- Twelve monthly payments of $233.97, commencing on September 17, 2015, and ending on August 17, 2016;

- Twelve monthly payments of $264.99, commencing on September 17, 2016, and ending on August 17, 2017;

- Twelve monthly payments of $296.94, commencing on September 17, 2017, and ending on August 17, 2018;

- Twelve monthly payments of $329.85, commencing on September 17, 2018, and ending on August 17, 2019;

- One payment of $30,000 on August 17, 2034.

118. In each of these sales, the Purchaser obtained from Dockery a stream of payments with a present value vastly more than the payment provided to Dockery. In each instance, therefore, Dockery received a payment that was far lower than he would have been paid if he had received independent advice.

33

## CLASS ALLEGATIONS

119. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of himself and the Class, consisting
of all persons who, at the time of their purchase:

    a. Were beneficiaries of one or more SSAs;

    b. Were parties to a proceeding in which Defendant Heretick represented a
Purchaser Defendant seeking judicial approval of a sale, by the beneficiary
to a Purchaser Defendant, of the beneficiary's right to a stream of
payments from one or more SSAs, where

        i. The proceeding occurred in the Portsmouth, Virginia Circuit
Court;

        ii. The proceeding was presided over by one of the Complicit
Judges;

        iii. The beneficiary waived his or her right to counsel, and was not
represented by counsel;

        iv. The petition approving the sale was approved either on the
same day it was filed or within two weeks thereafter, and
without the court's meaningful review of any evidence;

        v. The beneficiary was not present during the proceedings.

120. There are thousands of members of the Class, and the Class is therefore so
numerous that joinder of all members is impracticable.

121. Common questions of law and fact exist as to all members of the Class and
predominate over any questions solely affecting individual members of the Class.

34

Among the questions of law and fact common to the Class are:

a. Whether Defendants violated federal and state law by virtue of their wrongful conduct alleged herein;

b. Whether Defendants participated in and pursued the common course of conduct and alleged herein;

c. Whether Defendants engaged in "racketeering activity" as defined by RICO § 1961, 18 U.S.C. § 1961 and made unlawful under RICO § 1962, 18 U.S.C. § 1962, including whether Defendants employed the mails and wires in furtherance of a scheme to defraud Plaintiffs and members of the Class;

d. Whether Heretick and the Complicit Judges developed the scheme described herein, pursuant to which Heretick would be given a special block of time in which he would be permitted by the Complicit Judges to present multiple Petitions at a time requesting judicial approval of the sale of payment streams from SSAs, and in which the Complicit Judges would in each instance grant such Petitions with no meaningful review, and while aware that none of the beneficiaries was present or represented by counsel.

e. Whether Plaintiffs and the members of the Class have sustained damages and, if so, the appropriate measure thereof.

122. Plaintiff will fairly and adequately represent the Class and the subclass, protecting the interests of the members of the Class and the subclass. The Named Plaintiff has retained competent counsel experienced in class action litigation, and intends to prosecute this action vigorously.

35

123. The Named Plaintiff is a member of the Class and he does not have interests antagonistic to, or in conflict with, the interests of the other members of the Class.

124. Plaintiff's claims are typical of the claims of the members of the Class.

125. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

126. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## COUNT I
## FOR VIOLATION OF THE
## RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. §1962(c) (the Annuity Fraud Enterprises)

127. Plaintiff repeats and realleges each of paragraphs 1 through 126 as if fully set forth herein.

128. Defendant Heretick, the Complicit Judges and each separate Purchaser Defendant together formed an Association in Fact (each an "Annuity Fraud Enterprise").

129. Each Annuity Fraud Enterprise engaged in, and its activities affected, interstate commerce, inasmuch as

   a. The streams of annuity payments which the Purchaser Defendant in question purchased originated, in all or virtually all cases, from insurance companies located outside of the Commonwealth of Virginia.

   b. Each Purchaser Defendant itself was incorporated, and maintained its principal place of business, outside of the Commonwealth of Virginia, and its representatives only travelled to Virginia or communicated with persons in Virginia in order to execute the transactions at issue in this case.

