**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LARRY G. DOCKERY, on behalf of himself and all others similarly situated,**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**STEPHEN E. HERETICK, et al.,**<br><br>**Defendants**<br><br>**And**<br><br>**NEW YORK LIFE INSURANCE COMPANY, et al.,**<br><br>**Nominal Defendants** | **CIVIL ACTION**<br><br>**NO. 17-4114** |

Baylson, J.                                                              May 14, 2019

### MEMORANDUM RE: DEFENDANTS' MOTIONS TO DISMISS

**I.      Introduction**

In this Second Amended Class Action Complaint, Plaintiff Larry G. Dockery alleges the existence of a scheme between an attorney, companies in the business of purchasing payment streams from Structured Settlement Annuities, and additional persons to obtain annuities from unsuspecting and unsophisticated annuitants without meaningful judicial review, as required by state and federal law.  (ECF 99, "SAC").  Plaintiff seeks to represent a class of annuitants who sold their annuities to financial institutions in exchange for lump sum cash payments, and, in so doing, received far less than the present value of their annuities.   Defendants 321 Henderson Receivables LLC, J.G. Wentworth Originations LLC, Stephen Heretick, and Seneca One Finance, Inc. have filed Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3),

and 12(b)(6). (ECF 78–80, 100–02). For the following reasons, Defendants' Motions to Dismiss are GRANTED IN PART AND DENIED IN PART.

## II. Factual Background

For the purposes of these Motions to Dismiss (the "Motions"), the following facts are taken as true from the SAC.

In March, 1988, Plaintiff's left arm was severed in a piece of machinery. (SAC ¶ 30). Plaintiff brought a tort action against the manufacturer of the equipment, which settled for an initial payment of $407,757, plus periodic payments to Plaintiff throughout his life. (Id.). As a result, Plaintiff became the beneficiary of a Structured Settlement Annuity ("SSA") which provided for the following future payments:

- Monthly payments in the original amount of $1,200, increasing annually at a rate of 3%, to be paid through the span of Plaintiff's life but in no event for less than 30 years
- A payment of $15,000 in 1994
- A payment of $30,000 in 1999
- A payment of $45,000 in 2004
- A payment of $60,000 in 2009
- A payment of $75,000 in 2014
- A payment of $90,000 in 2019
- A payment of $105,000 in 2024
- A payment of $120,000 in 2029
- A payment of $135,000 in 2034

(Id. ¶ 32). Plaintiff alleges that several of the above payment streams were improperly purchased by Defendants in Virginia commonwealth court proceedings that did not comport with federal and state law.

Defendants 321 Henderson Receivables LLC ("321 Henderson"), J.G. Wentworth Originations LLC ("Wentworth"), Seneca One Finance ("Seneca"), and Structured Settlement Purchaser John Doe Inc. 1-100, are companies that purchase SSA payment streams (altogether

"Purchaser Defendants").[1]  (Id. ¶¶ 34–37).  Each of the Purchaser Defendants purchased payment streams from SSAs issued to Plaintiff.  In connection with such purchases, Purchaser Defendants were each represented by Defendant Heretick, an attorney in Virginia who serves in the Virginia House of Delegates.  (Id. ¶¶ 33–36).[2]

Several "Nominal Defendants" are also the subject of Plaintiff's lawsuit.  New York Life Insurance Company ("New York Life") and MetLife Insurance Company ("MetLife") are Nominal Defendants currently making payments on annuities which are the subject of this case.  (Id. ¶¶ 39–41).[3]

Plaintiff further alleges that several persons not named as defendants participated in Heretick's scheme.  These persons include attorneys who falsely claimed to have provided independent legal advice to beneficiaries.  (SAC ¶¶ 43, 50).

According to the SAC, at the center of the alleged scheme to obtain SSAs was Defendant Stephen E. Heretick, the aforementioned Virginia attorney, who worked with the Purchaser Defendants and others to evade state and federal requirements governing the judicial review of transactions involving SSAs.  (Id. ¶¶ 12–16, 42).  Specifically, the SAC alleges that SSA annuitants were exploited by Heretick's clients, the Purchaser Defendants, in a process by which:

- The Purchaser Defendants would identify vulnerable SSA beneficiaries through court records and gain their trust so that the beneficiaries would agree to sell their streams of monthly payments on terms that were as low as possible; (Id. ¶¶ 87–89).

- Heretick would file petitions seeking judicial approval of the SSA payments in Portsmouth Circuit Court, where he had been granted permission to submit his petitions

---

[1]     The SAC alleges that Defendants 321 Henderson and Wentworth maintain their respective principal places of business in the Eastern District of Pennsylvania, while Defendant Seneca maintains its principal place of business in Maryland.  (Id. ¶¶ 34–36).

[2]     The SAC alleges that Defendant Heretick is a "citizen" of the Commonwealth of Virginia.  (Id. ¶ 33).

[3]     The SAC also names Symmetra Life Insurance Company as a Nominal Defendant, however Symmetra was dismissed by stipulation on April 8, 2019.  (ECF 107).

in batches and where he knew that the petitions would not be carefully scrutinized for misrepresentations, errors, or other defaults; (<u>Id.</u> ¶ 98)

- The petitions would include representations by interested persons, paid on a contingent basis by the Purchaser Defendants, who purported to provide independent legal and financial advice to the SSA beneficiaries even though they did not do so; (<u>Id.</u> ¶ 42–50)

- Heretick and the Purchaser Defendants prevented the SSA beneficiaries from obtaining independent legal or professional advice, which was their right, by telling the beneficiaries that the transaction would not occur if they did not waive their right to counsel or by providing a financial adviser who was not, in fact, independent; and (<u>Id.</u> ¶¶ 100–101, 110, 112, 114)

- Heretick then filed petitions and represented to the court, in the absence of an appearance by the SSA beneficiaries, that each beneficiary had been advised by the Purchaser Defendants to seek independent professional advice and that each beneficiary had either received such advice or knowingly waived such advice in writing. (<u>Id.</u> ¶ 101).

According to the SAC, Defendants would also bring SSA beneficiaries to Virginia from outside the Commonwealth and then arrange for them to execute papers falsely stating that they resided in Virginia so that their petitions could be filed in Portsmouth County. (<u>Id.</u> ¶ 124). The scheme allegedly took place between 2000 and 2016, during which time Heretick filed approximately 375 petitions per year. (<u>Id.</u> ¶¶ 91, 93). Defendants also took steps to prevent their scheme from becoming public, such as sealing cases, preventing the seller's names from appearing on the court docket (instead using only their initials), preventing sellers from retaining counsel or from obtaining independent financial advice, and urging sellers not to appear in court proceedings. (<u>Id.</u> ¶¶ 147–150).

## A. Alleged Issues Regarding State Law

Virginia law requires judicial approval for the transfer of SSA payment streams. Specifically Virginia Code § 59.1-476 requires findings that:

a. The transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;

4

b.   The payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived in writing the opportunity to seek and receive such advice; and

c.   The transfer does not contravene any applicable statute or order of any court or other government authority

(Id. ¶ 54).

Plaintiff claims that Defendants fraudulently circumvented the above state law requirements designed to protect SSA beneficiaries by inducing the beneficiaries into selling annuity payment streams on terms on which no rational, well-informed, or well-advised person would sell, and with terms that would never be approved of by any court that engaged in any meaningful review of the transaction or in any proceeding in which the beneficiary was represented by counsel.  (Id. ¶¶ 66–69).

Among the allegations in the SAC regarding evasion of state law requirements are that: (1) Plaintiff and the putative class members were advised the SSA transfer would not take place if Plaintiff sought independent professional advice, and (2) numerous "anomalies" in the petitions filed by Heretick would have put a careful reviewer on notice that the transactions were not in the best interest of the beneficiaries.  (Id. ¶¶ 114, 145).

**B.   Alleged Issues Involving Federal Law**

Federal law, codified at 26 U.S.C. § 5891, also requires SSA approval consistent with Virginia state law, or else a 40% tax on the sale of the payment stream is imposed.  (Id. ¶ 57). Under the regime established by 26 U.S.C. §5891, to avoid the 40% tax penalty, SSA payment transfers must be approved by a court of the state in which the seller of the income stream (e.g., Plaintiff) is domiciled.  (Id. ¶ 63).  Plaintiff in this case claims in his SAC that the domicile requirement of 26 U.S.C. §5891 was fraudulently circumvented as part of the alleged scheme.

Specifically, Plaintiff alleges that Defendants violated federal law by inducing many SSA beneficiaries to falsely state that they were domiciled in Virginia. (Id. ¶ 66).

Among the allegations in the SAC regarding evasion of federal domiciliary requirements are that: (1) evidence presented to the Virginia court of a beneficiary's domicile was often recently created (such as driver's licenses or leases); and (2) the law in Virginia was changed to require SSA transfers only in the county of the beneficiary's residence after a Washington Post article in 2015 revealed the "flawed system." (Id. ¶¶ 128, 136).

