**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Dockery | : | |
| | : | **CIVIL ACTION** |
| v. | : | |
| | : | **No. 17-4114** |
| Heretick, et al. | : | |
| | : | **Kenney, J.** |
| | **Memorandum** | |

## I.    INTRODUCTION

In this civil RICO case, plaintiff Larry G. Dockery alleges the existence of an unlawful scheme between companies who purchase future settlement annuity payments, an attorney who represented those companies in connection with such transactions, and other persons, to obtain annuities from unsophisticated annuitants on unfair terms.  *See* ECF No. 99, Second Amended Complaint ("SAC").  Having survived a motion to dismiss on his RICO claims and after engaging in some discovery, Plaintiff seeks certification of a class of annuitants who, like him, sold their annuities to companies in exchange for lump sum cash payments and allegedly received less than their worth.

## II.    FACTUAL BACKGROUND

Plaintiff Larry Dockery's left arm was severed in a piece of machinery in the 1980s. SAC ¶ 30.  He brought a tort action against the manufacturer of that machine, which settled for an initial payment of $407,757 plus periodic payments for the rest of his life.  *Id.*  Through this settlement, Dockery became the beneficiary of a Structured Settlement Annuity ("SSA"), which provided for monthly payments and specified payments every five years through 2034.  *Id.* ¶ 34.

Defendants 321 Henderson Receivables, LLC, J.G. Wentworth Originations LLC, and Structured Settlement Purchaser John Doe Inc. 1-100 are companies that purchase SSA payment

streams from annuity recipients ("Purchaser Defendants").[1]  *Id.* ¶¶ 34-37.  These Purchaser

Defendants, as well as Seneca, purchased payment streams from SSAs issued to the Plaintiff and

to the putative class members.  Defendant Heretick, a Virginia attorney who serves in the

Virginia House of Delegates, represented the Purchaser Defendants in connection with those

purchases.  *Id.* ¶¶ 33-36.[2]

### A.  The Statutory Framework

Individuals who have structured settlement annuities sometimes wish to receive some or

all of their funds before they are due to be disbursed.  *See* ECF No. 260-2.  Companies like the

Purchaser Defendants will purchase future annuity payments from annuitants in exchange for a

lump sum at a discounted rate.

Such sales are subject to numerous legal requirements.  In 2002, Congress enacted 26

U.S.C. § 5891, which levies a 40 percent tax on companies purchasing rights unless the company

submits a court application and a state court where the annuitant ("seller") is domiciled issues a

"qualified order" approving the transaction before it is consummated.  26 U.S.C. § 5891(a)-(b).

A "qualified order" must contain judicial findings that the transaction: (1) does not violate

applicable law or administrative authority; and (2) is in the best interests of the seller, "taking

into account the welfare and support of [the seller's] dependents."  *Id.* § 5891(b)(2)(A).

Virginia law also requires judicial approval for the transfer of SSA payment streams.  To

obtain a qualified order, the purchasing company is required to file an application for approval in

any Virginia court.  Va. Code § 59.1-477(A).  The SSA purchaser must make certain disclosures

---

[1] Default Judgment was entered as to Defendant Seneca One Finance, Inc., another purchaser defendant, in June 2020.  *See* 17-4114, ECF No. 202.

[2] There are also several "Nominal Defendants" listed in the suit who are currently making payments on annuities that are the subject of this case.

to the SSA seller, and the buyer must file a notice with the Virginia court that includes the transfer agreement and required disclosures. *Id.* § 59.1-477(B). The court must then hold a hearing on the application. *Id.* § 59.1-477. The Virginia Act does not require sellers to attend the hearing on the buyer's application. *Id.* Then, in order to authorize a sale, courts are required to make express findings that:

1.  The transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;

2.  The payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived in writing the opportunity to seek and receive such advice; and

3.  The transfer does not contravene any applicable statute or the order of any court or other governmental authority.

Va. Code § 59.1-476 (the "Virginia Act"). Under the Act, "[i]ndependent professional advice means advice of an attorney, certified public accountant, actuary or other licensed professional adviser." *Id.* § 59.1-475.

The key aspects of the statutory structure for the alleged scheme here are the requirement that the court find that the transfer is in the beneficiary's best interest and that the payee has been advised to seek independent professional advice and either received such advice or knowingly waived such advice in writing.

### B.  The Alleged Scheme

The above legal requirements, according to Dockery, were designed to protect SSA beneficiaries from being induced to sell SSA streams on terms on which no rational, well-informed or well-advised person would sell. They were also allegedly designed to protect SSA beneficiaries from being induced to sell on terms that would never by approved of by any court

that engaged in any meaningful review of the transaction or in any proceeding in which the beneficiary was represented by counsel.  SAC ¶¶ 12, 68-69.

Dockery alleges that the Purchaser Defendants and Heretick, along with others, developed and executed the "Heretick scheme" to profit from the breach of these state laws and from the exploitation of the sellers that is possible when these state law protections are defeated. *Id.* ¶ 69.  Those "other individuals" include "individuals purporting to be [sellers'] lawyers [who] signed letters stating that they had provided [sellers] with independent advice, which were submitted with petitions relating to the [sellers'] transactions.  *Id.* ¶ 156.

The "crucial fact" at the center of the alleged scheme was the defeat of the legal requirements underpinning Section 59.1-476(2) of the Virginia Act.  SSA sales in Virginia cannot go forward unless the Court conducts a hearing and finds that "[t]he payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived in writing the opportunity to seek and receive such advice."  Va. Code. § 59.1-476(2).

Dockery claims that it was Defendants' policy to defeat this requirement and that they did so by lying to the Portsmouth court each time they submitted a Petition to approve an SSA sale through Defendant Heretick.  Heretick allegedly filed all such petitions in the Portsmouth, Virginia Circuit Court ("the Portsmouth court").  SAC ¶ 98.  He did so because he had allegedly been granted permission by that Court to submit petitions in batches, and he therefore knew that his petitions would not be carefully scrutinized for misrepresentations, errors, and defaults.  *Id.* The operative alleged misrepresentations are as follows.

Dockery takes issue with a representation in Petitions sent to the Portsmouth court in which Heretick represented that "the transferor/payee has been advised in writing by the

transferee to seek independent professional advice regarding the transfer and has received such advice reflected in the letter of his legal counsel which is attached hereto." *See, e.g.,* ECF No. 264-28.  The letter referenced was an Estoppel Letter, described below, which was included in the paperwork sent to the Court.  He claims that this representation was untrue every time Heretick made it, that Heretick and Wentworth knew it was untrue, and that the Portsmouth court materially relied on this representation in its review of the submitted petitions.[3]

**Advised in Writing**.  Dockery claims that the representation that "the transferor/payee has been advised in writing by the transferee to seek independent professional advice" is false because Wentworth (and 321 Henderson) affirmatively *required* individuals to consult a lawyer. SAC ¶ 114.  Until 2009, as part of the approval process, Wentworth required all purchasers to hire an attorney and obtain an "estoppel letter" from the attorney representing them before Wentworth would proceed with the transaction.  *See* ECF No. 260-3 at 134.

Mr. Kelly, Wentworth's 30(b)(6) witness, testified that the letters were an evidentiary tool that Wentworth used to demonstrate to courts that the transaction complied with the independent professional advice requirement of the state law by showing that the customer had met with an attorney about the transaction.  ECF No. 260-1 at 4.  After Wentworth received the Estoppel Letter and executed transaction documents, Wentworth's counsel, Mr. Heretick, would provide the Estoppel Letter, executed transaction documents, and other required materials to the Portsmouth Court.  *See, e.g.,* ECF No. 261-11, 261-12, 262, 262-1, 262-2.  After 2009, Wentworth stopped requiring sellers to hire Estoppel Lawyers.  ECF No. 260-3 at 135.

---

[3] Dockery's original complaint alleged that the Judges of the Portsmouth Circuit Court – whom he termed "Complicit Judges" – were also part of the RICO enterprise.  *See* ECF No. 1 at 12. But in order to keep his case in the Eastern District of Pennsylvania, Dockery pivoted theories and alleged that the Judges were the victims of the fraudulent scheme instead of complicit in the execution of the scheme.

**Received Independent Advice.**  The representation that the transferee has received independent professional advice is also allegedly false because the structure the Purchaser Defendants created ensured that no advice by Estoppel Lawyers could possibly be independent. That structure included the following.

***Estoppel Letters.***  In every instance, the petition would include an "Estoppel Letter," addressed to the Purchaser Defendants, signed by the "Estoppel Lawyer" who purportedly advised the seller.  Dockery asserts that the purpose of these letters was to protect Defendants from sellers attempting to undo their transactions.  Yet the Estoppel Letter and this purpose were not specifically mentioned in one of Dockery's purchase agreements.  *See* Kelly Dep. at 162:7-8. But Wentworth's standard Purchase Agreement did include a provision noting that "You must retain the services of an attorney and deliver an opinion of your attorney about the sale of assigned assets to us in a form acceptable to us."  ECF No. 289-1 at 64.

Dockery also claims that Wentworth directed what Estoppel Lawyers were saying to the Portsmouth court by controlling what was included in the Estoppel Letter.  Wentworth would tell Estoppel Lawyers what features of their representation they should discuss in the letter or would provide samples if an Estoppel Lawyer was unsure what needed to be included.  ECF No. 261-3 at 158; *see also* 289-1 at 63.  In one Estoppel Letter for one of Dockery's transactions, the document contained blanks that the Estoppel Lawyer could fill in.  ECF No. 246-20.  In his deposition, another Estoppel Lawyer testified that he told his clients the transaction's terms were disadvantageous, but that he did not include his view in his Estoppel Letter because "this is an opinion letter that they wanted, so I gave it back to them."  ECF No. 246-34 at 53.

Dockery also takes issue with the fact that the Estoppel Letters did not indicate that the lawyer provided advice on whether the transaction is actually in his client's best interest. As an example, an Estoppel Letter in Dockery's file stated:

> This office has acted as legal counsel to the Seller . . . with respect to a transaction more fully described in a Purchase Agreement . . . This estoppel letter is being delivered at the Purchaser's request pursuant to the Purchase Agreement and is being relied upon by the Purchaser in entering into the within transaction . . . The undersigned and his firm have acted as independent legal counsel to the Seller in the above-referenced transaction and has provided legal, accounting and tax advice . . . The undersigned has made himself available to the Seller to explain the terms of the transaction contemplated in the Purchase Agreement and . . . is satisfied that the Seller understands the nature and terms of such transaction.

ECF No. 261-5 at 20.

Another of Dockery's Estoppel Letters stated:

> This is to advise that I have consulted with the above-named client concerning the sale of structured funds to J.G. Wentworth.  I have provided the client with legal, tax, and financial advice regarding the same.  Due to the attorney/client privilege, I cannot disclose the conversation we had concerning this matter, except to say that it concerned this transaction. After the consultation, the client advised me to proceed with this transaction.

ECF No. 260-32.

***Contingency Fees*.**  Dockery claims that Estoppel Lawyers were paid an amount agreed to by the Estoppel Lawyers and the Purchaser Defendants on a contingency basis, and that Estoppel Lawyers were paid out of the proceeds of the sale by Wentworth only after transactions were approved.

Mr. Kelly testified that Wentworth had no preference for how attorneys collected their fees, ECF No. 60-1 at ¶ 20, but testified that Wentworth maintained records reflecting its payment of fees to estoppel lawyers, ECF No. 246-6 at 178-79.  Estoppel Lawyers would sometimes invoice Wentworth seeking a check payable to the Estoppel Lawyer from the seller's funds, ECF No. 246-3, and other times the Purchase Agreement would include a provision where

7

the client's attorney could select that his fee would be disbursed from his client's funds.  ECF No. 261-6 at 35.

Every Estoppel Lawyer to have been deposed denied being paid on a contingency basis, ECF No. 246-34 at 28, ECF No. 246-35 at 44.  However, both also noted that they had worked on transactions that were not consummated, and that they did not receive payment in those instances.  *Id.*; *Id.*  Another attorney noted that if Dockery had not gone through with the transaction, he would have charged Dockery something "[o]r he would have brought me a bag of apples. You never know."  ECF No. 246-16 at 73-74.

*Referrals.*  In choosing an Estoppel Lawyer, some sellers would use an attorney they already knew.  *See* ECF No. 260-13 (noting that Dockery's first Estoppel Lawyer was an attorney who had previously represented him in a different matter).  Others would find and hire attorneys on their own.  *See* ECF No. 260-14 (noting that Dockery's second Estoppel Lawyer was from Dockery's town and was retained by Dockery).

Dockery alleges that in many of the transactions involving Estoppel Lawyers, the Estoppel Lawyer was chosen by the Purchaser Defendants.  Dockery contends that four "Frequent Flyer" Estoppel Lawyers provided 440, 228, 18, and 104 Estoppel Letters, respectively.  *See* ECF No. 246-5.  As evidence of the alleged referral scheme, Dockery points to testimony from one "Frequent Flyer" lawyer who explained that, at one point, Wentworth "had gotten legal advice that they could no longer . . . refer people to me."  ECF No. 246-35 at 43.  Notes from a customer service representative demonstrate that Wentworth "told [a seller] to call Bob Haley," one of the Frequent Flyers.  ECF No. 246-23.  And another Frequent Flyer testified that at least one or two of the sellers, if not more, would call him and ask if he were interested in representing them, but that the purchasing company would also call and ask if he was interested

in representing a seller.  ECF No. 246-34 at 17.  Dockery notes that one of his "Frequent Flyer" lawyers, who served as an Estoppel Lawyer more than 235 times, lived 350 miles from Dockery.  *See* ECF No. 246-25 (customer service notes showing that Dockery "found" Hassell); ECF No. 256-25 at 79.  Dockery also cites a memo produced in discovery that was sent to a seller, advising that "[a]t your request, we have provided you with the names of attorneys who have represented clients in prior transactions similar to the one in which you intend to enter . . . You are free to seek an attorney of your own choosing."  ECF No. 246-26 at 2.

