**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Dockery** | : | |
| | : | **CIVIL ACTION** |
| v. | : | |
| | : | **No. 17-4114** |
| **Heretick, et al.** | : | |
| | : | **Kenney, J.** |

**Memorandum**

## I.     INTRODUCTION

In this civil RICO case, plaintiff Larry G. Dockery alleges the existence of an unlawful scheme between companies who purchase future structured settlement annuity payments, an attorney who represented those companies in connection with such transactions, and other persons to obtain structured settlement payments from unsophisticated beneficiaries on unfair terms.  *See* ECF No. 99, Second Amended Complaint ("SAC").  Before the Court are Defendants' Motions for Summary Judgment.

## II.     FACTUAL BACKGROUND[1]

### A.  Structured Settlement Annuities

Parties to a lawsuit sometimes use structured settlement annuities to settle their claims. ECF No. 297-1, Joint Statement of Stipulated Undisputed Facts (JSUF) ¶ 1.  Under such settlements, the plaintiff receives compensation over time instead of in a single lump sum at the time of the settlement.  *Id.*  However, plaintiffs who receive such annuities sometimes wish to receive some of their money before it is due to be paid.  *Id.* ¶ 2.  While their reasons vary,

---

[1] The below factual background includes only those facts that are relevant to the Court's analysis in this memorandum.  For a more complete factual background, see the Court's memorandum on Plaintiff's Motion for Class Certification.

beneficiaries may want to use the money due to them to pursue an education, start a business, pay off a mortgage, or pay down debt. *Id.* ¶ 3.

### B.  Statutory Framework

Structured settlement annuity sales are subject to numerous legal requirements.  Title 26 U.S.C. § 5891 levies a 40 percent tax on companies purchasing rights unless the company submits a court application and a state court where the annuitant ("seller") is domiciled issues a "qualified order" approving the transaction before it is consummated.  26 U.S.C. § 5891(a)-(b). A "qualified order" must contain judicial findings that the transaction: (1) does not violate applicable law or administrative authority; and (2) is in the best interests of the seller, "taking into account the welfare and support of [the seller's] dependents."  *Id.* § 5891(b)(2)(A).

Virginia law affirmatively requires judicial approval to transfer SSA payment streams. To obtain a qualified order, the purchasing company must file an application for approval in any Virginia court.  Va. Code § 59.1-477(A).  The SSA purchaser must make certain disclosures to the SSA seller, and the purchaser must file a notice with the Virginia court that includes the transfer agreement and the disclosures made.  *Id.* § 59.1-477(B).  These disclosures include the amounts and due dates of the payments to be transferred, the discounted present value of the payments, and other information on the financial aspects of the transfer.  *Id.* § 59.1-475.1.

The court must then hold a hearing on the application.  *Id.* § 59.1-477.  Sellers are not required to attend.  *Id.*  To authorize a sale, courts are required to make express findings that:

1. The transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;

2. The payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived in writing the opportunity to seek and receive such advice; and

3. The transfer does not contravene any applicable statute or the order of any court or other governmental authority.

Va. Code § 59.1-476 (the "Virginia Act"). Under the Act, "[i]ndependent professional advice means advice of an attorney, certified public accountant, actuary or other licensed professional adviser." *Id.* § 59.1-475.

### C. Purchaser Defendants' Business

Companies like J.G. Wentworth S.S.C. Limited Partnership and 321 Henderson Receivables Origination (the "Purchaser Defendants")[2] are engaged in the business of providing immediate cash payments to beneficiaries of structured settlement annuities in exchange for the right to receive a beneficiary's future structured settlement annuity payments.[3] *Id.* ¶ 4.

Until approximately 2009, the Purchaser Defendants required all purchasers nationwide to hire an attorney to review the transaction with them and sign a letter confirming they had provided advice. *Id.* ¶ 10; *see also* PSUF ¶ 5. The Purchase Agreements involved in this case stated that the seller "must retain the services of an attorney and deliver an opinion of your attorney about the sale of assigned assets to us in a form acceptable to us." ECF No. 289-1 at 64. Wentworth referred to these letters as "Estoppel Letters." ECF No. 301-2 at 131. At the time of the policy change, Wentworth understood that some customers wanted to waive the option of receiving independent professional advice because they wanted to "move through the transaction as seamlessly as possible." JSUF ¶ 11.

---

[2] Default Judgment was entered as to Defendant Seneca One Finance, Inc., another purchaser defendant, in June 2020. *See* 17-4114, ECF No. 202.

[3] There are also several "Nominal Defendants" listed in the suit who are currently making payments on annuities that are the subject of this case.

### D.  Dockery's Transactions

Plaintiff Larry Dockery became a beneficiary of a structured settlement in 1989 after he lost his left arm in a work accident.  JSUF ¶ 13.  He received an immediate payment of over $400,000, recuring monthly payments for 30 years of $1,200 a month, compounding annually, and increasing periodic lump sum payments.  *Id.* ¶¶ 14-16.

#### 1.  2002 Transaction

Dockery became interested in selling his structured settlement payments in 2002 when an individual called him hoping to broker a transaction.  *Id.* ¶¶ 19-20.  This individual, who was not employed by Wentworth, directed Dockery to J.G. Wentworth in July 2002.  *Id.* ¶ 19.

In September 2002, Dockery entered into a purchase agreement with J.G. Wentworth.  *Id.* ¶ 26.  Wentworth gave Dockery disclosures under the Virginia Act, and Dockery signed a document stating that he sought to carry out the transaction for educational purposes.  *Id.* ¶ 23. In connection with the transaction, Dockery also executed an affidavit stating that "[i]t is my belief, and my representation to the Court, that this transfer lies in my best interests, together with that of my family."  *Id.* ¶ 25.