36

130. The Defendants in question participated in the affairs of each of the Annuity
Fraud Enterprises through a pattern of racketeering activity, including the following
activities:

a. The Purchaser Defendant acted to perpetrate the fraud by inducing each of the
victim sellers to abandon the right each of them had to independent counsel or
advice regarding the Purchase transactions. It did this, as alleged above at
¶¶79-80, by

   i. Instructing each victim to execute a document in which the victim
   stated that he or she had been advised that he or she had the right
   to independent advice or counsel, while

   ii. Simultaneously, it also informed each and every victim that in fact
   they could not exercise this right in any way, because if they did
   the transaction would be either completely impossible to
   consummate or would take immeasurably longer to close.

b. Each Purchaser Defendant hired and paid Heretick to file these documents and
to develop and operate the agreement with the Complicit Judges, pursuant to
which the court would accept and approve petitions even when they

   i. Were filed in bulk

   ii. Waived each victim's right to counsel and to independent financial
   advice

   iii. Were presented at hearings at which the victim seller was not
   present and so could not be questioned by the court.

37

    iv.      Included victims who were residents of and domiciled in other states, whom the Purchaser Defendants had arranged to travel to Virginia and make fraudulent representations that they were domiciled there.

c.  Each Purchaser Defendant and Heretick used the United States mails to transmit documents in the service of the scheme to defraud described herein, as more fully set forth below.

d.  The Complicit Judges enabled the scheme by the following acts and intentional omissions and intentional complete abnegation of their obligations as judicial officers:

    i.      The Complicit Judges granted to Heretick a special block of time during which the Complicit Judges gave Heretick the exclusive right to present petitions to one of the Complicit Judges, seeking approval of the Purchase Transactions.

    ii.      The Complicit Judges knew that in every single instance at issue in this case, the victim was not represented by counsel.

    iii.      The Complicit Judges knew that in each instance, the victim and seller – the person whose rights, by Virginia law, were supposed to be protected by the judicial proceeding over which the Judges presided – was not even in the courtroom when the petition was presented and adjudicated.

    iv.      Each of the Complicit Judges therefore knew that the record in each Petition afforded absolutely no basis for an independent

38

> assessment of the fairness of the terms of sale, or of the beneficiary's need for the funds or of whether the sale was actually in the best interest of the seller.
>
> v. Knowing all of the above facts, the Complicit Jndges granted every single one of the thousands of petitions at issue in this case which was put to them, in every instance and officially within a few days, and in practice within a matter of moments and without any meaningful consideration at all.

131. All of the actions taken by each of the Defendants was in the service of the scheme here at issue, which was in every instance consummated using the United States mails to, among other things, transmit the documents that would enable the redirection of the annuity payment streams which were being captured by the scheme.

132. By committing these actions, and committing or facilitating the predicate acts described above and more fully detailed below, Defendants conducted and participated, directly and indirectly, in the conduct of each of the Annuity Fraud Enterprises' affairs through a pattern of racketeering activity.

133. The predicate acts alleged here are acts of mail fraud, in violation of 18 U.S.C. §1341. These mailings occurred, and were intended by the Defendants to occur, in that, as a matter of law, each time a Petition is filed of the kind here at issue, a series of notices must be sent at least twenty days prior to the hearing to all Interested Parties, as that term is defined by law. See Virginia Code §59.1-477B (defining service requirement); §59.1-475 (defining "Interested Party"). This service was effected through the United States mails.

39

134.    Each of these mailings was in direct service of the Heretick scheme, in that they
        advanced the process of having the courts rubber stamp the applications being mailed.
        In addition, each of these mailings, and the filings of which the mailings included a
        copy, contained the false statement that the victim sellers had knowingly waived their
        right to legal counsel and to independent financial advice.

135.    Mailings were sent by or at the direction of Defendant Heretick, and received by
        Plaintiff Dockery, in connection with each of the Petitions to which Mr. Dockery was
        a party, identified above in ¶¶109-117. These mailings include, but are not limited to,

        a.  the dispatch through the United States mails of the Petition for Court Approval of
            Transfer of Structured Settlement Payment Rights, filed in Circuit Court of the
            City of Portsmouth, with respect to each Petition identified in ¶¶109-117 above,
            not less than twenty days prior to the scheduled hearing on each such Petition.

        b.  Thousands of other mailings of the same kind were sent, by or on behalf of the
            Defendants, throughout the relevant time period, with respect to each Petition
            filed by Heretick as part of the scheme here at issue, in a period extending from
            January 1, 2000 through at least through 2016.

        c.  In addition, the purpose of the Heretick scheme was to cause the dispatch of
            payments, pursuant to the SSAs here at issue, to the Structured Settlement
            Purchaser Defendants or their designees. Each of these payments, made on or
            about the dates identified above, were, are, and will continue to be sent through
            the United States mails, or via wire transfer, in financial transactions, each of
            which is governed by 18 U.S.C. §1956. Each such mailing or wire transfer
            constitutes a predicate act for purposes of the RICO scheme here at issue.