## III.    Procedural Background

### A.    Original Class Action Complaint

Plaintiff first filed this putative class action on September 14, 2017. (ECF 1). The original Complaint alleged a scheme between Heretick, the Purchaser Defendants,[4] and "complicit judges" sitting on the Circuit Court of Portsmouth County, Virginia. The Complaint also named several insurance companies making payments on the annuities as "Nominal Defendants." The Complaint was comprised of the following ten counts:

Counts I through V of the Complaint alleged violations of RICO, 18 U.S.C. § 1962(c), by SSILP, Seneca, Wentworth, 321 Henderson, and Heretick.

Count VI alleged conspiracy to violate RICO, 18 U.S.C. § 1962(d) against Defendants.

Count VII alleged unjust enrichment against all Defendants.

Count VIII alleged violation of Due Process against Defendants, pursuant to 42 U.S.C. § 1983.

Count IX sought a constructive trust against all Defendants and all Nominal Defendants.

---

[4]     The original Complaint also alleged claims against Defendant Structured Settlement Investments LP ("SSILP"). Plaintiff told the Court that he would not pursue claims against that Defendant and dropped the company as a Defendant in the Amended Complaint. (ECF 75).

Count X alleged breach of fiduciary duty as well as aiding and abetting breach of fiduciary duty against all Defendants.

Defendants previously filed motions to dismiss in the fall of 2017. (ECF 12, 22, 24). The Court then ordered Plaintiff to file a RICO Case Statement, which he did in March of 2018. (ECF 36, 37). The Defendants then separately filed new Rule 12 motions (ECF 39, 40, 41), which were fully briefed. Defendants moved pursuant to:

1.     FRCP 12(b)(1), arguing that the Court did not have jurisdiction to hear the case because of the Rooker-Feldman doctrine, the Anti-Injunction Act, and preclusion and estoppel principles under the Full Faith and Credit Statute;

2.      FRCP 12(b)(3), arguing that venue in the Eastern District of Pennsylvania was improper; and

3.     FRCP 12(b)(6) and 9(b), arguing that Plaintiff failed to sufficiently state a claim for relief on any of his counts.

The Court held oral argument in August 2018, after which it granted Plaintiff leave to file an Amended Complaint that removed his previous "complicit judges" theory. (ECF 67).

**B.     Amended Class Action Complaint**

Plaintiff filed his Amended Class Action Complaint on October 22, 2018. (ECF 75, "Amended Complaint" or "Am. Compl."). A second RICO Case Statement was filed on November 6, 2018. (ECF 77). The Amended Complaint is largely premised on the same scheme, although Plaintiff removed allegations related to the "complicit judges" and replaced them with allegations that Heretick and the Purchaser Defendants engaged with "[a]dditional persons, including but not limited to those persons identified herein, . . . including persons who falsely represented themselves to have provided independent advice to the sellers of SSA payments, and

7

at least one other person who falsely portrayed herself as a notary public." Am. Compl. ¶ 185.[5] The Amended Complaint is comprised of the following eight counts:

Count I of the Amended Complaint alleges violations of RICO, 18 U.S.C. § 1962(c), by Seneca, Wentworth, 321 Henderson, and Heretick.

Counts II through IV also allege violations of RICO, 18 U.S.C. § 1962(c), but only against Heretick.

Count V alleges conspiracy to violate RICO, 18 U.S.C. § 1962(d) against Defendants.

Count VI alleges unjust enrichment against Defendants.

Count VII seeks a constructive trust against all Defendants and all Nominal Defendants.

Count VIII alleges breach of fiduciary duty as well as aiding and abetting breach of fiduciary duty against Defendants.

Defendants again filed motions to dismiss on November 20, 2018. (ECF 78, "Wentworth Br."; ECF 79, "Heretick Br."; ECF 80, "Seneca Br."; collectively, the "Motions"). The Motions are premised on the same arguments Defendants made in response to the previous Complaint. Plaintiff responded in opposition on December 4, 2018, (ECF 82, "Opp'n"), and Defendants replied in support on December 10 and 11, 2018. (ECF 84, "Heretick Reply"; ECF 85, "Seneca Reply"; ECF 86, "Wentworth Reply"). The Court again held oral argument on February 19, 2019, and ordered Plaintiff to amend Count I. The Court also allowed the parties to file supplemental letter briefing and allowed supplemental motions to dismiss in response to Plaintiff's amendment. (ECF 91).

---

[5] Plaintiff also names several insurance companies making payments on the annuities as "Nominal Defendants."

### C.     Second Amended Class Action Complaint

Plaintiff filed the SAC on March 6, 2019.  (ECF 99).  The SAC amended only Count I, in accordance with the Court's order.  (ECF 91).[6]  The SAC makes clear that Count I is pled against "all Defendants," and specifies that Plaintiff is alleging three different association-in-fact enterprises (collectively, the "Annuity Fraud Enterprises") between Heretick, each of the three Purchaser Defendants, and "[a]dditional persons, including but not limited to those persons identified herein, . . . including persons who falsely represented themselves to have provided independent advice to the sellers of SSA payments, and others who performed other services, including without limitation notarization services."  (SAC ¶ 184).  The SAC also identifies some of those additional persons.  (Id.).

In response to the Court's order and the filing of the SAC, the parties filed supplemental letter briefs (ECF 90, 93–96) and supplemental motions to dismiss (ECF 100–102), which largely adopt the arguments made in prior briefing.  Plaintiff again responded in opposition on March 26, 2019.  (ECF 105).

This Memorandum Opinion takes into account all arguments made in the briefing on the Amended Complaint and SAC, to the extent those arguments remain valid as to the amendments made in the SAC.

## IV.     Legal Standards

### A.     Federal Rule 12(b)(1)

In considering a motion to dismiss under Rule 12(b)(1), the court "must grant" the motion if it "lacks subject-matter jurisdiction to hear [the] claim."  In re Schering Plough Corp.

---

[6]     The SAC also removed a remaining allegation that the Virginia state court judges participated in the alleged fraudulent scheme.  (Compare Am. Compl. ¶ 150, with SAC ¶ 150).

Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction may present either a facial or a factual attack. CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008). A facial attack concerns "an alleged pleading deficiency," and a factual attack concerns "the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." Id. (alteration in original) (internal quotation marks and citation omitted).

Defendants' challenge here is factual, not facial, because the Motion challenges whether the district court has actual jurisdiction to hear the case. Id. The fact that the Rule 12(b)(1) motion makes a factual attack has three important procedural consequences for this Court: (1) "no presumption of truthfulness attaches to the allegations of the plaintiff"; (2) the plaintiff has the burden of proving subject matter jurisdiction; and (3) the court has the authority to review evidence outside the pleadings and make factual findings that are decisive to determining jurisdiction. Id. at 139, 145.

## B.     Federal Rule 12(b)(3)

Under Federal Rule of Civil Procedure 12(b)(3), a court must grant a motion to dismiss if venue is improper. Leone v. Cataldo, 574 F. Supp. 2d 471, 483 (E.D. Pa. 2008). When deciding a Rule 12(b)(3) motion, the court must "accept as true all of the allegations in the complaint, unless those allegations are contradicted by the defendants' affidavits." Kimmel v. Phelan Hallinan & Schmieg, 847 F. Supp. 2d 753, 759 (E.D. Pa. 2012) (citing Bockman v. First Am. Mktg. Corp., 459 F. App'x 157, 158 n.1 (3d Cir. 2012)). While the court may consider facts outside the complaint to determine the proper venue, all reasonable inferences must be drawn in the plaintiff's favor. Fellner ex rel. Estate of Fellner v. Philadelphia Toboggan Coasters, Inc., No. 05-2052, 2005 WL 2660351, at *1 (E.D. Pa. Oct. 18, 2005)). In a motion to dismiss for improper venue, the

defendant bears the burden of showing that venue is improper. <u>MacKay v. Donovan</u>, 747 F. Supp. 2d 496, 502 (E.D. Pa. 2010) (citing <u>Leone</u>, 574 F. Supp. 2d at 483).

### C.    Federal Rule 12(b)(6)

In considering a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all factual allegations as true [and] construe[s] the complaint in the light most favorable to the plaintiff." <u>Warren Gen. Hosp. v. Amgen, Inc.</u>, 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

The Court in <u>Iqbal</u> explained that, although a court must accept as true all the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. <u>Iqbal</u>, 556 U.S. at 678, 684. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 678 (citing <u>Twombly</u>, 550 U.S. at 555); <u>see also</u> <u>Phillips v. Cty. of Allegheny</u>, 515 F.3d 224, 232 (3d Cir. 2008) (citing <u>Twombly</u>, 550 U.S. at 556 n.3) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."). Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556).