Wentworth's Rule 30(b)(6) witness testified that there was no formal referral process for attorneys, ECF No. 260-1, but that Wentworth would suggest contacting a bar association or referral service, offer to introduce customers to previous customers, or at times refer an attorney if the customer had no one else to represent them.  ECF No. 260-3 at 146.  He also explained that Wentworth did not train its employees on the "very narrow point" of directing customers back to the tort lawyers who represented them in the proceeding that gave them a structured settlement annuity in the first place.  ECF No. 289-1 at 48.

***Seller's Affidavits.***  Every package sent to the Portsmouth court allegedly included an affidavit signed by the seller stating that it is "my belief, and my representation to the Court, that this transfer lies in my best interest, together with that of my family."  *See, e.g.,* ECF No. 263-8.  Dockery alleges that Heretick would send the affidavits directly to purportedly represented sellers to execute, although he sometimes also sent them to the Estoppel Lawyer.

## C.  Scheme in Action

According to Dockery, the above structure–which Defendants lied about to the Portsmouth court–ensured that the Estoppel Lawyers and the "advice" they purported to provide were controlled by Defendants.  Pl.'s Br. at 10.  For example, one of Dockery's Estoppel

Lawyers told Dockery the transaction was a "shitty deal," but he did not include that view in his Estoppel Letter. ECF No. 246-16 at 71. Frequent Flyer Estoppel Lawyer Mr. Hassell testified that he "never checked" whether his clients could obtain better terms from another purchaser because "[t]he fact that they were in my office, they were there to sell to Wentworth." ECF No. 246-35 at 35. He did, however "want[] to do whatever he could for [his clients], including calling Wentworth in many cases to try to improve the deal, realizing, frankly . . . after the first two or three times, [that] they weren't going to do it, but if the client asked me to try to, I would." *Id.* at 69. Mr. Hassell was asked whether the fact that he would more likely be able to collect legal fees if the deal went through than if it did not compromised his independence in any way. ECF No. 246-35 at 60. He responded, saying that "I guess psychologically you could say yes, but . . . my view of the whole thing was that I was representing these people, and they wanted to go through with it, reluctantly, but they wanted to go through with it . . . [so] it never seemed to become an issue." ECF No. 246-35 at 60. He also testified that he did not think he discussed the option of bankruptcy with his clients because, in all probability, "they were there, they had an opportunity for a source of funding . . . And the issue was whether they should deal with the source or try to get money from some other source, not so much bankruptcy." *Id.* at 82.

**D. Heretick's Involvement**

Dockery alleges that the following evidence demonstrates that Heretick knew that the sellers did not have real lawyers. First, Heretick's letter to Mr. Dockery instructed him to sign the affidavit, informed him that he could retain counsel to appear at the hearing, and explained that Mr. Heretick could answer any questions Dockery may have. Heretick also acknowledged that he participated in drafting some of the affidavits signed by sellers. *See* ECF No. 121, Heretick's Answer to the Complaint at ¶ 141. The Estoppel Letters, which Heretick submitted to

the Portsmouth court, did not state that the Estoppel Lawyer opined on the question of whether a transaction was in the client's best interest. *See supra.* The Purchaser Defendants also, through Heretick, sought to seal court records as a "common practice" so that their "competitors either can't find or would have a harder time finding our court filings" because "they may try to reach out to our customer and ultimately secure the customer's business." ECF No. 246-6 at 275. Dockery also cites various inconsistencies in petitions Heretick submitted to the Portsmouth court.

### E. Experts

Both parties retained liability and damages experts in support of their respective positions.

**Liability.** Plaintiff retained Thomas Baker, Measey Professor of Insurance Law at the University of Pennsylvania Law School and Reporter for the American Law Institute's Restatement of the Law, Liability Insurance, to offer an expert opinion on how the Defendants' alleged scheme affected the independence of the Estoppel Lawyers. ECF No. 246-12. In his opinion, an attorney representing the seller of SSA payments has a duty to be independent of any other party interested in that transaction and has a duty to provide his client with his informed opinion as to whether the terms of the transaction, including the discount rate to be applied, are in the client's best interest. *Id.* at 3. He also has a duty to explain how to comparison shop, assist in that endeavor, and review the results of the comparison shopping with the client. ECF No. 246-12 at 16. Moreover, an attorney representing the seller in such a transaction necessarily also represents the seller in the legal proceeding in which the Court will determine whether the transaction is in the seller's best interest. *Id.* In his view, an attorney who believes that a transaction is not in his client's best interest must withdraw from representation. *Id.* at 17. In

such a situation, he must also attempt to dissuade his client from signing an affidavit stating the transaction is in his best interest and, if the seller persists in signing such an affidavit, the lawyer must advise the Court that the lawyer believes the testimony is untrue and that the transaction is not in the seller's best interest.  *Id.* at 18.

He concludes that an attorney is *not* independent when the following conditions exist: (1) when the attorney is selected by the purchaser; (2) when the attorney is paid on a contingent basis by the purchaser; (3) when an attorney follows directions on drafting an Estoppel Letter; and (4) when an attorney knowingly allows the client to testify to the court that the transaction is in his or her best interest unless the attorney has a good faith basis for believing the statement is true.  *Id.*  If a lawyer cannot prevent a seller from signing such an affidavit, then the lawyer must inform the Virginia court that he believes the testimony is untrue and that, in the lawyer's opinion, the transaction is not in the client's best interest.  *Id.* at 18.

Defense Expert, Leslie Haley, Esq., opined on the conduct of Wentworth, Heretick, and the Estoppel Lawyers.  In her view, Wentworth and Heretick did not interfere with the independence of the lawyers consulted by Dockery or other sellers, Virginia law did not require Wentworth or Heretick to inquire into or assess the performance of a seller's lawyer, Estoppel Letters did not create a lack of independence, and Defendants could properly rely on the representations in the Estoppel Letters that attorneys were independent, among other views. ECF No. 264-20.  She also opines that rendering candid advice, however, does not include interfering with a client's pursuit of his or her objective.  *See id.* at 4 ¶¶ 26-28.

**Damages.**  Plaintiff's damages expert, Mr. Scherf, explains how damages in this matter could be calculated for the class.  *See* ECF No. 246-29.  Mr. Scherf proposes a rate that he concludes recipients would have received with independent advice, which is the prime rate plus

6 percent.  He derives this amount from the rate that Allstate charged during the class period because some of the annuitants had Allstate annuities.  Second, he examined the cost of capital to the Purchaser Defendants, which ranged between 6.9 percent and 4.6 percent during the class period, plus a reasonable cost of business operations and a profit margin.  He also examined the North Carolina SSA statute, which imposes a threshold discount rate that transactions cannot exceed, and used that threshold as part of his calculation.

Defendants retained Earl Nesbitt, lawyer and former Executive Director and General Counsel of National Association of Settlement Purchasers, as their damages expert.  Nesbitt opines that Dockery's damages expert's rate is flawed because the prime rate does not impact the calculation of purchase price offers.  ECF No. 264-18 at 14.  Rather, determining the discount rate can only be done on a transaction-by-transaction, payee-by-payee basis.  *Id.*

### F.   Named Plaintiff's Transactions

In 2002, Dockery was approached by an individual seeking to broker a transaction between him and Wentworth.  ECF No. 261-9 at 46.  Dockery and Wentworth then preliminarily agreed that Dockery would sell a $35,000 payment due to him on August 17, 2004, and a payment of $40,000 due on August 17, 2009, for the price of $36,298, payable to him in 2002. ECF No. 261-12.  Dockery hired James Shull, an attorney who previously performed legal work for Dockery and his family on multiple occasions, as his lawyer to represent him in the transaction.  ECF No. 261-9 at 592.  Mr. Shull testified that Dockery "wanted assistance in correctly completing certain documents he had with him."  ECF No. 260-13.  Mr. Shull's practice was "to go over with a client the documents that they were going to execute," and that he would not have let a client "go forward with executing legal documents without . . . being satisfied that the clients understood the nature and terms of the legal documents."  *Id.*  Dockery

13

testified that he sold his right to his SSA payments because he and his family needed the money and he had no alternative source of funds.

Mr. Shull provided an Estoppel Letter to Wentworth.  ECF No. 261-12 at 17-18.  The letter confirmed that "[t]his office has acted as legal counsel to the Seller" with respect to the SSA transaction" and that "[t]his estoppel letter is being delivered at [Wentworth's] request pursuant to the Purchase Agreement and is being relied upon by [Wentworth] in entering into the within transaction."  ECF No. 261-12 at 17.  It further confirms that Mr. Shull has "acted as independent legal counsel to the seller . . . and has provided legal, accounting and tax advice."  *Id.*  Finally, it confirmed that Mr. Shull "has made himself available to the Seller to explain the terms of the transaction" and "is satisfied that the Seller understands the nature and terms of [his] transaction."  *Id.*

After all the paperwork was filed with the Circuit Court for the City of Portsmouth, a Judge held a hearing and approved the transaction in a written order, finding that the Virginia Act had been complied with and that the "transfer is in the best interests of the Payee/Transferor, taking into account the welfare and support of the Payee's/Transferor's dependents."  ECF No. 26.  Dockery did not attend the hearing.  ECF No. 264-6 at 253 ("[The Purchaser Defendants] didn't say not to, but they said I didn't have to be there and I never did go.").

Between 2002 and 2009, Dockery entered into seven more transactions with the Purchaser Defendants.  ECF No. 261-12; ECF No. 262, 262-1, 262-2.  He explained that he received quotes from different companies for some of his transactions, but chose Wentworth because Wentworth provided the best rates.  ECF No. 261-9 at 560-62.

 Dockery also alleges that he "never retained, and never received any advice, from any" of his Estoppel Lawyers.  The representations made by them to the contrary are false, and were

known by them to be false when made." SAC ¶ 123.  In his first deposition, Dockery testified

that he never used Mr. Shull as his lawyer for anything, ECF No. 264-8 at 8, although he

admitted in his second deposition that Mr. Shull had represented him in a separate matter well

before his transactions with Wentworth, ECF No. 264-8 at 33.  Dockery also testified that he

does not know, and has never met, lawyers who wrote Estoppel Letters for him.  ECF No. 261-9

at 82-83.  This includes Mr. Haley, ECF No. 261-9 at 82-83, although Dockery admitted in his

second deposition that Haley had come to his house to notarize paperwork regarding his sale to

Wentworth, ECF No. 261-9 at 639-41.  Dockery also testified that he does not know who Mr.

Rhoton is and that Mr. Rhoton had nothing to do with his sale of SSA payment rights, ECF No.

26108 at 80-81.  Yet, Mr. Rhoton testified that he met with Dockery and went over the

transaction materials with him.  ECF No. 260-16 at 21.  Similarly, Dockery repeatedly testified

that he did not remember meeting a notary whose signatures appeared on his documents, and that

she did not notarize his transaction documents. *See, e.g.,* ECF No. 261-8 at 108, 112, 145, 171-

72, 212, 215, 280, 440.  But he later testified that he selected Ms. Myers to notarize his signature,

ECF No. 21-9 at 638, and that he knows her, *id.* at 501.

 In his deposition, Dockery admitted to longstanding issues with his memory.  *See* ECF

No. 264-8 at p. 34-35.  He also admitted that it was "very possible" that "[his] answers that [he]

didn't have contact with lawyers about [his] transactions to sell [his] structured settlement

annuity payments may not be correct."  *Id.* at 35.

 After 2009, Dockery entered into transactions with Seneca One (2010) and Symetra

(2011), in which he waived his right to independent professional advice.  ECF No. 263, 263-37,

263-38.  Through these various transactions, Dockery eventually sold all of his remaining

payment streams.  Dockery testified that he sold his SSA payments because he and his family really needed the money.  ECF No. 264-2 at 260.

### III.    PROCEDURAL HISTORY

Dockery filed this putative class action in September 2017, asserting 10 separate counts on behalf of himself and other beneficiaries who sold their annuities to the Purchaser Defendants for less than their present value.  After a first round of motion to dismiss briefing and the filing of a RICO Case Statement, Judge Baylson, then the presiding Judge over this matter, granted the plaintiff leave to file an Amended Complaint.  The Amended Complaint included a count alleging a RICO violation by Purchaser Defendants Seneca and Wentworth as well as attorney Heretick; three counts (counts II through IV) alleging a RICO violation against Heretick; an unjust enrichment claim; request for a constructive trust; and a breach of fiduciary duty claim. Dockery also filed a Revised RICO case statement.

In response to the Court's order to amend Count I, the plaintiff filed a Second Amended Complaint in March 2019 (SAC).  The SAC specifies that Count I is pleaded against "all defendants" and clarifies that Plaintiff is alleging three different "association-in-fact enterprises" (the "Annuity Fraud Enterprises") between Heretick, each of the three Purchaser Defendants, and "additional persons, including but not limited to those persons identified as persons who falsely represented themselves to have provided independent advice to the sellers of SSA payments, and others who performed other services, including without limitation notarization services." SAC ¶ 184.

The Court granted in part and denied in part defendants' motion to dismiss in a memorandum and order in May 2019.  Specifically, the Court dismissed the unjust enrichment claim, breach of fiduciary duty claim, and claim seeking a constructive trust.  Therefore, the

remaining counts and the basis for seeking class certification are the RICO and conspiracy to violate RICO claims.  Dockery then filed his first Motion for Class Certification under seal in March 2020, and deadlines were periodically stayed to continue discovery.  ECF No. 197.

The case was transferred to the undersigned in June 2020 after Judge Baylson recused himself from the case.  ECF Nos. 200, 201.  In December 2020, Dockery requested leave to file an Amended Motion for Class Certification, which the Court granted.  The motion has now been fully briefed and argued.

## IV.    JURISDICTION AND LEGAL FRAMEWORK

Plaintiff alleges four claims on behalf of himself and others similarly situated.  The first three allege violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) pursuant to 18 U.S.C. § 1962(c), and the fourth states a claim for conspiracy to violate RICO pursuant to § 1962(d).  SAC ¶¶ 183-213.  The Court has jurisdiction to adjudicate these claims under 28 U.S.C. § 1331.