Because court approval was required for the sale under the Virginia Act, J.G. Wentworth's attorney (Defendant Heretick) filed a petition with the Portsmouth Circuit Court in Portsmouth, Virginia (the "Portsmouth court") to approve the sale.  *Id.* ¶ 22, 25-26.  Along with the petition, Heretick submitted the purchase agreement and an "estoppel letter" from Dockery's attorney, Mr. Shull.  *Id.* ¶¶ 21, 27.  That letter stated that:

> This office has acted as legal counsel to the Seller referenced above with respect to a transaction more fully described in [the] Purchase Agreement . . .  This estoppel letter is being delivered at the Purchaser's request pursuant to the Purchase Agreement and is being relied upon by the Purchaser in entering into the within transaction . . .  The undersigned and his firm have acted as independent legal counsel to the Seller in the above-referenced transaction and has provided legal,

4

> accounting and tax advice.  The undersigned has made himself available to Seller to explain the terms of the transaction . . . and is satisfied that the Seller understands the nature and terms of such transaction . . . Neither this office nor the undersigned has any interest, financial or otherwise, in the transaction contemplated in the Purchase Agreement.

ECF No. 291-10 at 56.

The Court approved the transaction after a hearing, stating in its order its findings that the transfer was in Dockery's best interest and that Dockery had been advised to seek independent professional advice and received that advice or waived the right to do so.  JSUF ¶ 28.

Dockery did not attend the hearing (or any of his future hearings) because he was told he did not need to attend for the transaction to be approved, although no one told him that he was prohibited from attending.  WSUF ¶ 208.  He does not deny that he received a copy of Mr. Shull's estoppel letter at or about the time of the transmission.  HSUF ¶ 86.

### 2.   Additional Transactions

In September 2003, Heretick represented 321 Henderson in the Portsmouth court in a transaction to approve a sale of another portion of Mr. Dockery's structured settlement.  JSUF ¶ 29, 31.  Dockery again received the required disclosures and signed a similar affidavit.  *Id.* ¶¶ 33.  Mr. Heretick also again submitted a petition to the Portsmouth court seeking the transfer. This petition included a statement that the transferor/payee had been advised in writing by the transferee to seek independent professional advice regarding the transfer and has received such advice reflected in the letter of his legal counsel which is attached hereto.  ECF No. 293-6 at SH000858.  The Purchase Agreement between Dockery and Heretick was attached, along with an identical Estoppel Letter from Mr. Shull as he provided regarding the 2002 transaction.  JSUF ¶ 35.  The Court again approved the transaction after a hearing, stating in its order that the

transfer was in Dockery's best interest, that Dockery had been advised to seek independent

professional advice, and that he received that advice or waived the right to do so.  JSUF ¶ 28.

In April 2004, Dockery again sold a portion of his structured settlement to 321

Henderson.  JSUF ¶¶ 37-45.  The transaction proceeded in the same way as Dockery's 2003

transaction, with Heretick submitting a petition to the Portsmouth court that included: (1)

statements that Dockery had been advised to seek independent professional advice and received

such advice, ECF No. 293-8 at SH000999; the purchase agreement, JSUF ¶ 43; (2) a similar

affidavit signed by Dockery, *id.* ¶ 42; (3) and (3) an Estoppel Letter filed by Dockery's Estoppel

Lawyer, Mr. Rhoton.  This letter stated:

> This is to inform you that I have reviewed the paperwork from J.G. Wentworth that
> Larry Dockery brought to my office.  I have discussed the purchase agreement Mr.
> Dockery is making . . . Mr. Dockery has assured me that he has read and fully
> understands this purchase agreement and any consequences thereafter, and that this
> is what he desires to do.

*Id.* ¶ 44.  After a hearing and making the required findings, the Portsmouth court approved the

transaction.  *Id.* ¶ 45.

Dockery continued to sell off portions of his structured settlement.  In 2005, Dockery

sold a portion to another purchasing company, who was also represented by Mr. Heretick.  *Id.*

¶ 48.  In October 2007, Dockery again sold a portion of his settlement to 321 Henderson, this

time represented by Estoppel Lawyer Thomas Hassell.  This transaction also proceeded the same

way as the 2003 and 2004 transactions and included the same Heretick statements in the petition

and same documents provided to the Portsmouth court.  *Id.* ¶¶ 58-60.  These included an

Estoppel Letter signed by Mr. Hassell, which was largely identical to the Estoppel Letter

provided by Mr. Shull in Dockery's prior transactions, except that Mr. Hassell explained that he

had no interest in the transaction "other than legal fees for services rendered."  ECF No. 301-9.

The Portsmouth court again approved the transaction, finding that the requirements of the Virginia Act were met.  JSUF ¶ 60.

The process repeated in 2008, with Dockery entering into two separate, additional transactions with 321 Henderson.  Heretick's petitions included all the same statements and attachments, including Estoppel Letters from Dockery's Estoppel Lawyer Robert Haley.  *Id.* ¶¶ 64-68, 75-76.  These Estoppel Letters stated:

> This is to advise that I have consulted with the above-named client concerning the sale of structured funds to J.G. Wentworth.  I have provided the client with legal, tax, and financial advice regarding the same.  Due to the attorney/client privilege, I cannot disclose the conversation we had concerning this matter, except to say that it concerned this transaction. After the consultation, the client advised me to proceed with this transaction.

ECF No. 291-18.  The Portsmouth court approved the sales, finding that Dockery had been advised to seek independent professional advice and received or waived such advice, among the other statutory requirements.  JSUF ¶¶ 69, 77.