## COUNT II
## FOR VIOLATION OF THE
## RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. §1962(c) (the 321 Henderson Enterprise)

136. Plaintiff repeats and realleges each of paragraphs 1 through 135 as if fully set

forth herein.

137. Defendant 321 Henderson is an enterprise within the meaning of 18 U.S.C. §

1961(4). 321 Henderson engaged in, and its activities affected, interstate commerce,

as described above. Defendant Heretick conducted and participated, directly and

indirectly, in the conduct of 321 Henderson's affairs through a pattern of racketeering

activity, as described above.

## COUNT III
## FOR VIOLATION OF THE
## RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. §1962(c) (the Wentworth Enterprise)

138. Plaintiff repeats and realleges each of paragraphs 1 through 137 as if fully set

forth herein.

139. Defendant Wentworth is an enterprise within the meaning of 18 U.S.C. § 1961(4).

Wentworth engaged in, and its activities affected, interstate commerce, as described

above. Defendant Heretick conducted and participated, directly and indirectly, in the

conduct of Wentworth's affairs through a pattern of racketeering activity, as

described above.

## COUNT IV
## FOR VIOLATION OF THE
## RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. §1962(c) (the Seneca Enterprise)

140. Plaintiff repeats and realleges each of paragraphs 1 through 139 as if fully set forth herein.

141. Defendant Seneca is an enterprise within the meaning of 18 U.S.C. § 1961(4).

Seneca engaged in, and its activities affected, interstate commerce, as described

above. Defendant Heretick conducted and participated, directly and indirectly, in the

conduct of the Seneca's affairs through a pattern of racketeering activity, as described

above.

## COUNT V
## FOR VIOLATION OF THE
## RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. §1962(c) (the SSILP Enterprise)

142. Plaintiff repeats and realleges each of paragraphs 1 through 141 as if fully set forth herein.

143. Defendant SSILP is an enterprise within the meaning of 18 U.S.C. § 1961(4).

SSILP engaged in, and its activities affected, interstate commerce, as described

above. Defendant Heretick conducted and participated, directly and indirectly, in the

conduct of the SSILP's affairs through a pattern of racketeering activity, as described

above.

## COUNT VI
## FOR CONSPIRACY TO VIOLATE RICO
## UNDER 18 U.S.C. §1962(d)

144.    Plaintiff repeats and re-alleges paragraphs 1 through 143 as if fully set forth

herein.

145.    Defendant Heretick conspired with the Complicit Judges and with each of

Defendants 321 Henderson, Wentworth, Seneca One, and with Structured Settlement

Purchaser John Doe Inc. Purchaser Defendants 1-100, And John Doe Individual

Defendants 1-100 to violate 18 U.S.C. §1962(c) by creating and operating the

Enterprises alleged herein and by committing, or causing the commission of, the

predicate acts identified herein.

## COUNT VII
## FOR UNJUST ENRICHMENT

146.    Plaintiff repeats and re-alleges paragraphs 1 through 145 as if fully set forth

herein.

147.    By engaging in the wrongful acts described herein, Defendants have collected and

retained funds rightfully belonging to the Named Plaintiff and the Class he seeks to

represent.

148.    By virtue of the foregoing, Defendants have been unjustly enriched, and Plaintiff

and the class he seeks to represent are entitled to judgment requiring Defendants to

disgorge and reimburse Plaintiff and the proposed class all sums unlawfully and/or

unjustly obtained.

43

## COUNT VIII
## FOR DEPRIVATION OF PLAINTIFFS' RIGHT TO DUE PROCESS OF LAW
## IN VIOLATION OF 42 U.S.C. §1983

149. Plaintiff repeats and realleges paragraphs 1 through 148 as if fully set forth herein.

150. Defendant Heretick, in agreement with Sword, Morse, and each Structured

Settlement Purchaser Defendant, is a "Person" within the meaning of 42 U.S.C.

§1983.

151. Each of these Defendants and persons acted under color state of law to deprive the

Plaintiff, and each member of the proposed class, of his or her rights to due process

pursuant to the United States Constitution, Amend. XIV.

## COUNT IX
## FOR A CONSTRUCTIVE TRUST
## AGAINST ALL DEFENDANTS AND ALL NOMINAL DEFENDANTS

152. Plaintiff repeats and realleges paragraphs 1 through 151 as if fully set forth herein.

153. Each Defendant received and continues to receive payment as compensation for

its role in the Scheme – either in the form of direct payment (e.g., from the

Purchasing Defendants to the Attorney Defendant, or from the downstream

purchasers to the Purchasing Defendants) or in the form of receipt of a portion of the

periodic payments made pursuant to the SSA policies here at issue.