### D.    Federal Rule 9(b)

All allegations of fraud must meet Fed. R. Civ. P. 9(b)'s heightened pleading standard (the "particularity" requirement). Rule 9(b)'s heightened pleading standard not only gives defendants

notice of the claims against them, but also provides increased measure for protection of their reputation and reduces the number of frivolous lawsuits brought solely to extract settlements.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).

Rule 9(b) may be satisfied by describing "the circumstances of the alleged fraud with precise allegations of date, time, or place, or by using some means of injecting precision and some measure of substantiation into [the] allegations of fraud."  Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 172 n. 10 (3d Cir. 2002) (internal quotation marks and citation omitted).  Stated another way, the plaintiff must plead the who, what, when, where, and how of the fraud.  Institutional Investors Grp. v. Avava, Inc., 564 F.3d 242, 253 (3d Cir. 2009); see Bonavitacola Elec. Constr. v. Boro Developers, Inc., No. 01-5508, 2003 WL 329145, at *6 (E.D. Pa. Feb. 12, 2003) (Baylson, J.).

However, "courts should be sensitive to the fact that application of [Rule 9(b)] prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud. Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."  In re Burlington, 114 F.3d at 1418 (internal quotation marks and citations omitted).  Thus, plaintiffs may plead certain factual allegations based "upon information and belief" but must allege that the necessary information lies within the defendant's control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based.  Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989).  Boilerplate and conclusory allegations will not suffice.  In re Burlington, 114 F.3d at 1418.

## V.     Threshold Questions

### A.     Motion to Dismiss for Lack of Subject Matter Jurisdiction—<u>Rooker-Feldman</u> Doctrine

The <u>Rooker-Feldman</u> doctrine engenders the principle that lower federal courts lack subject-matter jurisdiction to adjudicate cases stemming from state-court decisions if exercising jurisdiction would function as an appeal of those decisions.  This doctrine receives its name from two United States Supreme Court cases, <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923), and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983).  In <u>Feldman</u>, the Supreme Court held that district courts "do not have jurisdiction[] . . . over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional."  460 U.S. at 486.  A federal statute—28 U.S.C. § 1257— reserves review of final state-court decisions for the Supreme Court itself.  <u>Id.</u>  The Supreme Court also found the federal claims in <u>Feldman</u> to be "inextricably intertwined" with the state-court decisions at issue, suggesting that a lower federal court would not have subject-matter jurisdiction to adjudicate the action.  <u>Id.</u> at 486–87.  In its holding, the Supreme Court distinguished between a plaintiff challenging "the validity of a rule promulgated in a non-judicial proceeding" and "a final state court judgement in a particular case," and held that lower federal courts retain subject-matter jurisdiction over the former, but not the latter.  <u>Id.</u> at 486.

Since the <u>Feldman</u> decision, the Supreme Court has refined the scope of the <u>Rooker-Feldman</u> doctrine on two occasions.  First, in <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280 (2005), the Supreme Court held that the doctrine is "confined" to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  544 U.S. at 284.  Second, in <u>Lance v. Dennis</u>, 546 U.S. 459 (2006), the Supreme Court reaffirmed

the doctrine's underlying jurisdictional nature, warning not to conflate it with the preclusion principles stated in the Full Faith and Credit Act. It held that "Rooker-Feldman is not simply preclusion by another name." 546 U.S. at 466. Thus, while a lower federal court may be precluded from adjudicating an action previously litigated in state court under the principles set forth in the Full Faith and Credit Act, this does not mean the court would be divested of subject-matter jurisdiction over the claim. Exxon Mobil, 544 U.S. at 293.

In interpreting the Supreme Court's decision in Exxon Mobil, the Third Circuit held in Great Western Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159 (3d Cir. 2010) that there are four requirements to be met before the Rooker-Feldman doctrine applies:

1. the federal plaintiff lost in state court;

2. the plaintiff complains of injuries caused by the state-court judgments;

3. those judgments were rendered before the federal suit was filed; and

4. the plaintiff is inviting the district court to review and reject the state judgments.

Id. at 166 (citing Exxon Mobil, 544 U.S. at 284) (internal quotation marks and citations omitted). In Great Western, similar to the original complaint in this case, the plaintiff alleged a conspiracy among a law firm, an arbitration service provider, and various Pennsylvania state-court judges to engineer the plaintiff's defeat in state court on contract and tort claims filed after a conflict of interest was discovered between the arbitration parties and provider. Id. at 161–63. The Third Circuit explained that Rooker-Feldman does not bar federal jurisdiction when the "federal plaintiff present[s] some independent claim," even if that claim denies a legal conclusion reached by the state court. Id. at 169 (quoting Exxon Mobil, 544 U.S. at 293). By reaching a conclusion contrary to the state-court judgment "without concerning itself with the bona fides of the prior judgment," a federal court "is not conducting appellate review, regardless of whether

compliance with the second judgment would make it impossible to comply with the first judgment." Id. at 169 (quoting Bolden v. City of Topeka, Kan., 441 F.3d 1129, 1143 (10th Cir. 2006)).

The Third Circuit also decided that, in accordance with the Supreme Court's express desire to limit the scope of the Rooker-Feldman doctrine, "[t]he phrase 'inextricably intertwined' does not create an additional legal test or expand the scope of Rooker-Feldman beyond challenges to state-court judgments," because "[w]hen a federal plaintiff brings a claim[] . . . that asserts injury caused by a state-court judgment and seeks review and reversal of that judgment, the federal claim is 'inextricably intertwined' with the state judgment." Id. at 170. Ultimately, the Court held that the plaintiff's claim of being forced to litigate in a rigged system, where he could not receive a fair hearing, did not assert an injury caused by state-court judgments, nor did it seek review and rejection of those judgments. Id. at 171. Rooker-Feldman thus did not bar federal jurisdiction in the case.

In their Motions to Dismiss, Defendants argue that Rooker-Feldman prevents this Court from exercising jurisdiction over Plaintiff's claims. Defendants contend that this case is essentially an improper federal appeal of the Virginia state court's decision to grant the SSA transfer petitions. In analyzing this argument, the Court addresses each of the Great Western elements below, in turn.

### 1.    Plaintiff as state-court loser

The first element of Great Western requires that the federal plaintiff lost in state court. The determination is not straightforward in this case because the state-court proceedings were not adversarial. Pursuant to Virginia Code § 59.1-476, the state-court proceedings at issue here put the Virginia judge in a posture akin to a gatekeeper, ensuring the integrity of a mutually agreed upon private transaction. Plaintiff has not made a claim that was *rejected* by the state court—

rather, he is seeking review of a judicial determination that he himself requested and that was *granted* by the state court.[7]

Still, the <u>Rooker-Feldman</u> doctrine has been applied to bar jurisdiction over other cases that arise out of non-adversarial state-court proceedings. For example, in <u>Hartford Life Ins. Co. v. Solomon</u>, 910 F. Supp. 2d 1075 (N.D. Ill. 2012) (Grady, J.), which Defendants rely on heavily, an SSA beneficiary sold his annuity stream to 321 Henderson and, after he died, his estate sued in probate court to recover the annuity assets because the transfer was allegedly tainted by misrepresentations. <u>Id.</u> at 1078. Judge Grady concluded that although the underlying proceedings were not adversarial, they were judicial; and although the plaintiff was not a loser in a conventional sense, he qualified as one because his estate was seeking to overturn the state-court order in federal court. <u>Id.</u> at 1081–82. The plaintiff could not seek to voice his second thoughts about the deal he struck with 321 Henderson and at the same time avoid <u>Rooker-Feldman</u> by claiming that he was not a state-court loser. <u>Id.</u> at 1081.

<u>Hartford Life</u> likened the SSA transfer order to an agreed-upon order in <u>Johnson v. Orr</u>, 551 F.3d 564 (7th Cir. 2008), which involved an agreement regarding property taxes that the federal plaintiff later argued was erroneous. The <u>Johnson</u> court—and the <u>Hartford Life</u> court in turn—found that because the federal plaintiff was effectively seeking to overturn the agreed-upon state-court order in federal court, <u>Rooker-Feldman</u> barred the claim. <u>Johnson</u>, 551 F.3d at 569;

---

[7]     Defendants make much ado of the fact that Plaintiff supposedly "admitted" that he was a state-court loser during oral argument on the previous motions to dismiss. At that argument, held on August 22, 2018, the Court asked Plaintiff's counsel whether this element of the <u>Rooker-Feldman</u> doctrine was met. (<u>See</u> ECF 70, Hrg. Tr., Aug. 22, 2018, at 7:5-9). Plaintiff's counsel replied, "I think it's accurate to say that for the purposes of this case, the plaintiff is a loser in the sense that . . . the injury that he sustained would not have been sustained if the court had denied the petition, and the court granted the petition." (<u>Id.</u> at 7:20-8:1). The Court is not persuaded that this response amounted to a concession or waiver of the first <u>Great Western</u> element.