A violation of section 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010).  A plaintiff must also satisfy RICO's standing provision, which requires a plaintiff to be "injured in his business or property by reason of a [RICO] violation."  18 U.S.C. § 1964(c).  To satisfy this requirement, a RICO plaintiff must prove an injury to his or her business or property that constitutes a "concrete financial loss" and that the defendant's RICO violations proximately caused his or her injury.  *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000).

For purposes of RICO, an "enterprise" can include legal entities and/or "association-in-fact" enterprises.  *See, e.g., United States v. Turkette*, 452 U.S. 576, 581 (1981).  The latter type of enterprise must have at least three features: "a purpose, relationships among those associated

17

with the enterprise, and longevity sufficient to permit these associations to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  Such an enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associations function as a continuing unit." *Turkette*, 452 U.S. at 581.

A RICO plaintiff must also prove that defendants engaged in a pattern of "racketeering activity," i.e., "predicate acts." *See* 18 U.S.C. § 1961.  Predicate acts include federal mail fraud, which Dockery alleges here. *See* 18 U.S.C. § 1961(1) (referencing 18 U.S.C. §§ 1341 & 1343); *see also In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 408 n.26 (3d Cir. 2015).  The elements of mail fraud are (1) a scheme to defraud; (2) the use of the mails to further that scheme; and (3) fraudulent intent. *See United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002).  A "scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004).

The SAC alleges multiple enterprises engaged in the predicate act of mail fraud.  Count I is based on three separate association-in-fact enterprises (referred to as "Annuity Fraud Enterprises") consisting of Heretick, a Purchaser Defendant, and "persons who falsely represented themselves to have provided independent advice to the sellers of SSA payments, and others who performed other services, including without limitation notarization services."  SAC at ¶ 183-194.  Counts II through IV allege three separate enterprises consisting of the Purchaser Defendant (Defendant 321 Henderson, Defendant Wentworth, and former Defendant Seneca). *Id.* at ¶¶ 195-211.  In the conspiracy count of the SAC, plaintiff alleges a conspiracy consisting of Heretick, the Purchaser Defendants, and the additional persons who allegedly joined together

to ensure the approval of SSA transfer petitions on favorable terms for the purchasers and in ways that would evade judicial detection.

## V.     DISCUSSION

Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of individual named parties." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982).  To be eligible for this exception, a putative class action must meet the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3).  *See* Fed. R. Civ. P. 23(a)-(b); *see also Marcus v. BMW of N. Am.*, *LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  To satisfy the requirements of Rule 23(a), there must be numerosity, commonality, typicality, and adequacy. *Id.* at 590-91 (internal citations omitted).  And because this putative class action seeks damages, Rule 23(b)(3)'s requirements that "common questions of law or fact predominate" (predominance) and that "the class action is the superior method of adjudication" (superiority) must also be met.  *BMW of North Am.*, 687 F.3d at 591 (internal citations omitted).  Finally, "an essential prerequisite" of a Rule 23(b)(3) class action is that "the class must be currently and readily ascertainable based on objective criteria."  *Id.* at 592-93 (collecting cases).

These requirements are "not mere pleading rules"; rather, the plaintiff "bears the burden of establishing each element of Rule 23 by a preponderance of the evidence."  *Id.* at 591 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 316 (3d Cir. 2009)).  In determining whether a plaintiff has satisfied the Rule 23 requirements, the Court must conduct a "rigorous analysis of the evidence and arguments presented."  *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 190-91 (3d Cir. 2020) (citations omitted).

This rigorous analysis involves three aspects.  *Id.* at 191.  First, the Court is required to "find that the requirements of Rule 23 are met and any factual determinations supporting Rule 23

findings must be made by a preponderance of the evidence." *Id.* (internal citations and punctuation omitted). "Second, the [C]ourt must resolve all factual and legal disputes relevant to class certification, even if they overlap with the merits." *Id.* (internal citations omitted). Third, the Court is required to "consider all relevant evidence and arguments, including expert testimony, whether offered by a party seeking class certification or by a party opposing it." *Id.* (citations and quotation marks omitted).

The Court also keeps in mind that in practicality, the decision of whether to certify a class is typically a "game-changer"–"often the whole ballgame"–for plaintiffs and their counsel, and may "create unwarranted pressure to settle nonmeritorious claims on the part of the defendants." *BMW of N. Am.*, 687 F.3d 591 n.2 (internal citations omitted). "Accordingly, the potential for unwarranted settlement pressure is a factor [courts] weigh in [their] certification calculus." *Hydrogen Peroxide*, 552 F.3d at 310 (citation omitted).

### A.    PROPOSED CLASS

Plaintiff seeks to certify a class consisting of all persons who:

    a.  Were beneficiaries of one or more SSAs;

    b.  Were parties to a proceeding in which Defendant Heretick represented JG Wentworth or 321 Henderson, Inc., sought judicial approval of a sale, by the beneficiary to one or the other of these two Defendants, of the beneficiary's right to a stream of payments from one or more SSAs, where

        i.  The proceeding was filed and adjudicated in the Portsmouth, Virginia Circuit Court;

        ii.  In which Defendant Heretick filed representations to the court that the beneficiary had received independent advice when the basis for this representation was the fact that an Estoppel Letter had been issued by an Estoppel Lawyer relating to the transaction at issue in that proceeding; and

        iii.  The petition for the sale was approved.

Pl.'s Amended Mot. For Class Cert., ECF No. 246-1 (Pl.'s Br.") at 43.

Dockery also seeks to certify a subclass (which he calls the "Frequent Flyer" subclass), consisting of those class members who had Estoppel Letters in their file from any of the Estoppel Lawyers Robert Haley, Thomas Hassell, Geoffrey Hemphill, or Jad Sarsour, "with respect to each of whom it is clear that the 'client' made no independent choice to be represented by these attorneys, but instead Defendants chose the lawyers." *Id.*

While Dockery defined his proposed class and subclass (hereinafter called Class and Frequent Flyer Subclass, or together as Proposed Classes) as the above, he stated in the introduction to his brief that "[a]ll such lawyers [in the Class and Frequent Flyer Subclass] were paid on a contingent basis, because all Estoppel Lawyers were paid out of the proceeds of the transactions about whose merit they were supposed to be providing independent advice." Pl.'s Br. at 3.  Dockery's reply brief appeared to officially make the contingency arrangement allegation part of the class definition.  *See* ECF No. 274 at 11 ("[O]ur class is defined to include *only* lawyers who were paid on a contingent basis out of the proceeds of the transaction.  If (contrary to all the evidence in the record from either side) there actually were a lawyer who was engaged by a seller and whose compensation was received by the lawyer directly from the seller alone, before or even after the transaction, that transaction would not be part of the case.") (emphasis in original).  At oral argument, the Purchaser Defendants argued that plaintiff's counsel "changed their class [in their reply brief] to say that the class will be defined by those estoppel lawyers that were on a contingent fee," Transcript of Oral Argument, ECF No. 280 at 37, and Dockery's counsel did not contest this characterization.

Later at oral argument, Dockery's counsel also noted that the "appropriate" thing to do would be to narrow the class to those who received a discount rate of greater than prime plus 6 percent, the floor articulated by Plaintiff's damages expert.  Tr. of Oral Argument at 32.

## B.     RULE 23 REQUIREMENTS

### 1.   Preliminary Inquiries

Courts have recognized two essential prerequisites to Rule 23(b)(3).  First, an order certifying a class action must include "(1) a readily discernible, clear, and precise statement of the parameters defining the class… and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis."  *Marcus*, 687 F.3d at 591.  Second, the class must be ascertainable, meaning it is "currently and readily ascertainable based on objective criteria."  *Id.* at 592-93.  The ascertainability inquiry is two-fold, "requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).  A class action is inappropriate if it is not possible to identify class members "without extensive and individualized fact-finding or 'mini-trials.'"  *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 396 (3d Cir. 2015).  A plaintiff must show by the preponderance of the evidence that this requirement is met.  *Id.*

Dockery and the Purchaser Defendants do not raise any specific arguments about class definition or ascertainability in their briefs.  Heretick argues that the class and subclass are overbroad (and thus not properly defined) because they include individuals who were not harmed and are not ascertainable because members may be barred by the statute of limitations.  As mentioned, the Purchaser Defendants' counsel contended at oral argument that defining the

Proposed Classes to include only those sellers with estoppel lawyers who were paid out of the proceeds of the transaction raises separate ascertainability concerns.

Upon review of the record and arguments, the Court concludes that the Proposed Classes as Dockery has defined them are not currently and readily ascertainable.[4]  Because the Proposed Classes include only those whose Estoppel Lawyers were paid on a contingent basis out of the proceeds of the sale, extensive and individualized fact finding will be necessary to determine which class members fit this criteria, if any.

Dockery discusses the evidence on contingent fees in the context of the predominance element of the Rule 23(b)(3) analysis; however, the same evidence is relevant to ascertaining the class.  Dockery points to (1) a sample from a spreadsheet produced by Wentworth in discovery that shows payments made to estoppel lawyers, ECF No. 246-15, (2) Wentworth's 30(b)(6) witness's testimony that "Wentworth maintain[s] records reflecting its payment of fees to estoppel lawyers," ECF No. 246-6 at 178-79, and (3) an invoice sent by an Estoppel Lawyer to Wentworth requesting a check payable to the Estoppel Lawyer from Dockery's funds, ECF No. 246-3.  Dockery claims that this evidence shows, as a matter of Defendants' policy, that no payments were made to these Estoppel Lawyers until the transaction on which the lawyer had worked had been court-approved and funded.

The Purchaser Defendants claim that they had no preference how attorneys collected their fees.  ECF No. 60-1 ¶ 20.  It cites a provision in one of the sellers' purchase agreements saying "Funds are being disbursed to my client directly.  In order to be paid in full for my services,

---

[4] Heretick's argument that the Proposed Classes fail the definition requirement was premised on the argument that Mr. Scherf acknowledged that some class members had no harm under his damages methodology.  Because Dockery's narrowing of the class definition to exclude those who received discount rates above Mr. Scherf's floor renders that argument moot, the Court does not consider it here.

please disburse $ ___ to me directly from my client's purchase price upon funding." *See* ECF No. 261-16 at 35.

The parties point to the following testimony from Estoppel Lawyers, as well. First, every Estoppel Lawyer who was asked denied being paid on a contingent basis. *See* ECF No. 246-34, Hemphill Dep. at 28 ("I can't remember any time in my entire practice where I've ever done a contingent fee."); ECF No. 246-35, Hassell Dep., at 44 ("[Y]ou didn't have an arrangement with your clients where you were only going to get paid if they went through with the transaction, correct?" . . . No. They owed me for my time, period.").

Dockery notes that these attorneys also acknowledged that they had worked on transactions that were not consummated, and that in such instances they received no payment. *See* 246-34, Hemphill Dep. at 28 ("I have represented a number of clients that were not of means, that things didn't go well that I didn't bill them. . . [S]ometimes it just doesn't work and they don't pay my b[i]ll."), ECF No. 246-35, Hassell Dep. at 43 (Q: "What about for the individual who walked away from the transaction?" . . . A: "Well, the sad thing is, I think the guy was broke. I don't think I ever got paid."). Plaintiff also directs the Court's attention to Estoppel Lawyer Rhoton's testimony, who testified as follows after being asked if, "upon receiving legal advice from you, Mr. Dockery had decided not to go through with this transaction, [whether] you [would] have waived your fee":

> Not completely. At that time I had a $50 consultation fee, so I may have charged him something for my time. I would not have probably charged him what I would initially have charged him to complete the whole deal. But to compensate myself for a portion of my time, I probably would have charged him something. Or he would have brought me a bag of apples. You never know.

ECF No. 246-16, Rhoton Dep. at 73-74.

24

The parties also point to their expert reports and expert testimony relating to the contingency issue.  Plaintiff's expert Professor Baker based his expert opinion upon the factual assumption that the "lawyers agreed with Defendants that their compensation would be sent to them by the Defendants after court approval of the sale at issue.  This effectively made the payments contingent, and also meant that as a practical matter counsel were paid by the Defendants, and not by their ostensible clients."  ECF No. 246-12, Baker Report at 10.

Defendants' expert, attorney Leslie Haley–whose expertise and factual basis for her opinion Dockery disputes–stated in her report that "Payment of legal fees from legal proceeds was not a contingent fee."  ECF No. 260-21, Haley Report at 10.  In her deposition, she agreed that a matter "may be what you look at as a contingent matter" if "the lawyer knows as a practical matter there is no way I'm going to get paid unless this transaction closes."  ECF No. 274-2 at 107-08.  She later stated that: "[W]e have nothing that evidences the fact that the lawyer wasn't just willing to say there may be a case or two of these where the client really is not able to pay my fee at the end of the day . . . I mean, I guess that still would be someone contingent on the outcome, but the lawyer is willing to [] take that risk."  *Id.*  And when asked whether that situation "is contingent" or not, she agreed it was contingent.  *Id.*

Dockery discusses contingency fees slightly differently through his briefs.  He claims that payments were contingent because "as a matter of reality, the lawyers would only get paid if the transaction . . . was approved by the court and consummated."  Reply Br. at 21.  He suggests that a payment is contingent by the pure fact that an attorney's payment came from the proceeds of the sale.  *See* Reply Br. at 11 (stating that the definition includes only lawyers who were paid on a contingent basis out of the proceeds, and that a lawyer whose compensation was received from the seller through some other means is not part of the Proposed Classes).  But Dockery also

argues that a lawyer's *agreement* to be paid after consummation of a transaction is an agreement to accept a contingency fee.  Pl.'s Br. at 22.  He also endorses Ms. Haley's suggestion that a payment would be contingent if a lawyer knows as a practical matter that he will not be paid unless the transaction closes, or is willing to take the risk of their client not being able to pay the fee at the end of the day.  Reply Br. at 7-8.

Because Dockery endorsed those other definitions, the Court assumes that Dockery intended them to be part of his class definition, as well.  Setting aside the question of whether such an arrangement constitutes a contingency fee under the law, the Court looks to "contingency fees" as Dockery has defined them and to whether Class Members meeting such a definition are readily ascertainable, and concludes that they are not.  The class-wide evidence that Dockery references is insufficient to show by a preponderance of the evidence that members of the Proposed Classes can be ascertained without determining on a case-by-case basis whose transactions involved Estoppel Lawyers who were paid on a "contingent basis" out of the proceeds of the transaction as Dockery has defined contingency.