After the above transactions involving the Purchaser Defendants, Dockery continued to attempt to sell portions of his structured settlement.  He sold portions to Seneca in 2010 and to Symetra in 2011, in which he extinguished all remaining payments under his structured settlement annuity.  JSUF ¶¶ 94-102.  He unsuccessfully attempted to sell future payments four more times to other companies.  JSUF ¶¶ 96-102.

### E.  Alleged Scheme

Dockery alleges that the Purchaser Defendants and their attorney Stephen Heretick developed and executed a scheme to breach the Virginia Act and thereby induce beneficiaries to sell their SSA payments on unfair terms.  SAC ¶¶ 12, 68-69.  This scheme also involved "other individuals," including "individuals purporting to be [sellers'] lawyers [who] signed letters

7

stating that they had provided [sellers] with independent advice, which were submitted with petitions relating to the [sellers'] transactions."  *Id.* ¶ 156.

Specifically, Dockery argues that the Defendants schemed to defeat the requirement under the Virginia Act that sellers be "advised in writing by the transferee to seek independent professional advice regarding the transfer and [] either receive[] such advice or knowingly waive[] in writing the opportunity to seek and receive such advice."  Va. Code. § 59.1-476(2). Dockery claims that it was Defendants' policy to defeat this requirement, and that they did so via Heretick falsely telling the Portsmouth court in his petitions that both requirements had been met.  PSUF ¶¶ 2-3, 8-9.[4]

First, Dockery argues that Heretick falsely represented that the Purchaser Defendant advised Dockery in writing to seek independent professional advice regarding the transfer. PSUF ¶ 3.  He points to the fact that until 2009, Wentworth and 321 Henderson affirmatively required individuals to consult a lawyer.  *Id.* ¶ 5.

Second, Dockery claims that Heretick falsely represented to the Portsmouth court that Dockery had received independent professional advice "reflected in the letter of his legal counsel which is attached hereto."  *See, e.g.*, ECF No. 293-6 at SH000858.  These letters were the Estoppel Letters quoted above, which Wentworth's Rule 30(b)(6) designee testified were "statement[s] just confirming that an attorney reviewed the terms of the transaction with the customer and feels the customer understands or something to that effect."  ECF No. 297-2, Wentworth Additional Statement of Facts (WASF) ¶ 2.

---

[4] Dockery's original complaint alleged that the Judges of the Portsmouth Circuit Court, whom he termed "Complicit Judges," were also part of the RICO enterprise.  *See* ECF No. 1 at 12.  But in order to keep his case in the Eastern District of Pennsylvania, Dockery pivoted theories and alleged that the Judges were the victims of the fraudulent scheme instead of complicit in the execution of the scheme.

Dockery claims that Heretick's statement was false because the Purchaser Defendants created a system in which the Estoppel Lawyers had conflicts of interest and therefore were uniformly not independent advisors.  That alleged system is as follows.

Dockery points to the creation of the Estoppel Letter, whose purpose (which was not disclosed to Dockery) was allegedly to estop lawyers' clients from being able to undo their transactions.  He claims that the Purchaser Defendants directed what Estoppel Lawyers were saying to the Portsmouth court by controlling what was in the Estoppel Letter.  Wentworth admitted that it would provide Estoppel Letters drafted by other lawyers to Estoppel Lawyers who asked what Wentworth required in an Estoppel Letter.  WASF ¶ 3.  One of Dockery's Estoppel Lawyers testified that the text of the Estoppel Letter he signed "was provided to [him], and [he] simply reproduced it under [his] letterhead."  PSUF ¶ 26.  The letters he signed for the two Dockery transactions in which he was involved were virtually identical to the letter Mr. Hassel used in the hundreds of transactions in which he served as Estoppel Lawyer.  *Id.* ¶ 28.

Dockery also takes issue with the fact that the Estoppel Letters did not indicate that the lawyer provided advice on whether the transaction is in his client's best interest.  *See* Estoppel Letters, *supra.*  He further notes that the lawyers did not include their subjective views on the merits of the transaction.  For example, Mr. Shull believed that the terms of the transaction were exploitative but did not include that belief in his Estoppel Letter.  JSUF ¶ 29.  When asked why not, he explained that "this is an opinion letter that they wanted, so I gave it back to them."  *Id.*

Dockery also claims that the lawyers were not independent advisors because they were paid on a contingency basis out of the proceeds of the transaction.  Every Estoppel Lawyer to have been deposed denied being paid on a contingency basis.  JSUF ¶ 164, 117.  For example, Mr. Hassell testified that if the transaction had not been approved, then he would have billed his

clients directly for his legal advice.  *Id.* ¶ 164.  However, his Estoppel Letters noted that he had an interest in the transaction with respect to legal fees.  *See supra.*  Dockery also points to testimony from Defendant's expert that a matter is contingent "if the lawyer knows as a practical matter that they are not going to get paid unless the transaction closes."  PSUF ¶ 18.

Dockery also argues, with respect to the subclass that he sought to certify, that the Estoppel Lawyers were not independent because they were chosen by the Purchaser Defendants rather than the individuals who would be their clients.  Mr. Hassell, who represented Dockery twice, testified that Wentworth referred clients to him.  PSUF ¶ 22.  Wentworth's 30(b)(6) designee also testified that, at times, Wentworth would refer an attorney or attorneys to the customer if the customer had no one else to turn to for the representation.  WSUF ¶ 4.

Additionally, Dockery argues that Heretick's interactions with Dockery when he was purportedly represented by lawyers shows that those lawyers were not independent.  Dockery posits that Heretick, rather than Dockery's lawyers, drafted at least some of his affidavits.  PSUF ¶ 42.  For proof, he cites the identical content and similar typeface across different documents, and a 2015 letter from Heretick to Dockery asking Dockery to sign an enclosed affidavit before a notary.  ECF No. 302-24 at SH000561.  However, Dockery had waived his right to receive independent professional advice regarding his attempted 2015 transaction.  JSUF ¶ 101.