154. The Nominal Defendants hold the SSA policies here at issue, and continue to

make periodic payments pursuant to those policies.

155. The transfer of the periodic payments pursuant to the Scheme is invalid and

inequitable.

156. Defendants hold the amounts they have received as compensation for their

participation in the Scheme in a constructive trust for the benefit of the Plaintiffs.

44

157.    Nominal Defendants hold the SSA policies here at issue in a constructive trust for

the benefit of the Plaintiffs on behalf of whom these policies were initially purchased.

## COUNT X
## FOR BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

158.    Plaintiffs re-allege and reincorporate Paragraphs 157 as though fully set forth

herein.

159.    At all times relevant herein, the Purchaser Defendants, through advertising and

direct solicitations, induced beneficiaries of SSAs to enter into commercial

transactions, the substance of which was to sell a part or all of the anticipated future

payments for a discounted present lump sum of cash.

160.    The Purchaser Defendants used solicitations and advertisements to induce SSA

beneficiaries to sell their structured settlements. For example, these solicitations and

advertisements described Purchaser Defendants as "financial rescue[ers]" who have

"helped thousands" and "can help you every step of the way," as alleged above.

161.    One such Purchaser Defendant states on its website that it will "help prepare you

for any questions the judge may ask" and assures SSA beneficiaries that "you do not

need a lawyer when you appear before the judge," as alleged above.

162.    As such, each and every one of the participants in the scheme to purchase SSAs

undertook a duty to represent the Plaintiffs' financial interests and to advise them on

their rights with regard to selling their SSA future payments.

163.    Plaintiffs allowed Purchaser Defendants to manage that process for them based on

Defendants' representations and placed their trust in Defendants based on those

representations.

45

164.    Each of the various Defendants breached that duty by jointly acting to defeat the
right of SSA beneficiaries to be represented by counsel in the proceedings that
adjudicated their rights to sell and resulted in fraudulently obtained transfer orders.

165.    Defendant Heretick knowingly provided substantial assistance to the breaches of
fiduciary duty committed by the Purchaser Defendants, as described above.

166.    As a result of the transfer orders, Plaintiff and other class members were
proximately damaged in that they lost their future structured settlement payments to
which they were entitled. This would not have occurred but for Defendants conduct in
breach of their fiduciary duties.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all counts so triable in this case.

WHEREFORE Plaintiff demands judgment as follows:

A. Entry of an Order certifying this case as a class action as that Class is defined in ¶119
herein;

B. Judgment awarding Plaintiff and the Class damages in the amount of their total
damages, trebled pursuant to 18 U.S.C. §1964;

C. The establishment of a Constructive Trust maintained in the registry of this Court,
into which shall be paid all payments due now and in the future, pursnant to the
annuities at issue in this case;

D. A Declaration by the Court that all Defendants hold the amounts they were paid as
compensation for their participation in the Scheme in a Constructive Trust for the
benefit of Plaintiffs and the Class, and that all Nominal Defendants hold the SSA
policies in a Constructive Trust for the benefit of the Plaintiffs and the Class, and that

all Defendants be directed to pay into the Court's registry those amounts they hold,

and any future payments to be made pursuant to the Structured Settlement policies

here at issue;

E. Disgorgement by Defendants of all gains they have appropriated by operation of the

scheme described herein;

F. Punitive damages;

G. An Order granting Plaintiff and the Class all attorney's fees and costs expended in the

prosecution of this action; and

H. Such other and further relief as the Court deems proper.

Dated: September 14, 2017

Jonathan Auerbach, Esquire (PA No. 63083)
Jerome M. Marcus, Esquire (PA No. 50708)
MARCUS & AUERBACH LLC
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
Telephone: (215) 884-2250
Facsimile: (888) 875-0469
auerbach@marcusauerbach.com
jmarcus@marcusauerbach.com

*Counsel for Plaintiff*

OF COUNSEL:
Thomas E. L. Dewey
David S. Pegno
L. Lars Hulsebus
Dewey Pegno & Kramarsky LLP
777 Third Avenue
New York, New York 10017
Telephone: (212) 943-9000
Facsimile: (212) 943-4325
tdewey@dpklaw.com
dpegno@dpklaw.com
lhulsebus@dpklaw.com