Hartford Life, 910 F. Supp. 2d at 1082. Other federal courts have similarly applied the Rooker-Feldman doctrine to bar claims brought over consent orders or agreed-upon orders, even though the underlying state-court cases were not overtly adversarial. See, e.g., Crawford v. Adair, No. 08-281, 2008 WL 2952488, at *2 (E.D. Va. July 29, 2008) (holding Rooker-Feldman barred plaintiff's federal claims seeking review and rejection of a consent order agreed to by the parties in an earlier state court proceeding).

In light of the foregoing, the Court is satisfied that Plaintiff qualifies as a state-court loser for purposes of this proceeding. Plaintiff complains of injuries he allegedly sustained in relation to the non-adversarial, state-court proceeding, which is enough to qualify him as the loser of that proceeding for purposes of this Court's Rooker-Feldman analysis.

The first Great Western element is therefore satisfied.

### 2. The origin of Plaintiff's injuries

The second element of Great Western requires Plaintiff to complain of injuries caused by the state-court judgment. This element is "closely related" to the fourth Great Western element, discussed below, and the parties' arguments largely conflate the two. Still, "a federal plaintiff who was injured by a state-court judgment is not invariably seeking review and rejection of that judgment," Great Western, 615 F.3d at 168, and the Court must discuss each element separately.

In Great Western, the Third Circuit concluded that Rooker-Feldman did not bar federal jurisdiction because, although the plaintiff was attacking the state-court judgments, it was not "merely contending that the state-court decisions were incorrect or that they were themselves in violation of the Constitution." 615 F.3d at 172. Rather, the plaintiff was claiming violations of an independent right—the right to an impartial forum. Id. This separate constitutional violation

caused the adverse state decision and the plaintiff's harm, and the state-court judgments themselves did not cause the plaintiff's injuries. <u>Id.</u> at 172–73.

The Third Circuit has since made similar determinations in two notable cases. In <u>Williams v. BASF Catalysts LLC</u>, 765 F.3d 306 (3d Cir. 2014), a plaintiff filed a putative class action alleging conspiracy to prevent asbestos-injury victims from obtaining fair tort recoveries for their injuries. The plaintiff alleged that the conspirators—chemical companies and their attorneys—worked together for years to mislead claimants about the presence of asbestos in talc mined and sold by the defendant companies. Through false discovery responses and official representations, they induced class members to dismiss or settle claims that were, in reality, meritorious. <u>Id.</u> at 311–14. The Third Circuit held that <u>Rooker-Feldman</u> did not apply, finding that the plaintiff's alleged injuries arose from defendants' misconduct, not the state-court judgments themselves. <u>Id.</u> at 315 ("Because this suit does not concern state-court judgments, but rather independent torts committed to obtain them, the <u>Rooker-Feldman</u> doctrine does not apply.").

In <u>Philadelphia Entertainment & Dev. Ptnrs LP v. Dep't of Revenue</u>, 879 F.3d 492 (3d Cir. 2018), a debtor paid $50 million for a license to operate slot machines, which was eventually revoked. <u>Id.</u> at 495–96. In subsequent bankruptcy proceedings, the debtor liked the revocation to a fraudulent transfer and requested the return of the $50 million fee. <u>Id.</u> at 496. The bankruptcy court applied <u>Rooker-Feldman</u>, finding that the claim for the value of the license was barred because "the right to be compensated for the value of the license is the 'functional equivalent' of the right to retain the license." <u>Id.</u> at 497. But the Third Circuit reversed, holding that the fraudulent transfer claim was independent of the state-court revocation orders. <u>Id.</u> at 500–01. The Court explained that "a federal court can address the same issue 'and reach[] a conclusion contrary to a judgment by the first court,' as long as the federal court does not reconsider the legal

conclusion reached by the state court." Id. at 501–02 (quoting Great Western, 615 F.3d at 169). It further held that, although the plaintiff sought to recapture exactly the relief that the state court had denied, the federal claim could be prosecuted so long as the claim arose out of an independent right and was not simply a request that the federal court re-assess the merits of the claim that had been resolved in state court. Id. at 501–02. In so holding, the Third Circuit presumed that "the correct result [was reached] under state law" and therefore found that it did not have to review the merits of the state court's order. Id. at 501.

The question this Court must consider, then, is whether Plaintiff alleges an injury that arises from the state-court orders or from his purportedly independent RICO and state-law claims. Defendants partially argue that Plaintiff's injury must arise from the state-court orders because Plaintiff seeks the return of the exact amounts that were at issue in the transfer petitions. However, that argument is unpersuasive in light of the Third Circuit's decision in Philadelphia Entertainment, which allowed federal jurisdiction over claims that sought to recapture exactly the relief that had been denied by the state court. 879 F.3d at 502–03. Moreover, like in Williams, this case does not concern the state-court orders themselves, "but rather independent torts"—and the alleged enterprise's racketeering activity—"committed to obtain them." 765 F.3d at 315. Although recent decisions in this district have rejected a fraud exception to Rooker-Feldman, Plaintiff has alleged more than fraud on the state court. He has alleged a full RICO scheme, involving conspiracy and fraud on the state court as well as on Plaintiff and the putative class members. The injuries discussed in the SAC arise from this scheme. This Court will thus defer to the precedential authority, discussed above, that advises a cautious and narrow application of the doctrine.

The second element of the Great Western test is not satisfied here.

### 3. The timing of the state-court orders

The third element of <u>Great Western</u> is that the state-court judgments at issue must have been rendered before the federal suit was filed. The parties do not dispute that the state-court orders approving the transfer of Plaintiff's SSA payments were entered in state court and were entered prior to the commencement of this case. Indeed, the SAC alleges that the last order at issue in Plaintiff's case was entered by the Portsmouth Circuit Court in 2010, seven years before Plaintiff filed this action.

The third <u>Great Western</u> element is therefore satisfied.

### 4. Review/rejection of the state-court orders

The final <u>Great Western</u> element requires that Plaintiff seek federal review and rejection of a state-court judgment. Even if Plaintiff had alleged injuries that arose from the state-court orders, in satisfaction of the second <u>Great Western</u> element, the Court would not apply <u>Rooker-Feldman</u> because Plaintiff's claims are not seeking review and rejection of those orders.

As noted above, <u>Great Western</u> states that "a federal plaintiff who was injured by a state-court judgment is not invariably seeking review and rejection of that judgment." 615 F.3d at 168. This fourth element of the <u>Great Western</u> test "seeks to discern whether the plaintiff's suit requires the district court to conduct appellate review of the previous state-court decision." <u>King v. Burr</u>, No. 17-2315, 2017 WL 3705872, at *4 (E.D. Pa. Aug. 24, 2017) (Baylson, J.).

In <u>Philadelphia Entertainment</u>, the Third Circuit held that <u>Rooker-Feldman</u> did not apply because the plaintiff's federal claim seeking compensation for the value of an operating license was independent of the plaintiff's state-court claim to retain that same license. 879 F.3d 492, 500–01. In doing so, the Third Circuit reversed the bankruptcy court, which determined that the doctrine applied because the two claims were functionally equivalent. <u>Id.</u> at 497. The Third

Circuit explained that "a federal court can address the same issue 'and reach[] a conclusion contrary to a judgment by the first court,' as long as the federal court does not reconsider the legal conclusion reached by the state court." Philadelphia Entertainment, 879 F.3d at 501–02 (quoting Great Western, 615 F.3d at 169). "[I]f the federal court's review does not concern the bona fides of the prior judgment, the federal court is not conducting appellate review, regardless of whether compliance with the second judgment would make it impossible to comply with the first judgment. In that situation, the Rooker-Feldman doctrine would not apply because the plaintiff is not complaining of legal injury caused by a state court judgment because of a legal error committed by the state court." Id. at 500 (internal citations and quotation marks omitted).

The thrust of Plaintiff's SAC is that Defendants engaged in a pattern of racketeering activity meant to induce Plaintiff to sell his SSA payment streams for unfair rates and meant to convince the state court that the requirements of Virginia Code § 59.1-476 were met. Plaintiff is not asking the Court to review the bona fides of the state-court orders, nor is he appealing some legal error committed to obtain them.[8] Rather, his claims turn on a determination of whether

---

[8]     Plaintiff is also not claiming that the state-court orders were simply procured by fraud. As noted above, the Third Circuit has yet to adopt a fraud exception to the Rooker-Feldman doctrine. Defendants argue that claims contesting state-court judgments on the basis that those judgments were allegedly procured by fraud are more appropriately brought in state court. See Johnson, 551 F.3d at 569 ("If [the plaintiff] believes the state court was wrong [in its legal determination] or that he was induced fraudulently to sign away his rights . . . , his remedy is to ask the state circuit court to set aside the agreed order [between the parties.]"); Campbell, 2017 WL 3142118, at *4 ("[W]hether a state court judgment should be subject to collateral attack or review is an issue best left to the state courts." (citing Fielder v. Credit Acceptance Corp., 188 F.3d 1031, 1035–36 (8th Cir. 1999))). It appears that there is a vehicle to bring such a claim in Virginia state court. See Va. Code § 8:01-428 ("This section does not limit the power of the court to entertain at any time an independent action to relieve a party from any judgment or proceedings, . . . or to set aside a judgment or decree for fraud upon the court."). Plaintiff here has alleged a complicated, years-long scheme meant to take advantage of annuitants and subvert the review of state-court judges. These allegations raise claims wholly separate from an appeal of the state-court orders, and present more for this Court to consider than a plain lie or fraud on the state court.