There is no class-wide evidence sufficient to prove that the Purchaser Defendants *agreed* with the Estoppel Lawyers that their compensation would be sent to them by the Purchaser Defendants after court approval of the sale at issue.  In order for the fee structure to purportedly affect the Estoppel Lawyers' representation of their clients, that "agreement" must have been made before or during the representation, rather than after.  The fact that Wentworth kept a list of payments to Estoppel Lawyers and that at least one Estoppel Lawyer invoiced Wentworth for payment from his client's funds does not show by the preponderance of the evidence that such an agreement existed with each lawyer.  And while paperwork in one cited purchase agreement in the record shows that Wentworth's preprinted purchase agreement gave the option of having

payment remitted from the client's account, suggesting the possibility of an agreement, that one contract provision is insufficient to show an agreement existed with every client's lawyer.

Moreover, there is no class-wide evidence to prove that each Estoppel Lawyer knew as a practical matter that he or she would not be paid unless the transaction closed. Dockery repeatedly takes the position that it was the Purchaser Defendants who paid the Estoppel Lawyers, but he has put forward no evidence of a case in which the attorney's fees were paid out of the Purchaser Defendants' proceeds. Rather, each payment was taken out of the seller's portion of the proceeds, as Dockery concedes. *See* Pl.'s Br. at 41 ("[E]ach class member had the lawyer's fee deducted from the amount received in the transaction."). While attorneys obviously could not collect their fees from their client's share of the proceeds of a sale if that sale did not occur, this fact does not necessarily mean that attorneys could not have collected their fees from their clients in some other manner or knew that they could not do so. Therefore, the Court would need to conduct individualized and extensive fact-finding to determine whether each Estoppel Lawyer knew before representing their client that they would have no other means of collecting their fees from him or her if the transaction were not approved. This inquiry would involve understanding any discussions between the Estoppel Lawyer and client at the beginning of the lawyer's representation regarding fee arrangements as well as the lawyer's understanding of the client's ability to pay.

Dockery points out that there are no instances in the record of an Estoppel Lawyer receiving payment for a transaction that was not consummated. That may be true, but the burden is Dockery's to show that Estoppel Lawyers knew they would not be paid without the transaction occurring. As explained, this cannot be done with common proof.

Apart from the contingency fee issue, Heretick argues that the class is not ascertainable because the Proposed Classes are not limited to individuals whose claims are not barred by the statute of limitations.  He cites district court cases finding that "a class may only include those members whose claims are not barred by the applicable statute of limitations."  *Lanning v. SEPTA*, 176 F.R.D. 132, 148 (E.D. Pa. 1997) (excluding putative class members from the class under the Court's numerosity analysis); *see also Jackson v. SEPTA*, 260 F.R.D. 168, 183 (E.D. Pa. 2009) (finding a class action overbroad when it included putative class members who were barred by the statute of limitations).

The Court is not persuaded.  Those cases are distinguishable because they involve putative class members both clearly within the statute of limitations and members who are time-barred, while the putative members of the Proposed Classes here all have statute-of-limitations issues, as will be explained below.  Further, those cases involved Rule 23 prerequisites and elements other than the ascertainability of the class.  And finally, the Third Circuit has discussed potentially time-barred putative class members under other elements of Rule 23 without finding the classes were not readily ascertainable.  *See, e.g., Cmty. Bank of N. Va.*, 795 F.3d at 396; *see also In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) (discussing whether statute of limitations issues predominate in a class involving a class period mostly outside of the statute of limitations).

Nonetheless, the Court agrees that the contingency fee issue renders the Proposed Classes not readily ascertainable.  But the Court also "recognizes its ability to tailor the class definition to make it workable."  *Jackson v. SEPTA*, 260 F.R.D. 168, 183 (E.D. Pa. 2009); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) ("[H]olding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-

and-take inherent in class action litigation, particularly in the formation of a workable class definition.").

Therefore, the Court could remove the "on a contingency basis" provision of the definition of the Proposed Classes. This change would make the relevant aspect of the definition include those class members whose Estoppel Lawyers were paid out of the proceeds of the transaction without respect to whether such payments were contingent. This aspect of the definition is readily ascertainable from the database of payments Wentworth maintains. And because the Proposed Classes are ascertainable in all other respects, such a definitional change would allow the Proposed Classes to satisfy the prerequisites to Rule 23. Because the "contingent basis" aspect of Dockery's proposed class definition is not necessarily the death knell for the Proposed Classes, then, the Court will address the Rule 23 factors on the assumption that the definition is so narrowed.

### 2. Rule 23(b)(3) Requirements

Because Dockery seeks certification under Rule 23(b)(3), he must show by the preponderance of the evidence that "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### a. Predominance

The predominance requirement of Rule 23(b)(3) dictates that "questions of law or fact common to class members [must] predominate over any questions affecting only individual class members." Fed. R. Civ. P. 23(b)(3). This standard is "far more demanding" than commonality, and "require[s] more than a common claim." *Hydrogen Peroxide*, 552 F.3d at 311. In assessing

predominance, the Court must "examine each element of a legal claim through the prism of Rule 23(b)(3)." *BMW of N. Am.*, 687 F.3d at 600.

The plaintiff must show by the preponderance of the evidence that the elements of its legal claim are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 552 F.3d at 311. Predominance "does not require that common questions will be answered, on the merits, in favor of the class." *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 371 (3d Cir. 2015). Rather, the "predominance requirement focuses on whether essential elements of the class's claims *can* be proven at trial with common, as opposed to individualized evidence." *Hayes*, 725 F.3d at 359. "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Hydrogen Peroxide*, 552 F.3d at 311 (quotation marks omitted). However, Rule 23(b)(3) "does not require the absence of all variations in a defendant's conduct or the elimination of all individual circumstances." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 489 (3d Cir. 2015). If "issues common to the class *overwhelm* individual issues, predominance should be satisfied." *Neale*, 794 F.3d at 371 (citation omitted) (emphasis added).

Dockery notes that RICO cases are routinely certified as class actions. Pl.'s Br. at 36 (collecting cases). As the Third Circuit has explained, when a party seeks certify a class to bring a RICO claim, the "focus is on the defendant's conduct." *Reyes*, 802 F.3d at 486. "Due to the conspiratorial nature of allegations . . . in RICO actions, such cases often present common questions of law and fact and are frequently certified as class actions." *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 106 (D.N.J. 2012).

Dockery argues that common issues predominate over individual issues.  When a case challenges systemic operations, and when it attacks policies that are applied to all class members, such systems and policies necessarily mean that common questions predominate.  *See, e.g., Reardon v. ClosetMaid Corp.*, 2013 U.S. Dist LEXIS 169821 at *2 (W.D. Pa. Dec. 2, 2013).  And as the Third Circuit has noted, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud . . . [or in cases] involving a common scheme to defraud."  *In re Prudential Ins. Co.*, 148 F.3d 283, 314 (3d Cir. 1998).  Against this background, Dockery asserts that common issues predominate because the evidence shows that the corporate policies at issue applied across the board and to the transactions for each member of the Proposed Classes.

The predominance inquiry requires the Court to consider whether essential elements of Dockery's RICO claims and conspiracy claim can be proven at trial with common evidence.  "When Rule 23 is the mechanism to redress alleged RICO violations, predominance and commonality are satisfied if *each element* of the alleged RICO violation involves common questions of law and fact capable of proof by evidence common to the class."  *Reyes v. Neteposit*, 802 F.3d at 489 (emphasis in original).

To reiterate, the elements of the RICO violations alleged here require (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *See In re Ins. Brokerage*, 618 F.3d at 362.  The "racketeering" alleged is federal mail fraud, which requires (1) a scheme to defraud, (2) the use of the mails to further that scheme, and (3) fraudulent intent.  *See United States v. Pharis,* 298 F.3d at 234.  And to bring a civil RICO claim, a plaintiff must have suffered an injury to his business or property that constitutes a "concrete financial loss," and the Defendants' RICO violations must have proximately caused that loss.  *Maio v. Aetna, Inc.,* 221 F.3d at 483.  So, to satisfy the predominance requirement, Dockery must show by the

preponderance of the evidence that questions capable of common proof predominate under each of the above elements.  As will be explained, Dockery has not met this burden.

### i.   Racketeering Activity

A major issue at this stage is whether the alleged predicate act of mail fraud is capable of common proof.  As the basis for his mail fraud claim, Dockery cites the representation that Heretick made on behalf of the Purchaser Defendants in the petitions to the Portsmouth court.  In Dockery's case, these representations took the form of the following statement by Heretick in his papers petitioning the Portsmouth court to approve the transactions:

> [1] That the transferor/payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and [2] has received such advice reflected in the letter of his legal counsel which is attached hereto.

ECF No. 264-28.

The RICO scheme alleged here relies on a determination that either, or both, of these statements is a misrepresentation.  *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) (explaining that a scheme or artifice to defraud under the mail fraud statute "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension").  With the caution that the Court should only delve into the merits of the case to the extent necessary to determine whether Rule 23 is met, *see, e.g., In re Hydrogen Peroxide*, 553 F.3d at 320-22, in mind, the Court turns to the two alleged misrepresentations to determine whether Dockery can establish with common proof that there was a misrepresentation for purposes of proving the predicate act of mail fraud.

### aa.  First Representation: Advising

Dockery claims that the representation "[t]hat the transferor/payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer" is false

in every instance.  Therefore, Dockery claims, the issue of Defendants' racketeering activity and pattern thereof are capable of common proof.  The proof required to determine whether this statement was a misrepresentation is as follows: (1) the statement itself made by Heretick in the petitions to the Portsmouth court; and (2) relevant statements and disclosures in the Purchase Agreement paperwork between the Purchaser Defendants and the annuity sellers.

Based on the evidence in the record of petitions sent to the Portsmouth court on Dockery's behalf, Heretick's representation was identical in each instance.  *See, e.g.,* ECF No. 262-29 at 2-3; ECF No. 262-30 at 2.  Similarly, the statements made to Dockery in his transactions with J.G. Wentworth are consistent across transactions.  *See e.g.,* ECF No. 262-28; ECF No. 262-29; ECF No. 262-30.  While the statements made to Dockery in his transactions with purchasers other than Wentworth are slightly different, *see* ECF No. 25, the difference between these statements are immaterial for purposes of whether Heretick's characterization of the statements made to annuity sellers was false.  So, the statement is either false for all or false for none, and the falsity is capable of common proof.  *See Dalton v. Lee Publications, Inc.*, 270 F.R.D. 555, 563 (S.D. Ca. 2010) (finding that plaintiff's claim is subject to common proof based on uniform contracts).

However, Dockery cannot premise his mail fraud claim on this statement because the representation "that the transferor/payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer" was not false.  Dockery premises his argument on the Virginia Act, which requires the court to find that the "payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived in writing the opportunity to seek and receive such advice."  Va. Code § 59.1-476(2).  "Independent professional advice" under the Act

is defined to mean "advice of an attorney, certified public accountant, actuary or other licensed professional advisor." *Id.* § 59.1-475.

According to Dockery, this section means that sellers must have been told that they should receive the advice of either a lawyer, an accountant, a financial advisor, or another licensed professional, and that the Purchaser Defendants must have given sellers the opportunity to waive such advice. Dockery argues that, because sellers were not *advised* to seek independent advice from any of a lawyer, accountant, financial advisor, or other licensed professional, but were rather *required* to consult a lawyer and could not waive the right to do so, Defendants stripped sellers of the rights to another type of advisor and the right to waive advice. And Dockery further argues that Heretick's representation stated that Defendants did what he alleges Defendants did not do: make the statutorily required representations. These arguments miss the mark.

While the statute defines "independent professional advice" to "mean[] advice of an attorney, certified public accountant, actuary or other licensed professional advisor," nothing in the statute requires a seller to be explicitly advised of the opportunity to consult each or any of those four types of professionals. As long as an individual is advised to consult one of those types of professionals, the individual has been advised to seek "independent professional advice" within the meaning of the statute. *See generally* 1A N. Singer, *Sutherland on Statutes and Statutory Construction*, § 21.14 (4th ed. 1980) (noting that "[w]here a failure to comply with any [statutory] requirement imposes liability, the disjunctive 'or' should be used").

Nor does the fact that Wentworth required sellers to meet with a lawyer render the representation that sellers were advised to seek independent professional advice a lie. As a general matter, *advising* someone to seek advice is not mutually exclusive with *requiring*

someone to seek such advice in order to proceed with a transaction.  Moreover, the disclosures in

Dockery's purchase agreements demonstrate that Heretick's representation was not false.  In the

acknowledgment section of one of his Purchase Agreements, Dockery acknowledged that

Wentworth "*advised* you must obtain independent legal representation prior to executing this

agreement."  ECF No. 264-33 (emphasis added).  And in the disclosure statement, Wentworth

noted that "You should consult your own counsel, accountant, or financial advisor regarding any

federal or state income tax consequences arising from the proposed transfer," and that "[Y]ou are

strongly urged to consult with an attorney who can advise you of the potential tax consequences

of this transaction."  *Id*.

These disclosures and acknowledgements demonstrate that the Purchaser Defendants

advised sellers to seek independent professional advice.  The fact that Wentworth did not allow

sellers to waive their right to advice does not negate that the advice to seek counsel was given.

Nor did Heretick falsely state that the Purchaser Defendants gave the sellers the option to waive

their right to advice.[5]  Therefore, this representation was not a lie and, therefore, the predicate act

of mail fraud is not capable of common proof via this representation.