### F.  Effects of Scheme

According to Dockery, the above structure, which Defendants lied about to the Portsmouth court, ensured that the Estoppel Lawyers and the advice they purported to provide were controlled by Defendants.

### 1.  Advice Given

All of Dockery's Estoppel Lawyers who have been deposed testified about their interactions with Dockery.  Mr. Shull testified that Dockery told him he "wanted assistance in correctly completing certain documents he had with him," and that he believes he reviewed the Purchase Agreement and Disclosure documents with him.  JSUF ¶ 108.  Mr. Rhoton testified that he understood the scope of his representation to cover advising Dockery and making sure he understood what he was doing and the terms of the transaction.  JSUF ¶¶ 125, 133.  Mr. Rhoton further testified that he believed the terms of the deal were unfavorable and tried to explain to Dockery that if he could wait six or seven months, then he could get the whole amount.  *Id.* ¶ 136.  Dockery responded that he needed the money and intended to proceed with the transaction.  *Id.*  Mr. Hassell testified that he reviewed the terms of the purchase agreements with his clients, including Dockery, in detail, and would have gone over opportunities that he might have to get money other than through a sale to Wentworth.  *Id.* ¶ 156, ¶ 167.  He further testified that he called Wentworth on occasion to attempt to negotiate better deals, but was unsuccessful. *Id.* ¶ 160.  Dockery's other Estoppel Lawyer, Mr. Haley, is deceased.  *Id.* ¶ 168.

### 2.  Experts

Both parties retained liability and damages experts in support of their respective positions.  Only the liability expert opinions are relevant to the Court's analysis below.

Plaintiff retained Thomas Baker, Measey Professor of Insurance Law at the University of Pennsylvania Law School and Reporter for the American Law Institute's Restatement of the Law, Liability Insurance, to offer an expert opinion on how the Defendants' alleged scheme affected the independence of the Estoppel Lawyers.  ECF No. 301-8.  In his opinion, an attorney representing the seller of SSA payments has a duty to be independent of any other party

interested in that transaction and has a duty to provide his client with his informed opinion as to whether the terms of the transaction are in his or her best interest. *Id.* at 3. He also has a duty to explain how to comparison shop and to assist in that endeavor. *Id.* at 16. Moreover, an attorney representing the seller in such a transaction also represents the seller in the legal proceeding in which the court will determine whether the transaction is in the seller's best interest. *Id.* In his view, an attorney who believes that a transaction is not in his client's best interest must withdraw from representation. *Id.* at 17. He must also try to dissuade his client from signing an affidavit stating that the transaction is in his best interest and, if the seller persists in signing the affidavit, the lawyer must tell the Court that the lawyer believes the testimony is untrue. *Id.* at 18.

He concludes that an attorney is not independent when the following conditions exist: (1) when the attorney is selected by the purchaser; (2) when the attorney is paid on a contingent basis by the purchaser; (3) when an attorney follows directions on drafting an Estoppel Letter; and (4) when an attorney knowingly allows the client to testify that the transaction is in his or her best interest unless the attorney has a good faith basis for believing the statement is true. *Id.*

Defense Expert, Leslie Haley, Esq., also opined on the conduct of Wentworth, Heretick, and the Estoppel Lawyers. ECF No. 293-30. In her view, Wentworth and Heretick did not interfere with the independence of the lawyers consulted by Dockery or other sellers, the Estoppel Letters did not create a lack of independence, and Defendants could properly rely on the representations in the Estoppel Letters that attorneys were independent, among other views. *Id*. She also opines that rendering candid advice does not include interfering with a client's pursuit of his or her objective. *See id.* at 4 ¶¶ 26-28.

### III.    PROCEDURAL HISTORY

Dockery filed this putative class action in September 2017, asserting 10 separate counts on behalf of himself and other beneficiaries who sold their annuities to the Purchaser Defendants for less than their present value.  After a first round of motion to dismiss briefing and the filing of a RICO Case Statement, Judge Baylson, then the presiding Judge over this matter, granted Dockery leave to file an Amended Complaint.  The Amended Complaint included a count alleging a RICO violation by Purchaser Defendants Seneca and Wentworth as well as attorney Heretick; three counts (counts II through IV) alleging a RICO violation against Heretick; an unjust enrichment claim; request for a constructive trust; and a breach of fiduciary duty claim. Dockery also filed a Revised RICO case statement.

In response to the Court's order to amend Count I, Dockery filed a Second Amended Complaint in March 2019 (SAC).  The SAC specifies that Count I is pleaded against "all defendants" and clarifies that Dockery alleges three different "association-in-fact enterprises" (the "Annuity Fraud Enterprises") between Heretick, each of the Purchaser Defendants, and "additional persons, including but not limited to those persons . . .  who falsely represented themselves to have provided independent advice to the sellers of SSA payments, and others who performed other services, including without limitation notarization services." SAC ¶184.

The Court granted in part and denied in part Defendants' motion to dismiss in a memorandum and order in May 2019.  The remaining counts and the basis for seeking class certification were the RICO and conspiracy to violate RICO claims.  Dockery then filed his first Motion for Class Certification under seal in March 2020, and deadlines were periodically stayed to continue discovery and because of the COVID-19 pandemic.  ECF No. 197.

The case was transferred to the undersigned in June 2020 after Judge Baylson recused himself from the case. ECF Nos. 200, 201. This Court received briefing and heard argument on the Motion for Class Certification (ECF No. 246). This Court has also received briefing on the Purchaser Defendants' and Heretick's Motions for Summary Judgment (ECF Nos. 291, 292, 293, 297, 300, 301, 303). The Court denied class certification in a memorandum and order issued today for the reasons outlined in the memorandum.  The summary judgment motions are now also ripe for review.