Defendants acted in concert to pursue a pattern of racketeering activity that ultimately mistreated Plaintiff, the putative class members, and the state court itself. Although Plaintiff's RICO and state-law claims may raise issues that were considered by the state court, they do not require this Court to decide the state judges' decisions anew. This Court can fairly adjudicate the claims in the SAC without expressly deciding whether the requirements of Virginia Code § 59.1-476 were met. Such review is not barred by <u>Rooker-Feldman</u> under the narrow application espoused by <u>Philadelphia Entertainment</u>.

The fourth and final element of <u>Great Western</u> is also not satisfied. Because both the second and fourth elements have not been satisfied, the <u>Rooker-Feldman</u> doctrine does not apply to this case. The Court may continue to exercise jurisdiction over the claims in Plaintiff's SAC.

### B.      Anti-Injunction Act

The Anti-Injunction Act, 28 U.S.C. § 2283, was originally passed by Congress as part of the Judiciary Act of 1793 to protect federalism in the American judiciary. The statute provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

In <u>Hill v. Martin</u>, 296 U.S. 393, 403 (1935), the Supreme Court defined the term "proceedings" liberally, stating "[t]hat term is comprehensive. It includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process. It applies . . . not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective." 296 U.S. at 403 (internal citations omitted). Thus, where a plaintiff asks a federal court to enjoin the enforcement of a state-court judgment, the federal court is barred from doing so unless one of the three statutory

exceptions apply. Furthermore, the Supreme Court has reasoned that "[i]t is settled that the prohibition of § 2283 cannot be evaded by addressing the order to the parties [as opposed to the state court] or prohibiting utilization of the results of a completed state proceeding." Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 287 (1970).

Williams, 765 F.3d 306, provides clear precedent, on which this Court relies to find that the Anti-Injunction Act does not apply to this case. In Williams, as discussed above, the plaintiffs alleged that the defendant manufacturing corporation and its counsel defrauded litigants by suppressing evidence favorable to their state asbestos cases. The Third Circuit allowed the federal case to proceed, despite the fact that a judgment in the plaintiffs' favor would contradict earlier state court judgments regarding the plaintiffs' settlements. The Third Circuit's reasoning, which applies with equal force to the present case, was that "because there are no ongoing proceedings in a state court with which the District Court's judgment would interfere . . . [the Anti-Injunction Act] has no application. . . . [T]he named plaintiffs in this case have no other proceedings pending anywhere." Id. at 325–26 (citation omitted).

It is clear that Williams applies to the case now before the Court. Defendants are correct that Plaintiff's SSA payments continue to be paid—albeit not to Plaintiff. However, the state court proceedings determining that such payments should be made to Defendants rather than Plaintiff are already completed. Therefore, because no state court proceeding remains "ongoing," there is no possibility of this Court issuing any "injunction to stay proceedings in a State court." 28 U.S.C. § 2283.

## C.      Full Faith and Credit Statute

In their motions to dismiss, Defendants Wentworth, 321 Henderson, and Seneca contend that the Full Faith and Credit statute, 28 U.S.C. § 1738, and Virginia state law on *res judicata* and

collateral estoppel require this Court to dismiss Plaintiff's Complaint with prejudice. However, the Court finds that Defendants have not met their burden of establishing that Virginia *res judicata* law or collateral estoppel law mandate such an outcome.

The Full Faith and Credit statute, 28 U.S.C. § 1738, provides that "[s]uch Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738. Thus, Virginia state law on *res judicata* applies to the question of whether the claims outlined in Plaintiff's Complaint are precluded by the previous state-court orders Virginia state law on collateral estoppel applies to the question of whether this Court may consider issues that were already litigated in the previous state-court proceeding. The Court finds that Virginia law on *res judicata* and collateral estoppel do not require a finding that Plaintiff's claims are precluded.

There are two different standards for determining the application of *res judicata* under Virginia state law: The common-law standard (predating the July 1, 2006 effective date of Va. Sup. Ct. R. 1:6), and the transactional standard (resulting from the adoption of Va. Sup. Ct. R. 1:6). In order for the transactional approach to apply, "both the original action yielding final judgment and the subsequent action must have been filed after July 1, 2006." Coleman v. Pascarella, 81 Va. Cir. 167, 169 (Chesapeake Cty., 2010). Plaintiff's allegations make clear that Virginia judges issued several relevant state-court orders prior to July 1, 2006, and several after July 1, 2006. Therefore, analysis under both standards is required.

Under the common-law standard, there are four elements that a defendant must establish in order to demonstrate that a plaintiff's claims are barred by *res judicata*: "(1) identity of the remedies sought; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of

the quality of the persons for or against whom the claim is made." Rhoten v. Commonwealth, 750 S.E.2d 110, 114 (Va. 2013).

Under the common-law approach, in order to demonstrate that the causes of action of the two (or more) actions are identical, the defendant must demonstrate that the same evidence is required in both (or all) of the actions to establish the claims. Id. This approach was abandoned with the adoption of Virginia Supreme Court Rule 1:6 ("Rule 1:6"), which instead provides that *res judicata* will bar "any claim or cause of action that arises from the same conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought." Va. Sup. Ct. R. 1:6(a). Despite the differences between the two approaches, this Court holds that neither bars Plaintiff's claims.

### 1. For Virginia State-Court Orders Predating July 1, 2006, the Common-Law *Res Judicata* Standard Does Not Bar Plaintiff's Claims

For the reasons set forth below, the Court finds that Defendants have not established all of the elements under the common-law approach to *res judicata*. A party invoking *res judicata* must, by a preponderance of the evidence, establish four elements: "(1) identity of the remedies sought; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality of the persons for or against whom the claim is made." Rhoten, 750 S.E.2d at 114; see also Mowry v. City of Virginia Beach, 93 S.E.2d 323, 327 (Va. 1956) (holding that "there must be a concurrence of [the] four" elements to succeed in asserting *res judicata*). Defendants assert that they have demonstrated the existence of all four elements as they pertain to the state-court orders issued before July 1, 2006. Although the Court finds that the fourth element, identity of the quality of

the parties, has been satisfied, it also finds that Defendants have failed to establish the first three elements of *res judicata*.

### a.     Defendants Fail to Demonstrate an Identity of Remedies

Defendants argue that the remedies in the Virginia state-court orders and in this litigation are identical.  The Court disagrees.

Plaintiff's SAC seeks monetary damages for allegedly unlawful conduct violating RICO, facilitating unjust enrichment, and breaching fiduciary duties.  It also seeks equitable relief via disgorgement and a constructive trust.

Insofar as the state-court orders can be considered to constitute a "remedy," the remedy would be the transfer of a right to SSA payment streams.  Defendants do not speak to this element of *res judicata* in their most recent briefing.  (See ECF 78-1, at 17–18).  However, they reference their previous briefing, where they maintained that the remedies sought by Plaintiff and those provided via the SSA petitions are "functionally the same," because without the conduct of the Purchaser Defendants and Defendant Heretick, "the transfer orders never would have been approved and he would have retained the right to his SSA payment stream."  (ECF 22-1, at 23).  However, Defendants cited no authority demonstrating that "functionally equivalent" remedies satisfy this first element.

### b.     Defendants Fail to Demonstrate an Identity of Cause of Action

Under Virginia's common-law approach to *res judicata*, the second element is satisfied when the invoking party demonstrates that the same evidence is necessary to prove each claim. Brown v. Haley, 355 S.E.2d 563, 567 (Va. 1987).  Here, the evidence proffered in the state-court proceedings was not aimed at establishing unlawful behavior on the part of Defendants. Defendants had the burden in the state court of demonstrating, through affidavits or other

appropriate documentation, compliance with Virginia Code § 59.1-476.   In the present case, Plaintiff bears the burden of demonstrating, among other things, the existence of an enterprise, a pattern of racketeering activity, the wrongful transfer of a benefit, and the assumption of a fiduciary duty.

### c. Defendants Fail to Demonstrate Identity of Parties

To apply *res judicata*, Defendants must also show that the parties in this case are the same as those in the prior proceedings.   However, Defendant Heretick was not a party to the state-court proceedings.