### bb. Second Representation: "Received Such [Independent Professional] Advice"

Because Dockery cannot establish that a misrepresentation was made through common

proof via the first representation, he is left with attempting to demonstrate that sellers did not

---

[5] In none of the petitions to the Portsmouth court in the record involving a transaction with
Wentworth did Heretick represent that a seller had "received independent professional advice or
knowingly waived in writing the opportunity to seek and receive such advice."  In any event, the
statute's waiver language does not create a right to waive advice that must be respected by any
purchaser, but rather creates a floor that purchasers are not prohibited from exceeding.
Plaintiff's counsel appeared to concede as much at oral argument.  *See* ECF No. 280 at 25 ("If
they had said to the court, we require this, we have not told people that they have the right to
waive, then I wouldn't have this claim.").

receive "independent professional advice" and that the Purchaser Defendants and Heretick knew that Heretick's representation that "independent professional advice" was given was false.

Dockery argues that he can show that the Estoppel Lawyers were per se not "independent" because of the system Defendants constructed that affected every Estoppel Lawyer in the same way. In his view, every Estoppel Lawyer was not independent because he or she suffered from a conflict of interest by being paid on a contingent basis, because the Purchaser Defendants controlled what the Estoppel Lawyers told the Portsmouth court via the Estoppel Letters, because Estoppel Lawyers let their clients affirm to the Portsmouth court that the transaction was in their best interest, and because the lawyers in the subclass had clients referred to them by the Purchaser Defendants. *See* Reply Br. at 7. But he claims that the Court need not decide at this stage whether this structure rendered lawyers per se not independent; all the Court must do is determine whether the structure is capable of common proof.

Dockery's theory of the case depends on a number of premises. First, Dockery assumes that "independent professional advice" means advice given by a lawyer in compliance with applicable rules of professional conduct. Specifically, he assumes that when Heretick told the Portsmouth court that sellers received "independent professional advice," he was telling the Court that the Estoppel Lawyer in question did not suffer from any conflicts of interest as articulated by the Virginia Rules. Those rules state in relevant part that a conflict of interest exists if "there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a third person or by a personal interest of the lawyer." Va. R. Prof'l Conduct 1.7(a)(2); *see also* Reply Br. at 25. So, Dockery's theory of mail fraud relies on the idea that the structure the Purchaser Defendants imposed created a significant risk of material limitation to the Estoppel Lawyers' representation, and that such risk (and

36

therefore conflict of interest and therefore lack of independence) exists regardless of the advice given.

Inherent in that premise are two other premises.  First, that the conflict of interest asserted above is not waivable.  Because if the alleged conflicts of interest were waivable, individual inquiries into whether the conflict was disclosed and waived must be made.  Second and relatedly, Dockery assumes that complying with Virginia Rule 1.7 is something that can be assessed objectively based on common risks.  For if a lawyer's subjective belief that his representation was limited is relevant to determining whether he has violated Rule 1.7, then a lack of "independence" could not be established by common proof.

Defendants argue that independence or lack thereof cannot be proven on a class-wide basis.  First, they attack the premise that Dockery can prove per-se non-independence with common proof by arguing that the elements of the scheme cannot be proven on a class-wide basis.  The Purchaser Defendants also argue that the attorneys had ethical obligations to ensure the statements they made in their Estoppel Letters were accurate.  Therefore, this Court must evaluate whether each of these Estoppel Lawyers violated his or her ethical obligations by knowingly including false statements in their Estoppel Letters that the lawyers had acted as independent counsel, and whether the Defendants nonetheless had the right to rely on the statements in those letters.  Purchaser Defendants' Br. at 37-39.  Heretick also argues that whether the Estoppel Lawyers were independent turns on individualized inquiries, including the nature and extent of advice provided.  Heretick Br. at 43-45.

As a preliminary matter, Dockery has not pointed to any legal authority demonstrating that the phrase "independent professional advice" has a coextensive meaning with "advice given by a lawyer suffering from no conflicts of interest as defined by the Virginia Rules of

37

Professional Conduct."[6]  Nor has the Court found any.  Indeed, the Virginia Act defines "independent professional advice" to mean "advice of an attorney, certified public accountant, actuary or other licensed professional advisor" without mention of the adviser's compliance with his ethical responsibilities.  Va. Code § 59.1-475.

Nonetheless, the Court does not find it necessary to resolve for purposes of class certification the merits issue of whether Heretick's statement about "independent professional advice" reflects the lawyers' compliance with their ethical responsibilities.   Because Dockery's mail fraud claim is premised on the theory that Heretick was representing Estoppel Lawyers to not have a conflict of interest, the Court will consider the proof required to evaluate that theory and leave for summary judgment whether that theory succeeds under the law.

Dockery's theory that a "significant risk that the representation of [a seller] will be materially limited by the [Estoppel Lawyer's] responsibilities to . . . [the Purchaser Defendants] or by a personal interest of the lawyer," Va. R. Prof'l Conduct 1.7(a)(2), is premised on the alleged structural taint of each lawyer.  Again, that alleged taint is that the lawyers were paid by contingency fee out of the proceeds of the transaction; that the Purchaser Defendants told the Estoppel Lawyers what to put in their Estoppel Letters and therefore directed what the Estoppel Letters said to the Portsmouth court on behalf of their client; that the Estoppel Lawyers never disclosed their function as an estoppel against their client to their client; that Estoppel Lawyers

---

[6]The *Sioteco* case both parties cite involved the California Structured Settlement Transfer Act. *See 321 Henderson Receivables Origination LLC v. Sioteco*, 93 Cal.Rptr.3d 321 (Cal. Ct. App. May 6, 2009).  That Act has different requirements, including specific proscriptions against advice from individuals whose compensation is affected by the occurrence of the sale or who were referred by the purchaser.  Cal. Ins. Code § 10134, subd. (f).  Notably, the Virginia Act does not include these caveats.  In any event, *Sioteco* does not discuss rules of professional responsibility in its discussion of the independent professional advice requirement.

allowed their client to sign an affidavit representing that the transaction was in the client's best interest; and that every seller in the Frequent Flyer subclass had an attorney who was referred to them by the Purchaser Defendants and who received frequent referrals from them. However, even if the existence of this structural taint could prove that the lawyers per se had conflicts of interest and were therefore not independent, Dockery has not met his burden to show by the preponderance of the evidence that this the structure exists in the same way for each lawyer.

First, one of the components of the alleged scheme is that the Estoppel Lawyers were paid on a contingent basis. Dockery argues that the issue at this stage is not whether there was a contingency fee arrangement, but whether the presence or absence of a contingency fee arrangement is a class-wide question.

The Court concludes that Dockery has not met his burden to show that the presence or absence of a contingency fee arrangement is capable of common proof. Dockery claims in part that a fee is contingent if a lawyer is paid out of the proceeds of the transaction, knows in practicality that she would only be paid if the transaction is approved, and agrees with the Purchaser Defendants that she would be paid out of the proceeds of the sale. Even assuming such an arrangement could be a contingency fee arrangement under the law, Dockery's purported proof that the payments were contingent is that nothing in the record shows a lawyer being paid when a transaction did not go through. But whether a lawyer *knew* that he would only be paid if the transaction were approved cannot be proven on a class-wide basis; rather, as explained, it would depend on what that individual lawyer knew and agreed upon with his client. Dockery has also not established by the preponderance of the evidence his assumption that Estoppel Lawyers agreed with Defendants that their compensation would be sent to them by Defendants after court approval of the sale. *See supra.*

Second, Dockery's expert opined that an attorney representing the seller of SSA payments is not independent if he knowingly allows his client to testify to the Virginia court that the transaction is in the client's best interest unless the attorney has a good faith basis for believing that the statement is true.  *See* ECF No. 246-12 at 3.  However, "best interest" does not necessarily mean "receive the best deal possible," and whether the transaction was in the seller's best interest is an individualized determination.  The Virginia Act does not preclude courts from approving a sale that does not meet a certain threshold discount rate.  Rather, it requires courts to determine that an SSA-rights transfer "is in the best interest of the [seller], taking into account the welfare and support of the [seller's] dependents."  Va. Code § 59.1-476.  The second clause makes clear that the "best interests" determination is not limited to whether the discount rate is fair or comparable to other rates that may be available.  Rather, it requires the consideration of, at minimum, the long-term ramifications on a seller's dependents of giving up a payment stream over the course of many years in exchange for discounted present cash and, at maximum, the totality of the circumstances of the transaction.  *Compare* Va. Code § 59.1-476 (requiring a sale to be in the best interest of a seller taking into account their dependents) *with* N.C.G.S. § 1-543.12 (setting a discount rate threshold that must be met to approve an SSA sale in North Carolina).  An annuity seller's representation that his annuity payment stream is in his "best interest" similarly involves factors other than whether a more favorable rate for selling his annuity stream exists.  Therefore, determining whether Estoppel Lawyers allowed affiants to represent something that is not true can only be done on a case-by-case basis.

Third, Dockery's expert opined that an attorney representing a seller is not independent if the attorney "[i]s selected for the client by the purchaser or if material facts regarding the relationship between the purchaser and the attorney are known to the attorney but not disclosed

to the seller/client." ECF No. 246-12 at 2. But whether a Frequent Flyer was actually selected by a Purchaser Defendant for a seller in the subclass, as opposed to acquired in some other way, cannot be determined on a class-wide basis. Wentworth's 30(b)(6) designee testified that if a seller needed help finding an attorney, Wentworth would suggest contacting a bar association or referral service, offer to introduce customers to previous customers, or at times refer an attorney if the customer had no one else to represent them. ECF No. 260-3 at 146. While two of the four Frequent Flyers testified that they received referrals from Wentworth, *see* ECF No. 246-35 at 43; *id.* 246-34 at 17, Wentworth admitted to referring attorneys, and the four Frequent Flyers represented hundreds of sellers between them, individual inquiries would still need to be made regarding whether each seller in fact received their Frequent Flyer attorney via referral versus from another seller or another means.

To the extent that Dockery argues whether a particular seller received his or her Frequent Flyer lawyer by referral is irrelevant because the Frequent Flyers, by virtue of receiving so many referrals, had a conflict of interest in every instance, there are still individual inquiries that need to be made. Namely, whether there are "material facts regarding the relationship between the purchaser and the attorney" that are "known to the attorney but not disclosed to the seller," as Dockery's expert assumed, could only be determined on a case-by-case basis because the conflict would depend on whether the material facts were disclosed. Moreover, Professor Baker admitted that, to analyze whether this criterion is met, "you would have to know what the attorney knew about the relationship." ECF No. 264-14 at 348.

Finally, another issue facing Dockery's conflict-of-interest "independence" theory is whether the alleged conflicts of interest faced by the Estoppel Lawyers are waivable. The parties dispute this, although Dockery provides no support for his argument that the conflicts are not

waivable–a necessity for rendering his "independence" theory capable of common proof.  The

Court concludes that the waiver issue also requires an individualized inquiry.  Virginia Rule

1.7(b) allows lawyers to represent clients notwithstanding a conflict of interest if, in part, the

lawyer "reasonably believes that the lawyer will be able to provide competent and diligent

representation to each affected client."  Va. R. Prof'l Conduct 1.7(b).  This test "necessarily

includes an objective component."  *Simms v. Deggeller Attractions, Inc.*, Nos. 7:12-00038, 7:12-

00161, 2013 WL 49756 (W.D. Va. Jan. 2, 2013) (discussing Va. R. Prof'l Conduct 1.7(b); *see*

*also First Prof'ls Ins. Co. v. Sutton,* 607 F. App'x 276, 283 (4th Cir. 2015) (explaining that the

comparable Rule 1.7 of the South Carolina ethical rules is measured under an objective test)

(citations omitted).[7]  The comments to Rule 1.7 explain that a client may consent to

representation notwithstanding a conflict unless "a disinterested lawyer would conclude that the

client should not agree to the representation under the circumstances."  Va. R. Prof'l Conduct

1.7, cmt. 19.

Because Dockery has not shown by the preponderance of the evidence that the

"circumstances," as explained above, are uniform across the class, it is not possible to determine

on a class-wide basis that a disinterested lawyer would conclude that representation was

impossible under the circumstances.  Moreover, Dockery's expert suggests that at least two

elements of the alleged scheme are waivable.  Professor Baker notes that contingency fee

agreements are allowed in Virginia as long as they are in writing, and he asserts that a lawyer in

this context must explain the potential conflict and obtain consent–suggesting that the purported

conflict is waivable.  *See* ECF No. 246-12 at 13.  Professor Baker also assumes that in no case

---

[7] Therefore, contrary to the Purchaser Defendants' argument, the issue is not merely a subjective
one based on what the Estoppel Lawyer himself believed.

was a client of a Frequent Flyer attorney told of the compromised independence–also suggesting that any such purported conflict would be waivable.  In short, the conflicts issue requires individualized determinations.  If the conflict is waivable, then individual issues regarding whether the waiver was secured will arise.  And Dockery cannot demonstrate by common proof that conflicts are not waivable for the Estoppel Lawyers of the members of the Proposed Classes.

Because Dockery cannot prove that his Estoppel Lawyers were in violation of the Virginia Rules of Professional Conduct with common proof, his theory of mail fraud will involve a number of individual issues that will prevent class certification.

### ii.  Association-in-Fact Enterprise

To succeed with class certification, Dockery also needs to demonstrate that the enterprise element of his RICO claim is capable of common proof.  *See Reyes v. Neteposit*, 802 F.3d at 489. Count I of Dockery's claim includes three association-in-fact enterprises.  Each of these enterprises consist of Heretick, one of the Purchaser Defendants, and "other persons," notably including the Estoppel Lawyers.  Judge Baylson previously determined that Dockery plausibly alleged the existence of association-in-fact enterprises.  ECF No. 108.  But the question at this stage is whether the enterprise element of Dockery's first RICO count can be proven on a class-wide basis.