## IV.    JURISDICTION AND STANDARD OF REVIEW

Before the Court are the Purchaser Defendants' and Heretick's Motions for Summary Judgment. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(a). The moving party bears an initial burden of proving a lack of any genuine issues of material fact. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 & n.10 (1986). After that burden is met, the nonmoving party must "come forward with specific facts showing there is a genuine issue for trial." *Id.* (internal citations and quotation marks omitted). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

All facts "should be viewed in the light most favorable to the non-moving party, with all reasonable inferences [drawn] in that party's favor." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 2988 (3d Cir. 2018) (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006) (internal quotation marks omitted)).  Summary

judgment is warranted where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## V.    DISCUSSION

The first three counts of the complaint assert violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) pursuant to 18 U.S.C. § 1962(c), and the fourth alleges conspiracy to violate RICO pursuant to § 1962(d).  SAC ¶¶ 183-213.

A violation of section 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010).  A plaintiff must also satisfy RICO's standing provision, which requires a plaintiff to be "injured in his business or property by reason of a [RICO] violation."  18 U.S.C. § 1964(c).  To satisfy this requirement, a RICO plaintiff must prove an injury to his or her business or property constituting a "concrete financial loss" and that the defendant's RICO violations proximately caused his or her injury.  *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000).

Defendants claim that summary judgment is proper on all counts.  Defendants argue that Dockery cannot demonstrate a legally viable RICO association-in-fact enterprise, prove the substantive elements of mail/wire fraud, or prove an injury to his business or property that was proximately caused by racketeering activity.  And because the substantive RICO claims fail, the conspiracy to violate RICO claim must also fail.  Defendants also argue that Dockery's claims are barred by the statute of limitations, that he is judicially estopped from bringing them, and that his claims are barred by the doctrine of unclean hands.

15

### A.  Counts I-IV, Violations of § 1262(c) of the RICO Act

The Court will begin by addressing whether Dockery has shown a genuine dispute of material fact as to the elements of his RICO claim.

#### 1.  Racketeering Activity

A RICO plaintiff must prove that defendants engaged in a pattern of "racketeering activity," *i.e.,* "predicate acts." *See* 18 U.S.C. § 1961.  Predicate acts include federal mail fraud, which Dockery alleges here. *See* 18 U.S.C. § 1961(1) (referencing 18 U.S.C. §§ 1341 & 1343); *see also In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 408 n.26 (3d Cir.  2015). The elements of mail fraud are (1) a scheme to defraud; (2) the use of the mails to further that scheme; and (3) fraudulent intent. *See United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002).  A "scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004).   The "scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) (internal citations omitted).

Dockery premises his evidence of mail fraud on the alleged misrepresentations that Heretick made on behalf of the Purchaser Defendants to the Portsmouth court.  Specifically, Dockery claims that the following statement Heretick made in the petitions he submitted to the Portsmouth court for Dockery's 2003 through 2009 transactions was false:

> [1] That the transferor/payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and [2] has received such advice reflected in the letter of his legal counsel which is attached hereto.

PSUF ¶ 8.   Thus, the RICO scheme alleged here relies on a determination that either, or both, of these statements is a misrepresentation.

         **a.   "That the transferor/payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer."**

Dockery claims that the representation "[t]hat the transferor/payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer" was false every time that Heretick made it to the Portsmouth court in his petitions.  To demonstrate why, Dockery points to the Virginia Act.  The Act requires the court approving the transfer to make an express finding that "[t]he payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived in writing the opportunity to seek and receive such advice."  Va. Code § 59.1-476.  Another provision of the Act states that "'independent professional advice' means advice of an attorney, certified public accountant, actuary or other licensed professional adviser."  Va. Code § 59.1-475.  So, according to Dockery, Heretick's representation that Dockery "has been advised in writing . . . to seek independent professional advice regarding the transfer" was a representation that Dockery had only been advised (rather than required) to seek the advice of any of the four categories of professionals within the statute's definition, and that Wentworth mentioned all four categories.

First, Dockery claims that the representation was false because Dockery was *required* rather than *advised* to seek advice.  The Purchaser Defendants indisputably required Dockery to consult a lawyer for his transactions.  Mr. Kelly, Wentworth's 30(b)(6) designee, testified that the Purchaser Defendants required that any customer completing a transaction had to obtain an estoppel letter from an attorney representing him.  PSUF ¶¶ 4-5.  But as a general matter,

advising someone to seek advice is not mutually exclusive with requiring someone to seek such advice in order to proceed with a transaction.

Moreover, the disclosures in Dockery's purchase agreements demonstrate that Heretick's representation was not false. The disclosures that Dockery received from Wentworth included a statement that "You *should* consult your own counsel, accountant, or financial advisor regarding any federal or state income tax consequences arising from the proposed transfer," and that "[Y]ou are strongly *urged* to consult with an attorney who can advise You of the potential tax consequences of this transaction." ECF No. 301-4 at 12 (emphasis added). Further, Dockery's Purchase Agreements, which he signed, included provisions acknowledging that "We *advised* You must obtain independent legal representation prior to executing this Agreement and that We have advised You that We may not refer You to any specific attorney for such purpose." HSUF ¶ 31 (emphasis added). Dockery is assumed to have read that statement. *Cf. Upton v. Tribilcock*, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it.").