Therefore, this Court is not barred from adjudicating Plaintiff's claims that implicate state-court orders issued prior to July 1, 2006, because Defendants fail as to three elements of the common law *res judicata* standard.

### 2. For Virginia State-Court Orders Issued After July 1, 2006, Rule 1:6's Transactional *Res Judicata* Standard Does Not Bar Plaintiff's Claims

While Virginia state-court orders issued before July 1, 2006 are analyzed under the common-law standard of *res judicata*, state-court orders issued after that date are analyzed under the standard set out in Rule 1:6, which adopted the transactional approach to *res judicata*.   See Va. Sup. Ct. R. 1:6.   Rule 1:6(a) provides that a plaintiff's claim is precluded when it "arises from that same conduct, transaction or occurrence" previously litigated, "whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought."   Id.   The question, then, is whether the claims Plaintiff alleges in the Complaint arise out of the same "conduct, transaction or occurrence" addressed by the state-

court orders.  Id.  The Court finds that this is not the case, and thus, Plaintiff's claims pertaining to orders issued after July 1, 2006 are not precluded by *res judicata*.

Defendants previously asserted that the transaction at issue in the Virginia state-court proceedings is the transfer of rights to SSA income streams, effectuated by the issuance of the state-court orders.  (ECF 22-1, at 25).  Plaintiff alleges that the unlawful conduct giving rise to the claims occurred when Defendants "induce[d] the annuity beneficiaries to disarm themselves because they believed Defendants' claim that Defendants would protect them—so they did not need a lawyer, did not need to come to court, did not need independent financial advice, and could instead tell their story to Defendant's counsel in the Virginia proceeding, because all of these people would protect the beneficiaries and their interests."  (ECF 82, "Opp'n", at 87).  The alleged harm was not that the state court issued the orders leading to the SSA transfer; instead, it was the alleged prior agreement and cooperation among Defendants to reach that outcome, no matter the circumstances.  Such conduct is distinct from the mere issuance of an order to that effect.  Thus, the Court finds that for the orders issued after July 1, 2006, Plaintiff's claims are not barred by *res judicata*.

### 3.    Collateral Estoppel Does Not Apply

Under Virginia law, "[t]he doctrine of collateral estoppel precludes the same parties to a prior proceeding from litigating in a later proceeding any issue of fact that actually was litigated and was essential to the final judgment in the first proceeding."  Whitley v. Commonwealth, 538 S.E.2d 296, 299 (Va. 2000).  The doctrine "applies even when the later proceeding asserts a different claim for relief."  Id.  The following requirements must be met in order to apply the doctrine:  "(1) the parties to the two proceedings must be the same; (2) the factual issue sought to be litigated must have been actually litigated in the prior proceeding; (3) the factual issue must

have been essential to the judgment rendered in the prior proceeding; and (4) the prior proceeding must have resulted in a valid, final judgment against the party to whom the doctrine is sought to be applied." Id.

First, and as addressed in the *res judicata* analysis above, the parties in this case are not the same as the parties in the state-court proceedings. Moreover, the factual issues presented by this case were not litigated in the state-court proceedings. For example, the following allegations were not litigated previously: how the putative class members were induced to sell their SSA streams; that the putative class members were actually advised against seeking independent counsel; that interested persons, paid on a contingent basis, falsely represented that they provided independent advice to the putative class members; how the petitions were fashioned to avoid meaningful judicial review; that Defendants and additional persons joined together, or conspired together, in order to take advantage of the putative class members; and that Defendants and additional persons agreed to use the mails in furtherance of their scheme. These are just some of the issues that will be addressed by this Court and that were not litigated in the previous, state-court proceedings.

Because the first two requirements have not been met, Plaintiff's claims are not barred by collateral estoppel.

**D. Venue**

Defendant Seneca has moved to dismiss for improper venue, pursuant to Fed. R. Civ. P. 12(b)(3). This Court finds that venue is proper under RICO's venue provision, 18 U.S.C. § 1965(a), which states that venue is proper wherever a defendant "resides, is found, has an agent,

or transacts his affairs." Defendants Wentworth and 321 Henderson are alleged to be located in the Eastern District of Pennsylvania, and do not dispute such allegations.

Although venue must generally be established for each cause of action, there is an exception known as "pendent venue," which applies "where claims arise out of the same operative facts." Philadelphia Musical Soc., Local 77 v. Am. Fed'n of Musicians of U.S. & Canada, 812 F. Supp. 509, 517 n.3 (E.D. Pa. 1992); see Neopart Transit, LLC v. Mgmt. Consulting, Inc., No. 16-3103, 2017 WL 714043, at *8 (E.D. Pa. Feb. 23, 2017) (Brody, J.). Because all RICO claims in this case are proper under 18 U.S.C. § 1965(a), and the other claims in this case (unjust enrichment, constructive trust, and breach of fiduciary duty) all arise out of the same operative facts, venue is proper.

## VI.    Merits of the Claims at Issue

### A.    Violations of RICO (Counts I through IV)

Counts I through IV of the Complaint allege violations of RICO, 18 U.S.C. § 1962(c), by Seneca, Wentworth, 321 Henderson, and Heretick. Defendants assert in their motions to dismiss that Plaintiff:

1.    lacks standing to bring his RICO claim because he fails to plead a concrete injury to business or property

2.    fails to allege facts sufficient to plead a purported association-in-fact enterprise;[9]

3.    fails to plead the alleged predicate acts of mail and wire fraud with the specificity required by Fed. R. Civ. P. 9(b); and

4.    is barred from bringing RICO claims by the Noerr-Pennington Doctrine.

---

[9]    Defendant Heretick also contends that Plaintiff cannot allege that he participated in conducting the affairs of an enterprise because the SAC simply alleges that he was acting in his professional capacity as an attorney.

In response, Plaintiff contends that he:

1.      properly alleges concrete pecuniary injury to demonstrate standing;

2.      properly alleges association-in-fact RICO enterprises;

3.      properly alleged mail fraud and other predicate acts; and

4.      need not overcome the Noerr-Pennington doctrine because it does not apply here.

### 1.      RICO Standing

A violation of section 1962(c) "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). To overcome a motion to dismiss for failure to state a claim, a plaintiff must also satisfy RICO's standing provision, which states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter," may file suit.  18 U.S.C. § 1964(c).  Section 1964(c) requires the plaintiff to allege (1) an injury to the plaintiff's business or property that constitutes a "concrete financial loss," and (2) that the defendant's RICO violations proximately caused the plaintiff's injury.  Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000).

Here, Plaintiff alleges that he was the beneficiary of an SSA and that, as a result of a scheme amongst Defendants, he entered into an unfair settlement on terms substantially worse than he would have obtained if he had access to independent financial or legal advice.  Therefore, Plaintiff has alleged (1) a concrete loss, i.e., the difference between a fair settlement and an unfair settlement, and (2) that the scheme caused this loss through a process in which Defendants induced Plaintiff to settle without financial or legal advice and obtained judicial approved in a manner that guaranteed a lack of meaningful judicial review.  This suffices for purposes of RICO standing. See, e.g., Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 247–49 (3d Cir. 2001) (RICO

injury was the difference between the purchase price and actual value of the securities that the plaintiff was induced to purchase).

### 2.    Enterprise

Counts I through IV of Plaintiff's complaint also require that Plaintiff allege the existence of an "enterprise."  See Boyle v. United States, 556 U.S. 938 (2009).  An "enterprise" includes "two categories of associations."  United States v. Turkette, 452 U.S. 576, 581 (1981).  The first category "encompasses organizations such as corporations and partnerships, and other 'legal entities,'" while the second "covers 'any union or group of individuals associated in fact although not a legal entity.'"  Id. at 578–82 (quoting 18 U.S.C. § 1961(4)).  For an enterprise in the second category to be considered an association-in-fact, the enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle, 556 U.S. at 946.  Such an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  Turkette, 452 U.S. at 583.

Counts II through IV of Plaintiff's complaint adequately plead the existence of an enterprise through the first category discussed above, because the three claims pertain to each of the Purchaser Defendants (321 Henderson, Wentworth, and Seneca), which are "legal entities" within the meaning of section 1961.

Count I pleads the existence of three different association-in-fact enterprises (the "Annuity Fraud Enterprises"), consisting of Heretick, each separate Purchaser Defendant, and "additional persons . . . including persons who falsely represented themselves to have provided independent advice to the sellers of SSA payments, and others who performed other services, including without

limitation notarization services." (SAC ¶ 184(a)–(c)). Plaintiff goes on to name some of those "additional persons" involved in two of the three Annuity Fraud Enterprises.