Association-in-fact enterprises "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 366 (3d Cir. 2010).  In short, an association-in-fact enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).  Such an enterprise "is proved by evidence of an ongoing

organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 945; *see also id.* at 946 ("The concept of association requires both interpersonal relationships and a common interest.") (citations omitted) (cleaned up). The "existence of an enterprise is an element distinct from the pattern of racketeering activity, and proof of one does not necessarily establish the other." *Id.* at 947. However, "proof of a pattern of racketeering may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id.*

Dockery alleges that the scheme at issue here was "designed *not* to advance the legitimate legal interests of [Heretick's] clients, the Purchaser Defendants, but instead solely and entirely to defeat the . . . regulatory scheme, and to enable sales of the income streams from [sellers] on terms that . . . would never be accepted by a beneficiary of an SSA if the beneficiary had been advised by a well-informed and objective advisor; and . . . would never be approved after meaningful judicial review." SAC ¶ 12. His Revised RICO Case Statement asserted that "each [association-in-fact] enterprise had a common purpose, to obtain the valuable income streams of Mr. Dockery and the other SSA beneficiary victims of the scheme at prices that were grossly below the market value of those income streams." ECF No. 77 at 24.

To satisfy predominance, Dockery must demonstrate that the Purchaser Defendants, Heretick, and Estoppel Lawyers were "associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946. The Purchaser Defendants argue that the enterprise element requires *agreement* between the various persons constituting the association-in-fact, but have pointed to no case law demonstrating that something beyond a shared common purpose is required to satisfy that aspect of the element. Nonetheless, the Court finds that Dockery cannot demonstrate with common proof that the Estoppel Lawyers shared the common

purpose of ensuring class members received a below-market rate.  Rev. RICO Case Statement, ECF No. 77 at 24.

Violating Rule 1.7 of the Virginia Rules of Professional Conduct does not necessarily mean that an Estoppel Lawyer acted with the purpose of ensuring his or her client received a below-market rate for his or her SSA annuity.  As explained, Rule 1.7 is violated if a lawyer has a "significant risk" of "material representation," and the lawyer has not received a waiver or does not "reasonably believe[] that the lawyer will be able to provide competent and diligent representation."  Va. R. Prof'l Conduct 1.7(b).  Having a significant risk of a limitation and failing to receive a waiver for that conflict does not mean a lawyer intended to exploit his client.

Therefore, proving whether an Estoppel Lawyer shared that purpose requires individual inquiries.  For example, record evidence from certain Estoppel Lawyers suggests that they likely did not share the purpose of ensuring their clients sold their annuities at below-market rates.  *See* ECF No. 246-34 at 26 ("Did you feel as though you were acting as independent counsel to your clients in representing them?" "Yes.").  For example, one lawyer testified that he would attempt to negotiate better terms with Wentworth if his client desired him to do so–an action at odds with the purported purpose of the enterprise.  ECF No. 246-34 at 22.  And another testified that he told Dockery that if he could wait six or seven months, then he could get the whole amount without selling to Wentworth.  ECF No. 261-1 at 21.  Moreover, while Dockery has suggested narrowing the Proposed Classes' definition to include only those who did not receive a market rate as defined by Dockery's expert, the truth of the "common purpose" allegedly shared by Estoppel Lawyers is called into question by the fact that clients of many Estoppel Lawyers– including the "Frequent Flyers" –received purportedly market-value discount rates under Mr. Scherf's methodology.  *See* ECF No. 260-1.  Thus, to determine whether any Estoppel Lawyer

acted with the purpose of ensuring their client sold their annuities at below-market values, there would at minimum need to be individual inquiries into each Estoppel Lawyer's relationship with the Purchaser Defendants and what the Estoppel Lawyer understood that relationship to be, whether the lawyer understood that he or she had a conflict of interest that had not been waived or could not be waived and, most importantly, the advice that they gave their client.

To the extent that Dockery attempts to manufacture common failures of the attorneys' advice to show that these Estoppel Lawyers shared the common purpose of ensuring their clients received below-market rates, those alleged failures do not carry the day.  For example, Professor Baker opines that an attorney giving independent professional advice to a seller with respect to an SSA sale necessarily also represents the seller in the Virginia court proceeding.  ECF No. 246-3.  He also opines that such a lawyer–if he believes the terms of the sale are not in the best interest of his client–has an obligation to counteract his client's affidavit stating the transaction is in his best interest by informing the Court of his subjective belief to the contrary.  *Id.* at 18.

But the Virginia Act does not require that the seller's independent advisor believes the transaction to be in the seller's best interest–only the Court must so find.  And as explained, the 'best interest' determination is broader than the financial terms of the sale, so Estoppel Lawyers allowing their clients to sign affidavits stating that the transaction is in their best interest does not necessarily mean that the lawyer violated their duty of candor.  In short, because the Virginia Act is not a guardian-ad-litem statute, the Act does not require that an individual's advisor sabotage the transaction if the advisee does not take his advice; in fact, the Virginia Rules of Professional Conduct prohibit such actions.  *See* Va. R. Prof'l Conduct 1.2(a) ("A lawyer shall abide by a client's decisions concerning the objectives of representation.").  Nor does the Virginia Act require sellers' independent advisors–whether they are attorneys, accountants, or financial

planners–to appear at the hearing on the sale.  The fact that an Estoppel Lawyer did neither of these things does not mean that the lawyer's purpose was to ensure their client sold their annuities at below-market value.  Whether that purpose exists, then, can only be determined by individual inquiries.[8]

To prove his RICO claims, Dockery must show that the enterprise-in-fact has a common purpose.  *See Boyle*, 556 U.S. at 946 (explaining that the concept of "association" "requires both interpersonal relationships and a common interest"); *see also Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp.2d 64, 77 (E.D.N.Y. 2011) ("[T]he purpose or purposes of the enterprise must be common to all its members.").  Because of the individual inquiries required to prove the enterprise element of Dockery's first RICO claim, individual issues will predominate.

### ii.  Injury

Another element of establishing RICO liability is that the plaintiff must have suffered an injury to his property or business by reason of a RICO violation.  *In re Ins. Brokerage*, 579 F.3d at 269-70; 18 U.S.C. § 1964(c).  RICO injury requires "proof of a concrete financial loss, and not mere injury to a valuable intangible property interest."  *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 638 (3d Cir. 2015) (citations omitted).  To establish liability, Dockery must also show that the RICO violation was the but for and proximate cause of the tangible injury suffered by the members of the proposed class.  *Reyes*, 802 F.3d at 483 (citation omitted).  The proximate cause requirement dictates that there must be "some direct relation

---

[8] Even if the alleged common purpose of the enterprise were to merely accomplish the sale, rather than to ensure the client received a below-market rate deal–which is not the theory in Dockery's Revised RICO case statement–class certification would still not be appropriate. Whether the Estoppel Lawyers shared that common purpose, rather than sought to accomplish their client's goals for the transaction or sought to provide them fair, unbiased advice regarding the transaction independent of the result of that advice, is not capable of common proof for the same reasons.

between the injury asserted and the injurious conduct alleged." *Id.* (citing *id.*).  To demonstrate

that relation, the "manipulation alleged must not be purely contingent on another event or

action." *St Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 300 (3d Cir.

2020). (citation omitted).  This requirement "is employed in civil RICO as a limiting principle

intended to stymie a flood of litigation, reserving recovery for those who have been directly

affected by a defendant's wrongdoing." *Id.*

      To satisfy predominance, the *fact* of damages must be susceptible to common proof, even

if the exact amount of damages cannot be proven on a class-wide basis.  *Reyes,* 802 F.3d at 489.

Predominance has been satisfied in RICO cases when establishing an injury is not as conducive

to common proof as long as plaintiffs "have presented a plausible theory for proving a class-wide

injury as a result of the racketeering activities of the alleged enterprises at issue." *Id.*  (citations

omitted) (cleaned up).  However, the injury requirement may require individual proof in some

cases.  *See In re Ins. Brokerage*, 579 F.3d at 269-70.

      Dockery argues that the class members were financially injured in two respects.  First, the

Purchaser Defendants were able to charge a much higher discount rate than they would have

been able to charge if sellers had received independent advice.  *See* ECF No. 280 at 26.  Second,

sellers were forced to hire and pay attorney's fees for the "pleasure" of receiving an estoppel

letter.  ECF No. 246-1 at 33.  And Dockery asserts that both injuries were proximately caused by

Defendants' racketeering activity.

      ***Higher Discount Rate.***  For the putative class's first mode of injury, Dockery offers an

expert, Stephen Scherf, who created a methodology by which class-wide damages could

allegedly be determined.  He opined that damages should be measured as the difference between

the amount the seller received when he sold his SSA payments and the amount he would have

received had the Virginia Act been properly followed, *i.e.,* if the seller had received independent professional advice. Scherf calculated that amount–the "appropriate market discount rate"–as the prime rate plus six percent. ECF No. 246-37 at 6. He calculated this amount based on different sources, including the rate AllState (an insurer with whom some class members had annuities) charged to repurchase payment streams from its annuitants, the cost of capital to Wentworth plus a reasonable cost of business operations and a profit margin, and the discount rate mandated by the North Carolina SSA law. ECF No. 246-37.

Defendants argue that members of the class have suffered no injury under Scherf's methodology because well over 100 sellers in the Proposed Classes as originally defined received more money than they would have using Scherf's "appropriate market rate." *See* ECF No. 260-1. They also note that Scherf admitted in his deposition that a number of members of the class would not have been injured under his methodology. *Id.* at ex. 41. Therefore, in Defendants' view, Dockery has not provided common proof that supports the proposition that every member of the proposed classes has suffered RICO injury.

While Dockery suggested he would narrow the class to include only those who received a rate worse than Dockery's expert's floor, this narrowing of the Proposed Classes does not fix the RICO standing issue. Dockery has repeatedly represented to the Court that the actual advice or lack thereof given by estoppel lawyers is irrelevant to his claim. *See* Tr. of Oral Argument at 23. Again, Dockery's position is that counsel were per se not independent advisors because the Defendants' scheme gave them conflicts of interest; therefore, the representations to the Portsmouth court were false no matter how the lawyers advised their clients, and the Defendants therefore committed mail fraud each time they submitted a petition with Heretick's allegedly false statement during the class period. And because the Portsmouth court allegedly relied on

49

Heretick's statement to approve the transactions, class members were injured by having their below-market-rate transactions approved through Defendants' fraud.  But even under that theory of racketeering activity, for the reasons that follow, individual inquiries will be required to determine whether receiving a discount rate worse than the prime rate + 6 percent was proximately caused by Defendants' RICO violation.

While Dockery's theory of mail fraud may not depend on how a lawyer advised his client, his theory of financial injury assumes that, because of the presence of a conflict of interest, each Estoppel Lawyer did not provide the advice that an independent lawyer would have.  For example, Dockery's damages expert assumed for purposes of his analysis that estoppel lawyers did not try to negotiate better deals for their clients or tell their clients that they should shop their deal or look for other funding alternatives.  ECF No. 264-22 at 253.

But whether an Estoppel Lawyer did not provide the advice that a lawyer who did not have any conflicts of interest would have simply cannot be known without inquiring into the conversations between estoppel lawyers and their clients.  The record at this point already shows that advice deviated lawyer-to-lawyer.  *Compare* ECF No. 246-35 at 69-70 ("I wanted to do what I could for them, including calling Wentworth in many cases to try to improve the deal," and "my procedure . . . included a thorough discussion about how to get money other than do this") *with* ECF No. 246-34 at 62 ("[W]hen these came to me, all the negotiations had already taken place with the company" and "I don't recall speaking about alternatives.").  Nor, as explained *supra*, does the alleged common deficiencies in the lawyers' representations–allowing sellers to sign affidavits, not appearing at the court proceeding, and not sabotaging their client's objectives–render the deficiency of advice capable of common proof.  Therefore, whether receiving a high discount rate was proximately caused by the RICO violation depends on

whether the defendants' scheme in fact impacted the advice given, rather than merely created a risk of doing so.

Additionally, the wishes of each seller are relevant to whether the alleged RICO violation proximately caused the rate sellers received.  As explained, the best interest determination under the Virginia Act involves more than a seller getting the best discount rate possible for his annuity.  *See* Va. Code § 59.1-476.  An annuity seller's goals for his transaction similarly can be more complex than receiving the best deal possible.  If advice to shop one's deal or to negotiate with the Purchaser Defendants was given and the seller ignored that advice and decided to proceed with his initial offer from the Purchaser Defendants, then the fact he received a rate worse than prime + 6 percent was not an outcome proximately caused by Defendants' alleged efforts to skirt the requirements of the Virginia Act.  In other words, Dockery's theory assumes that each seller's primary goal was to receive the best rate possible from their annuity purchaser. But irrespective any conflicts allegedly created by the scheme, an individual may have been "injured"–*i.,e,* received a rate worse than the prime rate plus six percent–because he had a different priority for his transaction like convenience, speed, or working with a known company.

For these reasons, whether receiving a rate worse than the prime rate + 6 percent was proximately caused by Defendants' RICO violation would require individual inquiries into the discussions between estoppel lawyers and their clients, the clients' goals for their transaction, and, relatedly, the clients' best interests.  Without such inquiries, a seller would not be able to prove proximate cause, which requires that an injury "must not be purely contingent on another event or action."  *St. Luke's*, 967 F.3d at 301.  Therefore, Dockery has failed to show by the

preponderance of the evidence that receiving less than prime plus 6 percent is an injury proximately caused by Defendants' RICO violation.[9]

*Attorney's Fees.* Seeking another method of proving class-wide injury, Dockery argues that each class member was injured, and has quantifiable damages, by being required to pay attorney's fees for the "pleasure" of having an estoppel letter written by a non-independent attorney. Pl.'s Br. at 32. The Purchaser Defendants argue that this alleged injury does not satisfy RICO standing because the fees were not caused by the alleged predicate acts and because sellers would have incurred the attorney's fees regardless of whether they received quality or the allegedly substandard advice. Purchaser Br. at 32-33.

Defendants' arguments miss the mark here. Plaintiff's theory of the case is that the requirement to seek a lawyer plus the structure that made the lawyer's advice not independent together exploited SSA beneficiaries by inducing them to transfer payment streams on terms that would not otherwise have been accepted or approved. While the Court has determined that requiring a lawyer was permissible and that no misrepresentation was made in this respect, the requirement of hiring a lawyer is a necessary element of the scheme Dockery alleges. And as both parties recognize, once Wentworth stopped requiring individuals to hire lawyers, sellers typically waived their right to independent counsel. *See* Pl.'s Br. at 39. Therefore, by the preponderance of the evidence, the attorney fees charged here suffice as tangible injury proximately caused by the RICO violation. *See In re Ins. Brokerage.*, 579 F.3d at 269-70.