Nor is the statement otherwise a misrepresentation. Dockery argues that because he was not advised to seek independent advice from any of a lawyer, accountant, financial advisor, or other licensed professional, but was rather required to consult a lawyer, Heretick's statement that Dockery was "advised to seek independent professional advice" was false. But Heretick did not state that Dockery had been advised to seek the advice of an accountant, financial advisor, or other licensed professional. He stated that Dockery was advised to seek independent professional advice, and the statute defines "independent professional advice" to include the advice of a lawyer. While the statute defines "independent professional advice" to mean advice from any of those four individuals, nothing in the statute requires a seller to be explicitly advised

of the opportunity to consult each of them.  As long as Dockery is advised to consult any of those types of professionals, he has been advised to seek "independent professional advice" within the meaning of the statute.  *See generally* 1A N. Singer, *Sutherland on Statutes and Statutory Construction*, § 21.14 (4th ed. 1980) (noting that "[w]here a failure to comply with any [statutory] requirement imposes liability, the disjunctive 'or' should be used").  And in any event, Dockery was advised to seek the advice of counsel, an accountant, or a financial advisor. *See* ECF No. 301-4 at 12 ("You should consult your own counsel, accountant, or financial advisor regarding any federal or state income tax consequences.").  Therefore, this statement was not a misrepresentation and does not constitute a predicate act.

### b. That Dockery "has received such advice reflected in the letter of his legal counsel which is attached hereto."

Dockery also argues that Heretick's statement in the petitions he filed with the Portsmouth court that sellers "received such advice," meaning independent professional advice, was false.  To demonstrate why, Dockery points to his expert who opined that the system and structure the Purchaser Defendants imposed meant that every Estoppel Lawyer suffered from a conflict of interest.  Those conflicts of interest, according to Dockery, were so obvious that the Purchaser Defendants and Heretick knew that "independent professional advice" had not been given regardless of how any Estoppel Lawyer advised his client.

The structure that Dockery alleges existed and that rendered the Estoppel Lawyers not independent is as follows.  He alleges the lawyers were paid on a contingent basis, that the Defendants submitted Defendant-drafted but lawyer-signed Estoppel Letters setting forth only what Defendants wanted included in the Estoppel Letter that would be provided to the Court, that Heretick communicated directly with Dockery even though he was purportedly represented, and that Heretick drafted Dockery's affidavits and sometimes sent the draft affidavit directly to

19

Dockery.  Moreover, he alleges that in the subclass, Defendants picked the lawyers and that those lawyers each worked with Defendants dozens or hundreds of times.

Dockery's theory of the case requires that "independent professional advice" means advice given by a lawyer who is in compliance with applicable rules of professional conduct. Specifically, he asserts that when Heretick told the Portsmouth court that Dockery was "advised in writing by the transferee to seek independent professional advice regarding the transfer and has received such advice reflected in the letter of his legal counsel which is attached hereto," he was telling the court that Dockery's lawyer did not suffer from any conflicts of interest as articulated by the Virginia Rules.  Those rules state in relevant part that a conflict of interest exists if "there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a third person or by a personal interest of the lawyer."  Va. R. Prof'l Conduct 1.7(a)(2).   So, Dockery's theory of mail fraud depends on Defendants imposing a system that created a significant risk of material limitation to the Estoppel Lawyers' representation.  And it further depends on Heretick, on behalf of the Purchaser Defendants, representing that there was no such risk when he stated that "independent professional advice" was given.

This argument ignores the text of the Virginia Act.  As explained, the Virginia Act defines "independent professional advice" to mean "advice of an attorney, certified public accountant, actuary or other licensed professional adviser."  Va. Code § 59.1-475.  So, the Portsmouth court was required to find only that Dockery received advice of a lawyer, certified public accountant, actuary, or other licensed professional adviser regarding the transfer; the court was not required to make any findings about that person's compliance with their ethical responsibilities.  Similarly, when Heretick stated that Dockery "received [independent

professional] advice reflected in the letter of his legal counsel," Heretick was only representing that the statute was satisfied.  In other words, Heretick was only representing that Dockery received the advice of one of those four types of professionals regarding the transfer.

For this reason, all the evidence and disputes as to whether Dockery's lawyers were paid on a contingent basis, whether they were referred by Defendants, how the Estoppel Letters were drafted, and how Heretick's interactions with Dockery do or do not reflect on the independence of Dockery's lawyers are ultimately irrelevant.  To be sure, the structured settlement annuity acts of some other states place requirements on the lawyers who represent sellers that are similar to those Dockery asks the Court to find were required and violated here.  *See, e.g.,* Cal. Ins. Code § 10134, subd. (f) (defining "independent professional advice" as advice of an attorney, accountant, or other licensed professional who meets certain requirements, including that the adviser is not referred by the selling company and the adviser's compensation is not contingent on the outcome, among others); Md. CJ § 5-1101(d)(2) (explaining that an advisor is not independent if they are, among other things, "affiliated with or compensated by the transferee"); Mont. Code Ann. Title XXVI § 407.1060 (defining "disinterested counsel" as "legal counsel that has no business relationship with any transferee of structured settlement payment rights, will not receive any compensation directly or indirectly from any such transferee in connection with representing the payee, and whose compensation for representing the payee will not be affected by whether the transfer occurs or does not occur").  But the only requirement under the Virginia Act is that the seller receive advice of a lawyer or other professional adviser about the transaction.  And it was against the backdrop of the Virginia Act that Heretick's statement must be considered.

Therefore, Heretick's statement in the petition that Dockery received "independent professional advice" was not a representation that Dockery had been advised by lawyers free from conflicts of interest.  So, it was accordingly not a misrepresentation.  Heretick's statement only reflects that Dockery was advised by lawyers.  *See* JSOF ¶ 110 ("Mr. Shull stated in his declaration that he believes that he reviewed the Purchase Agreement and Disclosure documents with Mr. Dockery in connection with the September 2002 Transaction."); *id.* ¶ 120 (same regarding the 2003 transaction); *id.* ¶ 132-33 (Mr. Rhoton went over the documents with Mr. Dockery and testified that he wanted Dockery to understand what he was doing); *id.* ¶¶ 155-57 (Mr. Shull testified that he reviewed the terms of Dockery's purchase agreements with him, and that his advice would have been tailored to Mr. Dockery's particular needs).[5]

Whatever merit Dockery's arguments have that lawyers who are hired to advise individuals about selling SSA payments should not be referred to sellers by SSA purchasers, be paid on a contingent basis, or sign letters potentially drafted by a purchasing entity, those are arguments better suited for the Virginia legislature than for this Court via a RICO claim.