Defendants argue that Count I fails to allege a relationship or common purpose among the members of each Annuity Fraud Enterprise. But Plaintiff alleges that the Annuity Fraud Enterprise members actively participated in a scheme that had the common purpose of exploiting the SSA beneficiaries by inducing them to transfer their payment streams on terms that would not otherwise have been accepted or approved after meaningful judicial review. (Id. ¶¶ 12, 42). Plaintiff also alleges that the additional persons who participated in the Annuity Fraud Enterprises knowingly made false representations that they provided independent counsel and legitimate notarization services and that they were paid by the Purchaser Defendants on a contingent basis. (Id. ¶¶ 43–44, 46, 184(b)). Each additional person was only paid, according to the SAC, if the transaction received judicial approval and was executed. (Id. ¶ 46). The SAC therefore contains sufficient basis to find a common relationship and purpose among the members of the Annuity Fraud Enterprises. Indeed, the Third Circuit has explained that the conspirators need not know each other's identities or be aware of all the details of the conspiracy to have been found to have agreed to participated in it. United States v. DePeri, 778 F.2d 963, 975 (3d Cir. 1985).

Defendants also argue that the Annuity Fraud Enterprises do not satisfy the "continuing unit" requirement from Turkette because the SAC alleges that the "additional persons" were only involved in a "tiny minority" of cases. (SAC ¶ 50). In the "overwhelming majority" of petitions filed, the beneficiary allegedly did not purport to have received legal or financial advice. (SAC ¶ 49). But Plaintiff alleges that these additional persons were involved in more cases than just the ones where the beneficiaries purported to have received independent advice. (SAC ¶¶ 122–23) (alleging that at least three of Plaintiff's transfer petitions contained documents, signed by

individuals representing themselves to be attorneys, asserting that Plaintiff had received independent legal advice, unbeknownst to Plaintiff). Although the "additional persons" involved may have changed among the various class members' petitions, they all maintained the same role of falsely representing themselves to have provided independent advice and legitimate notarization services. (SAC ¶ 184(a)–(c)). This is enough, at this stage of the proceedings, to satisfy the broad requirements of the RICO statute. See Boyle, 556 U.S. at 944 (explaining that the RICO statute must be "liberally construed to effectuate its remedial purposes"); In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig., No. 04-2535, 2007 WL 2541216, at *17 (E.D. Pa. Aug. 29, 2007) (McLaughlin, J.) (finding that enterprise members functioned as a continuing unit because, "[a]lthough the sales agents and attorneys involved in each annuity sale were not identical, their roles in the organizational structure of the alleged enterprise remained the same").

Defendant Seneca further argues that the Annuity Fraud Enterprises are insufficiently pled because the SAC fails to identify all of their members. Although the SAC includes the names of certain individuals who acted as additional persons involved in the Annuity Fraud Enterprises related to 321 Henderson and Wentworth, it does not identify any additional persons who participated in the Annuity Fraud Enterprise related to Seneca. (SAC ¶ 184(a)–(c)). Other federal courts have determined that "a nebulous, open-ended description of the enterprise does not sufficiently identify this essential element of the RICO offense." Richmond v. Nationwide Cassel L.P., 52 F.3d 640, 645 (7th Cir. 1995); see also PortionPac Chemical Corp. v. Sanitech Sys., Inc., 210 F. Supp. 2d 1302, 1308 (M.D. Fla. 2002) (quoting Richmond).

Plaintiff admittedly does not yet know each member's identity, but his SAC does more than allege a nebulous enterprise. The SAC specifically alleges that the Annuity Fraud Enterprises are comprised of Heretick, each Purchaser Defendant, and additional persons who falsely

represented themselves as having provided independent advice or notarization services to bolster the transfer petitions. Where Plaintiff knows the identity of those additional persons, he specifically alleges it and provides details of how each individual furthered the goals of the enterprise. (SAC ¶¶ 145, 184, 198–99, 203–07). For the Annuity Fraud Enterprise involving Seneca, the SAC alleges that Seneca worked with an unidentified attorney who falsely represented that he or she gave independent advice to annuitants so that Seneca could purchase SSA streams in Maryland. (Id. ¶ 184(c)(i)). Plaintiff alleges that Seneca and Heretick engaged in the same practice in Virginia. (Id. ¶ 184(c)(ii)). These allegations are sufficient to identify the contours of the three alleged Annuity Fraud Enterprises and put Defendants on notice of the claims they must defend.

Although the Court finds that the Annuity Fraud Enterprises are sufficiently alleged to survive the Motions to Dismiss, Plaintiff should not take this decision as an invitation to expand the scope of these association-in-fact enterprises or to add more defendants to this case.[10] The "additional persons" comprising each Annuity Fraud Enterprise are limited to those persons specifically alleged in the SAC: (1) attorneys (or persons who represented themselves to be attorneys) who falsely represented that they provided independent advice to annuitants in order to bolster the SSA transfer petitions; and (2) persons who provided false or fraudulent notarizations on documents necessary for the passage of the transfer petitions.

---

[10] Plaintiff has now had several years to investigate his claims, and the Court will not readily grant any requests to add new defendants as that would only further delay the start of trial.

### 3. Predicate Acts Constituting "Racketeering Activity"

To state a claim for RICO, a plaintiff must also allege that the defendants engaged in statutorily-defined "racketeering activity," i.e., "predicate acts." See 18 U.S.C. § 1961. Here, Plaintiff alleges that the predicate acts are acts of mail fraud, 18 U.S.C. § 1341.[11] (SAC ¶ 192).

Defendants assert that Plaintiff has failed to plead mail fraud with the particularity required by Fed. R. Civ. P. 9(b).[12] The elements of mail fraud are: (1) a scheme to defraud; (2) use of the mails to further that scheme; and (3) fraudulent intent. United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002). When mail fraud is asserted as a basis for RICO liability, "plaintiffs must plead with particularity the circumstances of the alleged fraud in order to place the defendant on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004), abrogated in part on other grounds by Twombly, 550 U.S. at 557. A plaintiff may satisfy the heightened pleading requirement of Rule 9(b) "by pleading the date, place or time

---

[11] Plaintiff also alleges that, because the mail fraud statute was violated, the transferred funds violate 18 U.S.C. §§ 1956 and 1957 (money laundering). (SAC ¶¶ 163, 194(c)). However, if Defendants did not violate the mail fraud statute, the other two provisions cannot be predicate acts. Both provisions require that the underlying funds be criminally obtained and the only underlying criminal activity alleged by Plaintiff is mail fraud. Therefore, this Court need only determine whether the predicate acts of mail fraud are adequately pled.

The SAC references Defendants' use of wire transfers to effectuate their scheme. (SAC ¶¶ 162, 177(c), 194(c)). Because Plaintiff does not plead the predicate act of wire fraud, we do not address it here.

[12] Defendant Heretick also argues that the SAC fails to allege that his own mailings were themselves fraudulent or unlawful. But the mail fraud statute does not require that the mailings themselves be fraudulent. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991) ("[C]ompletely 'innocent' mailings can satisfy the mailing element."). Moreover, "the use of the mails need not be an essential element of the scheme," Schmuck v. United States, 489 U.S. 705, 710 (1989), and "[t]he defendant does not have to send the mailing or wire communication personally." In re Am Inv'rs Life Ins., 2007 WL 2541216, at *22 (citing Pereira v. United States, 347 U.S. 1, 8–9 (1954)).

of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id. at 224 (internal quotation marks and citation omitted). However, "the Third Circuit has cautioned against focusing too narrowly on Rule 9(b)'s particularity language." Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc., 885 F. Supp. 2d 767, 786 (E.D. Pa. 2012) (Baylson, J.).

Here, Plaintiff has clearly alleged a fraudulent scheme, the use of the mails to further that scheme, and fraudulent intent. Although the details of each mailing may not be spelled out day-by-day, Plaintiff describes the mailings at issue as: (1) those notices that were sent out to interested parties, as required by law, at least twenty days prior to each transfer petition hearing; and (2) those payments made by mail or wire transfer to the Purchaser Defendants or their designees pursuant to the state-court orders. (SAC ¶¶ 192–94). Plaintiff alleges the dates that his transfer petitions were approved, the dates that his SSA transfers were scheduled to take place, and the time period that other transfer petitions were approved for members of the putative class. (Id. ¶¶ 165–74, 194(b)). These allegations are sufficient to put Defendants on notice of the contours of Plaintiff's claim for a pattern of racketeering activity and particular enough to meet the requirements of Rule 9(b).[13]

The Motions to Dismiss will be denied as to Counts I through IV.

---

[13] Defendant Heretick argues that he is immune from liability because the Noerr-Pennington doctrine, which derives from antitrust law, protects "[t]hose who petition government for redress." Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993); see also Giles v. Phelan, Hallinan & Schmieg, LLP, No. 11-6239, 2013 WL 2444036, at *6–8 (D.N.J. June 4, 2013) (applying the Noerr-Pennington doctrine in a RICO context). But Plaintiff's claims are not based solely on Heretick's petitioning activities before the Virginia state court. Rather, the SAC alleges that Heretick took part in an ongoing scheme meant to induce annuitants to sell their SSA streams on unfavorable terms, strip annuitants of their rights to independent counsel, and fashion transfer petitions in such a way that they would be granted despite procedural safeguards. The Noerr-Pennington doctrine therefore does not shield Heretick from Plaintiff's claims.