---

[9] For this reason, the Court does not find it necessary to resolve the dispute between the experts as to whether the prime rate + 6 percent is the "appropriate market rate." *See Amgen*, 568 U.S. at 466 ("Merits questions may be considered to the extent – and only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

The Purchaser Defendants' caselaw does not support their argument that the attorney's fees are an incidental injury separate from the RICO violation.  In *The Knit With v. Knitting Fever,* plaintiffs attempted to show RICO injury through, in part, attorney's fees and the costs of lost profits.  *See The Knit With v. Knitting Fever*, No. 08-4221, 2012 WL 2938992, at *10 (E.D. Pa., July 19, 2012), *aff'd* 625 Fed. App'x 27 (3d Cir. 2015).  There, the alleged injuries (attorney's fees and other expenses incurred by discovering and mitigating the RICO scheme) were incidental to the RICO scheme, or "at best, 'indirect' injury which plaintiff did not automatically incur, but chose to incur, in mitigating the effect of Defendants' conduct."  *Id.* at *9 (citation omitted); *see also Strates v. Amusements of Am.*, 379 F. Supp. 2d 817 (E.D.N.C. 2005) (fees incurred in preparing disputed bids that would have been incurred regardless of the alleged racketeering activity).  Here, while the attorney's fees charged were not themselves illegal or the purpose of the scheme, they were charged in furtherance of the scheme to deprive victims of independent advice.  Therefore, they are not merely "indirect" injuries that sellers chose to incur or injuries that they would necessarily have incurred regardless of the scheme.

Although the thrust of Dockery's claim is that sellers were exploited to receive terms worse than they would have received with independent advice, which requires a multitude of individual inquiries, the Court is nonetheless "satisfied that the plaintiff[] ha[s] presented a plausible theory for proving a class-wide injury as a result of the racketeering activities of the alleged enterprises at issue," *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269-70. Therefore, predominance is not defeated by the RICO standing issue.

### iv. Statute of Limitations

Defendants also argue that individual issues predominate in this case because whether class members' causes of action are time barred is not capable of common proof.  Civil RICO

actions are subject to a four-year statute of limitations.  *See Forbes v. Eagleson*, 228 F.3d 471, 483 (3d Cir. 2000).  Because the class period extends from 2000 to some point in 2009, and the instant complaint was not filed until 2017, the statute of limitations is a significant issue facing the class's claims.  The questions the Court must confront at this stage are whether the statute of limitations issue can be resolved by common proof and, if not, how that affects the predominance requirement of Rule 23(b)(3).

Dockery and Heretick discuss the RICO discovery rule in their briefs, agreeing that a RICO claim begins to "accrue[] when plaintiffs knew or should have known of their injury." *Cetel Kirwan Fin. Grp.*, 460 F.3d 494, 507 (3d Cir. 2006).  A claim accrues (1) "no later than when the plaintiffs themselves discover their injuries" under the subjective component of the test, *Mathews v. Kidder Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001), or (2) when plaintiffs should have known, which "depends on whether [and when] they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity," *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.,* 435 F.3d 396, 400 (3d Cir. 2006) (alterations in original).

The Court finds that the accrual of the RICO claims poses individual issues.  When individuals subjectively knew of their claims could only be determined by individual proof of what that person knew when.  Additionally, whether sellers had enough storm warnings of culpable activity to be put on notice of their injury and who caused it, *see Forbes*, 228 F.3d 471, will depend upon the circumstances surrounding each seller's transaction and whether those circumstances should have put them on notice.  Each seller will be presumed to know the terms of his or her purchase agreements, *see Done v. Option One Mortg.*, No. 09-4770, 2011 WL 1260820, at *8 n.5 (E.D.N.Y. Mar. 30, 2011), and each seller should be aware that their

attorney's fees were taken out of the proceeds they received from the transaction.  Members of the subclass would also be aware of how they received their lawyers.

But whether these activities amounted to "storm warnings" would depend on the sellers' discussions with the estoppel lawyers.  If–assuming that the Estoppel Lawyers had not disclosed and sought waivers of any conflicts–the sellers received the type of advice a lawyer who was not subject to a conflict of interest may give, then that seller may not have any reason to suspect that their lawyer had a conflict of interest.  *See* Va. R. Prof'l Conduct 1.7.  In any event, Dockery, who holds the burden at the class certification stage, has not put forth a proposal for how the discovery rule issue could be determined on a class-wide basis.

If a statute of limitations has accrued, the running of the statute may nonetheless be equitably tolled.  Dockery argues that statutes of limitations are subject to equitable tolling if a divided loyalty of an adviser impedes the investigation that would permit discovery of his claim.  Pl.'s Br. at 50.  Whether or not Estoppel Lawyers had a divided loyalty that would toll the statute is, in Dockery's view, a common, class-wide question.  The Purchaser Defendants argues that Dockery cannot show that the elements of equitable tolling are satisfied with common proof.

Equitable tolling allows a plaintiff to sue after the time period for filing a complaint has run if certain criteria are met.  It may apply where "(1) [] the defendant has actively misled the plaintiff respecting the plaintiff's cause of action, (2) [] the plaintiff in some extraordinary way has been prevented from asserting his or her rights, or (3) [] the plaintiff has timely asserted his or her rights mistakenly in the wrong forum."  *In re Cmty. Bank*, 795 F.3d at 400.  "In addition, a litigant will not receive the benefit of tolling in any of these situations unless she exercised due diligence in pursuing and preserving her claim."  *D.J.S.-W. by Stewart v. United States*, 962 F.3d 745, 750 (3d Cir. 2020).

Dockery argues that the divided loyalty of his Estoppel Lawyers prevented him from asserting his rights, a claim which would fall within the second category.  The Third Circuit has recognized that this equitable tolling test "is the same test that the Supreme Court uses to assess whether a petitioner may be entitled to equitable tolling in the habeas context." *D.J.S.-W. by Stewart*, 962 F.3d at 751 (citing *Holland v. Florida*, 560 U.S. 631 (2020)).  In *Holland v. Florida*, the Supreme Court explained that a habeas petitioner "is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." 560 U.S. at 634. Therefore, both extraordinary circumstances and diligence must be satisfied for putative class members to be eligible for tolling in this case. *Id.*  According to Dockery, *Holland v. Florida* stands for the principle that a claim of divided loyalty will – as a bedrock, black law matter – justify equitable tolling.  Pl.'s Br. at 50.  That being the case, Dockery asserts, whether or not Estoppel Lawyers had a divided loyalty that would toll the statute is a common, class-wide issue.

But the Supreme Court has not held  that "divided loyalty" per se tolls the statute of limitations.  In *Holland v. Florida*, the Court was reviewing a decision by the Eleventh Circuit Court of Appeals, which had articulated a standard that "when a [habeas] petitioner seeks to excuse a late filing on the basis of his attorney's unprofessional conduct, that conduct, even if it is . . . grossly negligent, cannot rise to the level of egregious attorney misconduct that would warrant equitable tolling unless the petitioner offers proof of . . . divided loyalty . . . or so forth." *Holland v. Florida*, 560 U.S. at 634 (citation omitted) (internal quotation marks omitted).  The Supreme Court held that "this standard is too rigid," *id.*, and that extraordinary circumstances "are not limited to those that satisfy the test that the Court of Appeals used in this case," *id.* at 652.  Dockery takes this holding to mean that proof of divided loyalty per se tolls the statute,

even if it was too rigid to say less egregious activities do not as a matter of law.  But in its analysis, the Supreme Court emphasized that it had previously held that the "exercise of a court's equity powers . . . must be made on a case-by-case basis."  *Id.* at 649 (citation omitted) (collecting cases); *see also id.* (noting "equity's resistance to rigid rules").  Based on these precepts, this Court does not read *Holland* to adopt a rigid rule that divided loyalty per se tolls the statute.  And in any event, regardless of the "extraordinary circumstance," a plaintiff must have diligently pursued his claim.  *Id.* at 649.

Because the "extraordinary circumstance" prong requires a flexible approach, it cannot be demonstrated by common proof in this case.  The putative class's RICO claim is premised in part on the Estoppel Lawyers' lack of independence, purportedly evidenced by estoppel letters, the method in which the lawyers were paid, among others, and–in the case of the subclass–the referral scheme.  All of these factors were known or knowable to class members when they were referred to attorneys, paid their attorneys, or saw their approved transfer petitions.  So, it would have to be something else in the context of the discussion between the Estoppel Lawyer and his client that would constitute an "extraordinary circumstance" to toll the statute.

But even if "extraordinary circumstances" could be determined by common proof here, the reasonable diligence element of equitable tolling cannot be.  The Third Circuit recognizes that "reasonable diligence is generally a fact-specific inquiry."  *In re Cmty. Bank*, 795 F.3d at 404.  True, "when a wrongful scheme is perpetrated through the use of common documentation," . . . sometimes participation in the process that used the common documentation can alone be sufficient to establish due diligence.  *Id.*  In other words, if due diligence can be proven by something common, like participating in all aspects of a loan mortgage transaction, then the due

diligence element will not "cause the issue of equitable tolling to predominate over issues common to the class." *Id.*

Contrary to situations where signing loan paperwork can establish due diligence, however, no such common proof is available here. Dockery does not offer any common proof as to how the diligence element can be met or determined on a class-wide basis. But given the general rule that reasonable diligence is fact-specific, the Court would need to examine whether each seller diligently pursued his or her potential RICO claim based on his or her particular interaction with his Estoppel Lawyer. *See Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004) ("Due diligence does not require the maximum feasible diligence, but it does require diligence in the circumstances."). Accordingly, due diligence cannot be demonstrated with class-wide proof.

Dockery argues that even if individual questions exist regarding the statute of limitations and equitable tolling, the caselaw is clear that such questions would not preclude the Court from determining the predominance element of Rule 23(b)(3) is met. To support this argument, Dockery relies in part on the principles articulated in *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002). There, the Circuit held that plaintiffs' attempt to toll the statute of limitations based on a fraudulent concealment conspiracy did not raise individual issues that precluded class certification because common issues of concealment predominated over individual ones related to the statute of limitations. *Id.* at 161-62. Therefore, the predominance element of Rule 23(b)(3) was not defeated by the statute of limitations issue. *Id.* at 163. Moreover, the Court reasoned, "any individualized facts of fraudulent concealment may be adjudicated in the same fashion and at the same time as individual damages issues." *Id.* The Court noted that "[m]any courts faced with similar circumstances have certified class status with the expectation that

individual questions concerning fraudulent concealment can be resolved at a later damages phase." *Id.* (collecting cases).

The Court is not persuaded by Dockery's argument in the context of this case. While the Circuit held that individual issues relating to the statute of limitations did not defeat the predominance element of Rule 23(b)(3), it did so where common issues also predominated in the equitable tolling analysis, which is not the case here. To be sure, the Circuit also favorably cited a principle that "we reject any per se rule that treats the presence of [individualized statute-of-limitations] as an automatic disqualifier" and that "variations in the sources and application of statutes of limitations will not automatically foreclose class certification" if "a sufficient constellation of common issues binds class members together." *Linerboard*, 305 F.3d at 162 (citing *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000). But the Court also did not say that that individual issues regarding statutes of limitations could *never* foreclose class certification. And here, where individual issues predominate in the discovery rule and equitable tolling analysis and where the claims of every single class member may need to be equitably tolled, individual inquiries into the relationship between particular estoppel lawyers and their clients predominate. Thus, the Court concludes that individual inquires as to the statute of limitations would predominate over any common issues facing the class as a whole.

### v. The Predominance Element

In sum, the Court recognizes that the mere existence of individual issues do not defeat the predominance element. *See, e.g., In re Prudential*, 148 F.3d at 314. However, the numerous individual inquiries that proving class members' RICO claims would require–including into interactions between lawyers and clients, with their attendant privilege issues–for both liability

and timeliness issues, individual issues necessarily predominate over any common to the class. Therefore, for this reason alone, class certification is not warranted.

### C.       Superiority

Rule 23(b)(3) also requires that a class action be superior to other available means of adjudicating the claims of the class.  Fed. R. Civ. P. 23(b)(3).  The factors relevant to this analysis include: (a) the class members' interest in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.  *Id.*

Dockery claims that a class action is superior because it is the *only* feasible way of resolving these disputes.  In his view, it would be financially infeasible for any member of the class to bring an individual action given the size of any class member's damages relative to the cost of prosecuting a RICO action.  Nor could the factual record at play here have been adduced in a case brought by an individual.  And finally, the case is clearly manageable as a class action because "the proof . . . will not center around the plaintiffs' individual experiences, but rather on the defendant's program."  *Cullen*, 188 F.R.D. at 235; *see also Mathew v. Kidder Peabody & Co. et al.*, No. 95-85, 1996 WL 665729, at *5 (W.D. Pa. Sept. 26, 1996) ("Determining the issues of defendants' civil RICO liability . . . in one action will be more efficient and effective for all parties").

The Purchaser Defendants argue that a class action is not superior because class members will be interested in controlling their own cases.  Because Dockery's allegations suggest that he and the proposed class members lied to the Portsmouth court when they signed an affidavit

stating that the transaction was in his or her best interest, Dockery's theory necessitates a finding that the class members may have committed perjury.  Because of this reality, class members may want to decide for themselves whether to participate in such a case.  The Purchaser Defendants also argue that certifying a class will create myriad management issues because of all the individual issues involved and because of the nebulous associations-in-fact alleged.  Heretick separately contends that, because class-wide issues do not predominate, litigating this case via a class action is not superior.  He also argues that RICO is a fee-shifting statute, so individual actions are a viable alternative despite the cost.

A number of the relevant elements weigh in favor of class adjudication.  There are no other pending RICO actions being pursued by class members.  *See* Fed. R. Civ. P. 23(b)(3)(B).  And this court has previously determined that the Eastern District of Pennsylvania is the appropriate forum for the litigation as the headquarters of the Purchaser Defendants.  *See* Fed. R. Civ. P. 23(b)(3)(B).