Because Dockery has failed to demonstrate a genuine dispute of material fact about the racketeering activity he alleges, summary judgment is warranted.  *See Ideal Dairy Farms, Inc. v.*

---

[5] Dockery testified that one of his Estoppel Lawyers "showed up and we notarized this paperwork," and that he did not remember talking to the lawyer about the transactions.  ECF No. 301-22 at 670-71.  This testimony does not create a genuine dispute of material fact as to the predicate act, however, because Dockery has repeatedly premised his case on the lack of the lawyers' independence, not on the sufficiency or extent of advice given about the transaction. *See* Tr. of Oral Argument on Motion to Certify the Class, ECF No. 280 at 20 ("Your honor doesn't have to reach the merits of any individual instance of advice. We're not going to go back and open the door to ask, what was Mr. Dockery told by this lawyer? . . . The issue is, does this system create a lack of independence?"); *see also* Pl. Br. at 25 ("[I]t makes absolutely no difference . . . whether [estoppel lawyers] told the seller that the terms were extortionate or simply 'read them the paperwork and fill[ed] in the blanks.'").

*John Labatt, Ltd.*, 90 F.3d 737, 747 (3d Cir. 1996) (holding that without a predicate act, a plaintiff cannot succeed on its RICO claims).

### 2.   Injury by Reason of a RICO Violation

While the inquiry may end because Dockery has failed to establish the element of racketeering activity, the Court will nonetheless address an independent reason that summary judgment is proper: Dockery's failure to demonstrate that his alleged injuries were proximately caused by Defendants' racketeering activity.

To succeed on a RICO claim, a plaintiff must show that the RICO violation was the but for and proximate cause of a tangible injury to body or property. *Reyes v. Netdeposit LLC*, 802 F.3d 469, 483 (3d Cir. 2015). The RICO proximate cause requirement dictates that there must be "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (citing *id.*). To demonstrate that relation, the "manipulation alleged must not be purely contingent on another event or action." *St Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 300 (3d Cir. 2020)*. (citation omitted). This requirement "is employed in civil RICO as a limiting principle intended to stymie a flood of litigation, reserving recovery for those who have been directly affected by a defendant's wrongdoing." *Id.*

The Supreme Court has provided guidance on the proximate cause requirement in civil RICO claims premised on mail fraud. In *Bridge v. Phoenix Bond & Indemnity Co.*, the Court held that a RICO plaintiff need not have relied on the representation in order to show proximate cause. *Bridge & Phoenix Bond & Ind. Co.*, 553 U.S. 639, 657-658 (2008) (citation omitted). But the Court went on to explain that this analysis is not "to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." *Id.* at 658 (citing *Field v. Mans*, 516 U.S. 59, 66

(1995) ("No one, of course, doubts that some degree of reliance is required to satisfy the element of causation inherent in the phrase 'obtained by.'")).  In most cases, plaintiffs would not be able to establish even but-for causation if no one relied on a misrepresentation, and the "complete absence of reliance may prevent the plaintiff from establishing proximate cause."  *Id*. at 658-59. Therefore, "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation."  *Id.*

Dockery claims that he was injured by receiving a below-market rate for his sale.  The Portsmouth court could not approve those sales unless it, among other things, found that Dockery had been advised to seek independent professional advice and had either received that advice or waived the right to do so.  Therefore, Dockery argues that Heretick's misrepresentations in the petitions he filed with the court proximately caused his injury because the Court relied on Heretick's misrepresentations to make its finding and approve the sale with an inappropriately high discount rate.

Again, Heretick stated in the petitions he filed with the Portsmouth court on behalf of the Purchaser Defendants that "the transferor/payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has received such advice reflected in the letter of his legal counsel which is attached hereto."  *See* ECF No. 300 ¶ 8.  The Portsmouth court in each instance found that Dockery had been advised to seek independent professional advice regarding the transaction and obtained that advice or waived the right to do so.  JSUF ¶¶ 28, 36, 45, 52, 60, 69, 77, 86, 91.

However, Heretick's statement in the petition itself was not the only paperwork the Portsmouth court had before it as it made its decisions to approve Dockery's transfer.  Along with each petition, Dockery's Purchase Agreements and required disclosures were attached, and

those documents showed how Dockery had been advised by Wentworth on the issue of seeking independent professional advice. *Id.* ¶¶ 26, 34, 43, 49, 58, 67, 75, 84. Also attached were the estoppel letters from Dockery's attorneys that indicated the attorney had acted as legal counsel for Dockery. *See id.* ¶¶ 27, 35 ("The undersigned and his firm have acted as independent legal counsel to the Seller in the above-referenced transaction and has provided legal, accounting and tax advice."); *id.* ¶ 59 ("This office has acted as legal counsel to the Seller referenced above with respect to a transaction" and has "inquired of [Dockery] and is satisfied that [Dockery] understands the nature and terms" of the transaction); *id.* ¶¶ 68, 76, 85 ("This is to advise that I have consulted with the above-named client concerning the sale of the structured funds" and "I have provided [Mr. Dockery] with legal, tax, and financial advice regarding the same.").