**B. Conspiracy to Violate RICO (Count V)**

Count V alleges conspiracy to violate RICO, 18 U.S.C. § 1962(d) against Defendants. Specifically, Plaintiff alleges that "Defendant Heretick conspired with each of Defendants 321 Henderson, Wentworth, Seneca One, the other individuals alleged to have been part of the association in fact enterprises alleged herein and who participated in the affairs of the enterprises otherwise alleged herein, and with Structured Settlement Purchaser John Doe Inc. Purchaser Defendants 1-100, and John Doe Individual Defendants 1-100 to violate 18 U.S.C. § 1962(c) by creating and operating the Enterprises alleged herein and by committing, or causing the commission of, the predicate acts identified herein." (SAC ¶ 213).

"[A] defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001). Each conspirator need not "agree to commit or facilitate each and every part of the substantive offense." Salinas v. United States, 522 U.S. 52, 63 (1997). Rather, the allegations supporting the conspiracy claim "must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989).

Here, Plaintiff has alleged a tripartite conspiracy consisting of Heretick, the Purchaser Defendants, and the additional persons discussed in detail above. The parties allegedly joined together to ensure the approval of SSA transfer petitions on favorable terms for the purchasers, without objection from annuitants, and in a manner that would evade judicial detection. Their scheme was "in every instance consummated using the United States mails." (SAC ¶ 190). There are sufficient allegations to support a claim that the members agreed to facilitate the scheme, (see,

e.g., id. ¶¶ 45–48, 88–89, 98, 103, 142–45), and each member's role in the conspiracy is clearly alleged. Plaintiff has therefore satisfactorily alleged a claim for conspiracy to violate § 1962(c).

The Motions to Dismiss Count V are denied.

**C. Breach of Fiduciary Duty and Aiding and Abetting Said Breach (Count VIII)**

Count VIII alleges breach of fiduciary duty against Purchaser Defendants as well as aiding and abetting breach of fiduciary duty against Defendants Heretick. To allege a breach of fiduciary duty or aiding and abetting said breach, under either Pennsylvania or Virginia law, Plaintiff must first plead the existence of a fiduciary duty. See Sun Hotel v. SummitBridge Credit Invs. III, LLC, 86 Va. Cir. 189, 195, 2013 WL 8019584, at *4 (Fairfax Cty. 2013); Basile v. H & R Block, 777 A.2d 95, 101 (Pa. Super. Ct. 2001).

Plaintiff contends that he has demonstrated the existence of a fiduciary duty, citing Pennsylvania law. For purposes of this claim, the Court will apply Plaintiff's choice of law.

Plaintiff relies heavily on Basile for the proposition that "a confidential relationship may be established by evidence of either overmastering influence or of weakness, dependence or trust." Basile, 777 A.2d at 103 (internal quotation marks and citation omitted). "[T]hose who purport to give advice in business may engender confidential relations if others, by virtue of their own weakness or inability, the advisor's pretense of expertise, or a combination of both, invest such a level of trust that they seek no other counsel." Id. at 102.

In Basile, the defendant, an accounting corporation that advertised heavily on television, was found to have a fiduciary duty to plaintiff, who had sought the defendant's assistance with her taxes. In that case, the Superior Court specifically noted that "[the plaintiff] sought [the defendant's] assistance with her taxes in response to [the defendant's] ads, of which she was keenly aware, because she wanted to get money back as soon as possible." Id. at 105.

In this case, Plaintiff seeks to demonstrate that, because he graduated from high school with the assistance of special education classes, and because Purchaser Defendants advertised heavily, Purchaser Defendants should be viewed as owing a fiduciary duty to Plaintiff. However, nothing in Plaintiff's complaint has connected Purchaser Defendants' advertising and solicitation materials to Plaintiff. Unlike in <u>Basile</u>, where the plaintiff was "keenly aware" of the defendant's television advertisements, Plaintiff here has not alleged that he was influenced by, or even merely aware of, any Defendant's advertising.

Therefore, no Defendant in this case can be said to have "solicit[ed] another to trust him in matters in which he represents himself to be expert as well as trustworthy." <u>Id.</u> at 102 (citing <u>Burdette v. Miller</u>, 957 F.2d 1375, 1381 (7th Cir. 1992)). As a result, no fiduciary duty existed between the Purchaser Defendants or Heretick and Plaintiff.[14]

Count VIII must be dismissed.

### D.    Unjust Enrichment (Count VI)

Count VI alleges unjust enrichment against all Defendants, and Plaintiff cites Pennsylvania law in his briefs. For purposes of this claim, the Court will apply Plaintiff's choice of law.

Unjust enrichment claims under Pennsylvania law fall into one of two categories: (1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim. <u>See, e.g.</u>, <u>Zafarana v. Pfizer, Inc.</u>, 724 F. Supp. 2d 545, 561 (E.D. Pa. 2010) (dismissing the plaintiff's unjust enrichment claim because (1) the plaintiff did not

---

[14]    Because Plaintiff has failed to allege the existence of a fiduciary duty, it follows that he has failed to allege "aiding and abetting" the breach of said duty.

allege that the defendant refused to provide a service or good after securing a benefit, and (2) the plaintiff did not "plead a separate tort, the damages from which could be supported by a theory of unjust enrichment"); Torchia v. Torchia, 346 Pa. Super. 229, 233 (1985) ("To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." (internal quotation marks and citation omitted)).   Under either theory, the requisite circumstances do not exist to establish that the defendant has been "unjustly enriched."

As to the first theory, an unjust enrichment claim based on a theory of quasi-contract may be pled as an alternative to a breach of contract claim.   Lugo v. Farmers Pride, Inc., 967 A.2d 963, 970 (Pa. Super. Ct. 2009).   A quasi-contract theory is "typically invoked . . . when [the] plaintiff seeks to recover from [the] defendant for a benefit conferred under an unconsummated or void contract."   Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 936 (3d Cir. 1999).   As such, the doctrine does not apply where a written or express contract exists. Lackner v. Glosser, 892 A.2d 21, 34 (Pa. Super. Ct. 2006).   Such is the case here.

With respect to the second theory, an unjust enrichment claim may be pled as a companion, not an alternative, to a claim of unlawful or improper conduct as defined by law—e.g., a tort claim. "in the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)."   Steamfitters, 171 F.3d at 936.   Where the unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim.   See, e.g., id. at 937 (dismissing the plaintiff's unjust enrichment claim because it was based on the same improper conduct as the plaintiff's traditional tort claims, which were dismissed for lack of proximate cause).   In other words, unlike the quasi-contract

theory of unjust enrichment, which acts as an equitable stand-in for a failed breach of contract claim, an unjust enrichment claim based on wrongful conduct cannot stand alone as a substitute for the failed tort claim.  Zafarana, 724 F. Supp. 2d at 561; see also In re Avandia Mktg., Sales, Practices & Prods. Liab. Litig., No. 07-md-1871, 2013 WL 3486907, at *3 (E.D. Pa. July 10, 2013); Tatum v. Takeda Pharm. N. Am., Inc., No. 12-1114, 2012 WL 5182895, at *4 (E.D. Pa. Oct. 19, 2012).

Here, it is clear that Plaintiff's claim for unjust enrichment is based on an underlying tort claim of breach of fiduciary duty, because there is no allegation of breach of contract.  Therefore, because Plaintiff's underlying tort claim for breach of fiduciary duty will be dismissed for the reasons discussed above, Plaintiff's claim for unjust enrichment, Count VI, must also be dismissed.

E.      Constructive Trust (Count VII)

Count VII seeks a constructive trust against all Defendants and all Nominal Defendants. "[T]he ultimate test for whether to grant such a trust is whether it is necessary to prevent unjust enrichment." Spinner v. Fulton, 777 F. Supp. 398, 402 (M.D. Pa. 1991) (citing Stauffer v. Stauffer, 465 Pa. 558, 568, 351 A.2d 236, 241 (1976) ("The imposition of a constructive trust . . . is an equitable remedy designed to prevent unjust enrichment.")), aff'd sub nom. Spinner v. Hartford Acc. & Indem. Co., 947 F.2d 937 (3d Cir. 1991).

As discussed above, Plaintiff's claim for unjust enrichment will be dismissed.  Thus, the basis for a constructive trust is absent.  Count VII must therefore also be dismissed.

V.      Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss (ECF 78, 79, 80, 100, 101, 102) are GRANTED IN PART AND DENIED IN PART.  An appropriate Order follows.