However, a class action is not superior here because the number of individual inquiries that would be necessary in adjudicating the class action claim would render the class action unmanageable.  *See* Fed. R. Civ. P. 23(b)(3)(D).  Dockery asserts that the action would be manageable because "[t]he proof . . . will not center around the plaintiff's individual experiences, but rather on the defendant's program."  *See Cullen*, 188 F.R.D. at 235.  As a general matter, that may be true for RICO claims.  But for this claim, where individual inquiries are necessary at minimum to determine the predicate act of mail fraud, the enterprise element, and the timeliness of the class's claims for every class member, any class action will quickly become unmanageable.

61

Dockery's arguments do not persuade the Court otherwise.  He asserts that the expense involved in litigating this RICO claim–the four experts, thousands of pages of documents, and multiple depositions–make it unrealistic to litigate on an individual basis because the costs of litigating vastly outweigh the potential recovery available.  It is true that class actions are especially popular litigation devices when "individual persons allegedly injured are in a poor position to seek redress, either because they do not know enough or because the cost of suit is disproportionate to each individual claim."  C. Wright The Law of Federal Courts § 72 at 480 & n. 56 (1983 ed.).  But RICO is a fee-shifting statute, so the costs of litigating a RICO claim on an individual basis are not necessarily prohibitive.  *See Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp.2d 1123 (D.N.J. 1989) (finding superiority not met even though cost of litigating an individual RICO claim outweighs the potential damages because of cost-shifting).  Thus, the Court finds that the costs of litigating this RICO claim do not render a class action superior.  The Court's conclusion is further solidified by the fact that this particular RICO claim would involve numerous individual inquiries and attendant mini-trials if conducted as a class-action, which undermines Dockery's cost-saving argument.  *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 454 (E.D. Pa. 2000) (citations omitted) (finding a class action is not superior in part because individual issues predominate and mini-trials would be necessary).

While the cost of prosecuting a claim may be extreme, and certain aspects of the cause of action may need to be proven in multiple cases, the Court nonetheless concludes that a class action is not a superior method of adjudicating the RICO claims for the reasons above.

### 1.  Rule 23(a) Requirements

In order for a class to be certified, the named plaintiff must also establish that all four prerequisites of Rule 23(a) are satisfied.  Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if

    (1) The class is so numerous that joinder of all members is impracticable [numerosity];

    (2) There are questions of law or fact common to the class [commonality]

    (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class, and

    (4) The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

### a. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no minimum number of members needed; however, numerosity is generally found if the plaintiff demonstrates that the number of potential plaintiffs is more than 40. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). Nonetheless, the Court must "examin[e] the specific facts of each case" and plaintiff must prove numerosity by the preponderance of the evidence. *BMW of North Am.*, 687 F.3d at 595 (citations omitted).

The parties only briefly address numerosity. Dockery claims that the class involves thousands of members, and that the Frequent Flyer subclass consists of over 750 transactions. While the Purchaser Defendants do not challenge numerosity, Heretick argues that the overly broad definition of the class means that the evidence does not support a finding that joinder is impracticable. He also argues that plaintiff has provided no evidentiary support for the assertion that this case involves 1,610 relevant transactions and the class consists of thousands of members.

The numerosity requirement faces the same issue as ascertainability. Because Dockery amended his class definition to include only those paid on a contingency basis out of the proceeds of the transaction, Dockery has made it impossible for the Court to make a factual

finding that the class is sufficiently numerous because individual fact-finding would be required to determine who is in the class.  However, as explained in that section, the Court could narrow the definition to fix the ascertainability issue.  The Court reviews the following arguments regarding numerosity with that amended definition in mind.

Heretick first argues that there is insufficient evidence to substantiate the number of class members Dockery asserts are in the Proposed Classes.  He asserts that while Dockery "believes" 1610 relevant transactions exist, asserts that "the class consists of thousands of members," and believes the Frequent Flyer subclass consists of over 750 transactions, he has cited no evidence in his brief to substantiate these numbers.

Mere speculation as to the number of class members is insufficient.  *BMW of N. Am.*, 687 F.3d at 596.  In the absence of direct evidence of the exact number and identities of class members, a plaintiff "must show sufficient circumstantial evidence" to allow the Court to make a factual finding.  *Id.*  At that point, the Court may rely on "common sense to forego precise calculations and exact numbers."  *Id.* (citations omitted).

The Court concludes that there is enough evidence in the record to allow the Court to make a factual finding in support of numerosity.  Mr. Kelly, Wentworth's 30(b)(6) designee, noted in his declaration that there were at least 1,466 Virginia cases in which Heretick represented Wentworth between 2000 and 2009.  ECF No. 260-1 at 5-6.  In 768 of those cases, one of the "Frequent Flyer" attorneys represented a seller.  *Id.* at 6.  Per counsel's suggestion at oral argument that he would reduce the class size to those who received a worse deal than prime plus six percent, this would leave 1,251 and 639 transactions, respectively, for the Class and Subclass.  *Id.*  For each transaction during the 2000 to 2009 period, an Estoppel Letter was written on behalf of each seller per Wentworth's requirements.  *See* ECF No. 246-6 at 134.  The

Court also finds that, based on Mr. Kelly's declaration, the transactions he discussed were transactions that had been approved by the Portsmouth court. While the numbers discussed above reflect transactions rather than individuals, common sense dictates that 1,466 SSA transactions must involve at least 40 individual people, and that 768 transactions must involve at least 40 people. What is left is to determine whether Heretick made the allegedly false representations in each of those transactions. Based upon the fact that Heretick made the representation in the vast majority of Dockery's transactions as part of his form petition, the Court, using its common sense, can find that at least 40 people are within the Proposed Classes as originally defined (minus those whose discount rates are better than the prime rate plus six percent and plus those whose Estoppel Lawyers were paid out of the proceeds of the transaction).

Next, Heretick argues that Dockery has failed to show joinder is impracticable because the class includes those with discount rates better than Mr. Scherf's threshold. By narrowing the class as Dockery suggested at oral argument, this issue is moot.

Finally, Heretick also argues that Dockery has failed to show joinder is impracticable because the class includes claims that are time-barred. Related to his argument on ascertainability, Heretick argues that sellers with time-barred claims cannot be class members and therefore cannot be counted toward the numerosity requirement.

The Court is also not persuaded here. To be sure, caselaw exists for the principle that putative class members with untimely claims cannot be counted as members of a class. At least once, a district court in this circuit has found that classes may only include those members whose claims are not barred by the applicable statute of limitations. *See Lanning v. Se. Pa. Transp. Auth.*, 176 F.R.D. at 148; *c.f. Jackson v. SEPTA*, 260 F.R.D. at 183 (finding a class overbroad that included class members as to whom the statute of limitations has run) (citing *Lanning* and

*Vinson v. Seven Seventeen HB Phila. Corp.*, Civ. A. No. 00-6334, 2001 WL 1774073 (E.D. Pa. Oct. 31, 2001)).  But the only relevant Third Circuit opinion cited in these cases and found by this Court is distinguishable from the instant case.  In *Wetzel v. Liberty Mutual,* the Court addressed a Title VII class action case involving named plaintiffs who had filed charges with the EEOC, and certain putative class members who had not.  *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 246 (3d Cir. 1975).  The Court explained that Title VII, at the time, required that if a charging party instituted proceedings with a state agency having jurisdiction over discriminatory employment practices, then a charge must be filed with the EEOC within 210 days of the occurrence of the alleged unfair practice.  *Id.*  Because the timely filing requirements with respect to the EEOC was a jurisdictional prerequisite to court action under Title VII, the named plaintiffs could not represent individuals who could not have filed a charge with the EEOC at the time they filed their charges.  *Id.*  Here, there is no such jurisdictional prerequisite.  Moreover, that case, as with the district court cases cited above, involved named plaintiffs with timely claims and time-barred putative class member, which is not present here.

The Court again finds relevant the fact that the Third Circuit has repeatedly discussed statute of limitations and equitable tolling issues in the context of the predominance requirement. *See, e.g., In re Linerboard,* 305 F.3d 145; *In re Prudential*, 148 F.3d 314.  If those putative class members with potentially time-barred claims could not be included in the class definition, then there would be no need to discuss how equitable tolling principles affected the predominance requirement of Rule 23.  *See also Sullivan v. DB Invs., Inc.*, 667 F.3d 274, 310 (3d Cir. 2011) ("Should the court evaluate whether each class member's claim complies with the applicable statute of limitations? . . . No class would ever be certified because it would be impossible to demonstrate that every class member has a 'colorable legal claim.'").

66

Therefore, the Court finds by the preponderance of the evidence that numerosity is satisfied.

### a. Commonality

To establish commonality, a plaintiff must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In Rule 23(b)(3) putative classes, the commonality inquiry is subsumed under the more demanding predominance inquiry. *See Hydrogen Peroxide*, 552 F.3d at 311 (noting that predominance is a "far more demanding" requirement than commonality, and "require[s] more than a common claim"). Because the Proposed Classes fail under the predominance inquiry, the Court need not determine whether the lower threshold of commonality is met.

### b. Adequacy

Representative class members must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry has two components. *See In re Wayfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004). First, it tests the qualifications of the counsel to represent the class." *Id.* (citation omitted). Second, it looks "to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* (citation omitted). Described another way, "[t]he inquiry that a court should make regarding the adequacy of representation requisite of Rule 23(a)(4) is to determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." *In re Cmty. Bank of N. Va.*, 622 F.3d at 291.

Dockery argues that there are no conflicts between him and the members of the class because all seek the same relief and his personal interaction with Defendants is typical.

Moreover, he, a special-education high school graduate who has difficulty reading and whose workplace injury rendered him unable to support himself, is a model SSA payment seller who would have benefitted from independent advice.  And while Dockery is not fully conversant with the details of his transaction documents, this fact actually supports his typicality and his claim. Dockery also argues that proposed class counsel are qualified to represent the class.

The Purchaser Defendants argue that Dockery is not an adequate class representative because his lack of credibility, as evidenced by his contradictory testimony during his two depositions and his admitted severe memory issues, will be a detriment to the class members' claims.  They also argue that Dockery is an inadequate representative because he is not subject to a release signed by putative class members in 2000 that would bar those class members' claims and because he testified that he only blamed himself for his decision to sell his payments. Heretick further claims that Dockery's memory issues and inability to read render him an inadequate representative because they preclude him from showing that he is willing to vigorously or fairly represent the class.

Dockery replies that no memory issue impedes class certification.  Reply Br. at 12.  For example, the fact that Dockery does not understand himself to have been counseled by a lawyer is no surprise given that the lack of real legal advice is the point of the case.  *Id.* And in any event, the questions to be answered on the issue of adequacy are the qualifications of counsel and whether the class representative has conflicts with the class he seeks to represent.

The Court concludes that Dockery is an inadequate class representative for a slightly different reason.  The Third Circuit has noted that "[s]tatute-of-limitations issues also touch on the adequacy requirement."  *In re Cmty. Bank*, 622 F.3d at 294.  Such an issue facing a named plaintiff "may be relevant to evaluating their adequacy as class representatives in the same way

68

any type of defense may be relevant to that inquiry, *i.e.*, named plaintiffs may be inadequate representatives if their claims are extremely weak as compared to the rest of the class." *Id.* Therefore, "to the extent the claims of the named plaintiffs–as compared with the rest of the class–are subject to fatal statute-of-limitations defenses, that inquiry may be relevant to whether they can adequately represent absent class members whose claims do not suffer from timeliness problems." *Id.*

The facts underlying Dockery's claim pose issues that are not necessarily present for the others. As explained, a RICO claim accrues when a plaintiff discovers his injury or should have done so, which "depends on whether [and when] they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." *Benak*, 435 F.3d at 400. And equitable tolling may apply if a plaintiff has pursued his rights diligently and an "extraordinary circumstance" stood in his way and prevented timely filing. *Holland*, 560 U.S. at 634.

The putative class's statute of limitations argument in part is that the class members either did not discover their injury or should have their claims tolled because they did not know their attorney suffered from divided loyalty. Members of the putative class could attempt to argue that they had no "storm warnings" of culpable activity, or that extraordinary circumstances prevented them from pursuing their claim, based on the specifics of their interactions with their lawyer. While those inquiries must be conducted on a case-by-case basis, as explained above, some putative class members could potentially succeed in bringing a timely claim based on their lawyer/client interactions.

Dockery's testimony and claim demonstrate that he cannot make the same argument. Dockery's claim is that he "never retained and never received any advice from any" of his

Estoppel Lawyers.  SAC ¶ 123.  Dockery repeatedly testified that he did not meet with any lawyers.  *See* ECF No. 264-8 at 8; 261-9 at 82-83.  He later admitted meeting with Mr. Haley, but claimed that Haley had merely notarized paperwork for him.  *Id.*  And in his reply brief, Dockery argued that he "does not understand himself to have been counseled by a lawyer."  Pl.'s Reply Br. at 15.  Because Dockery in his own view did not believe he had a lawyer, he should have been aware that he had both not waived advice in writing and not received *any* professional advice based on his version of the facts.  Yet after he received court orders approving his sale (which he does not deny, *see, e.g.,* ECF No. 264-2, Ex. A at 8) that explicitly found that he had either waived or received independent advice, and receiving a payment minus attorney's fees for the lawyers he denies consulting, Dockery not only did not begin investigating his claim but continued doing business with the Purchaser Defendants numerous times.

Based on this factual scenario specific to Dockery, he is subject to a statute-of-limitations defense much stronger than members of the putative class who may have actually consulted with Estoppel Lawyers.  To be sure, other class members may be time-barred, but their likelihood of success is greater than Dockery's.  For this reason, the Court concludes that Dockery is not an adequate representative.[10]

## VI.    CONCLUSION

Because Dockery cannot satisfy each applicable requirement of Rule 23, his Amended Motion for Class Certification will be denied.  An appropriate order will follow.

**DATE:** September 1, 2021                          **By the Court:**

/s/ Chad F. Kenney
_____

**CHAD F. KENNEY, J.**

---

[10] Accordingly, the Court need not consider whether Dockery's claim is typical of the class.