The Court agrees with Heretick that Dockery has failed to put forward any evidence that the Portsmouth court relied on his statements in the petitions. The court was required to make "express findings" that Dockery "has been advised in writing . . . to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived in writing" the opportunity to do so. Va. Code § 59.1-476. There is no evidence that the court relied on Heretick's petition and the statements therein rather than evaluating the record before it to make its express factual finding. Said another way, nothing in the record shows that the Portsmouth court made its express finding based on a statement in a petition by the party against whom the Court was required to protect Dockery instead of looking to the Purchase Agreement and Disclosures to see how the Purchaser Defendants advised Dockery and to the Estoppel Letter to confirm that Dockery had received independent professional advice.[6]

---

[6] Nor does Dockery's argument that the Estoppel Letters were "Defendant-crafted, but lawyer signed" change the Court's conclusion. The Estoppel Letters that were presented to the Portsmouth Court were signed representations of the Estoppel Lawyers. *See, e.g.,* ECF No. 921-

Perhaps recognizing the lack of evidentiary support for reliance, Dockery argues that reliance can be established as a matter of law.  In his view, the statute required that the application/petition state that Wentworth had advised Dockery to receive advice and state that Dockery had either received or waived such advice, and that if the petitions did not include this representation, then the transaction could not be approved.  Therefore, this structure imposes a statutory mandate of reliance that renders Heretick's representations material as a matter of law.

But the statute does not require what Dockery asserts it does.  The Virginia Act requires only that a Court make an "express finding" that Dockery had been told to seek advice and had either received advice or waived it.  Nothing requires the purchasing company to include in its petition a representation that the seller had been advised to seek advice and sought or waived that advice.  *See* Va. Code § 59.1-477 (listing what must be included in the application).  If anything, by requiring the Virginia court to hold a hearing on the application and make an "express finding," and by not requiring the application to include the representations at issue here, the Virginia Act would suggest that courts should rely on the evidence presented at the hearing or in the record rather than statements by the purchasing entity in the application itself.

Also likely recognizing the lack of evidentiary support for proximate cause, Dockery argues that reliance is not required to succeed on a RICO claim.  He points to the Supreme Court's explanation that "*in most cases*, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation" and that "*it may well be* that a RICO plaintiff

---

10 at 56 (noting that "we represent and state. . . that [t]he undersigned and his firm have acted as independent legal counsel" in a letter signed by attorney Shull); JSUF ¶ 44 (stating that "I have discussed the purchase agreement Mr. Dockery is making" in a letter signed by attorney Rhoton). Whether Wentworth provided information regarding what should be included in the Estoppel Letters, or even provided draft letters, does not change the fact that the signed statements were ultimately those of the Estoppel Lawyers.

alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Bridge*, 553 U.S. at 658-59 (emphasis added).  However, the Supreme Court was merely refusing to foreclose the possibility of an instance in which someone could show that a misrepresentation led directly to their injury even though no one relied on it.  But here, if the Portsmouth court did not rely on Heretick's alleged misrepresentations, then the Court did not approve the transaction because of Defendants' racketeering activity.

The lack of evidence of third-party reliance is a fatal flaw.  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (1991).  Nothing in the record here shows that the alleged violation, Heretick lying to the Portsmouth court in his petitions, led directly to Dockery's transaction with allegedly unfair terms being approved.

For the reasons above, Dockery has failed to demonstrate a genuine issue of material fact that the Court relied on Heretick's representations.  Summary judgment to Defendants on Dockery's RICO counts is therefore warranted on this ground, as well.[7]

---

[7] Because summary judgment is appropriate under the above analysis, the Court need not consider the parties' arguments regarding other potential bases for summary judgment. However, the Court notes and rejects Dockery's attempt to amend his complaint to add the Portsmouth Circuit Court as an enterprise in this case.  Dockery abandoned the theory of "complicit judges" in the Portsmouth Circuit Court that was in his original complaint over three years ago so that Judge Baylson would not transfer his case to Virginia.  *See* ECF No. 70, Aug. 22, 2018, Hrg. Tr.  Dockery argues at summary judgment that he should be allowed to amend his complaint now because he now concedes that "in response to Defendant's contentions concerning the viability of the enterprises already pleaded.  But if Dockery wished to add the Portsmouth Circuit Court as an enterprise in this matter, he had repeated opportunities to do so when the Defendants challenged the enterprise element of his claim at the motion to dismiss stage.  The fact that he did not, even though he now concedes that "the existence and operation of the Portsmouth court has been a part of this case since its inception," Pl. Br. at 51, suggests that he was concerned the case would be transferred with such an amendment.  This Court declines to excuse this delay now.  *See Cureton*, 2000 WL 388722, at *2 ("When a party filing a motion to amend has no

**B. Count V, Conspiracy to Violate RICO**

Count V of the SAC brings a claim against Defendants for violation of 18 U.S.C.

§ 1962(d) of RICO for conspiracy to violate § 1962(c) of the statute.  A § 1962(d) claim based

on a conspiracy to violate a separate section of the RICO Act fails as a matter of law if the

substantive claim under the other subsection fails.  *See Lightning Lube Inc. v Witco Corp.*, 4 F.3d

1153, 1191 (3d Cir. 1993).   Because Dockery's RICO claims under § 1962(c) fail as described

above, his conspiracy to violate § 1962(c) claim also fails.

**VI.     CONCLUSION**

Dockery has failed to demonstrate a genuine dispute of material fact for his RICO and

conspiracy claims.  Accordingly, summary judgment will be granted to the Purchaser Defendants

and Heretick.  An appropriate order will follow.


**DATE:** September 1, 2021                           **By the Court:**

/s/ Chad F. Kenney

_____

 **CHAD F. KENNEY, J.**

---

adequate explanation for the delay, untimeliness can be a sufficient reason to deny leave to
amend.").

28